

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

        Plaintiff,

vs.

JAMES V. CROSBY, JR., et. al.,

        Defendants.
_____/

CASE NO.: 3:01-CV-799-J-32HTS

## DEFENDANTS CROSBY'S AND GIEBEIG'S MEMORANDUM OF LAW IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S CORRECTIONS/PRISON EXPERT, CHASE RIVELAND

Defendants, James V. Crosby, Jr. (hereinafter "Crosby") and Tim Giebeig (hereinafter "Giebeig"), pursuant to the Local Rule 3.01(a) hereby file this memorandum of law in support of *Daubert* Motion to Exclude Plaintiff's Corrections/Prison Expert, Chase Riveland, and state:

**I.    THE *DAUBERT* STANDARD FOR ADMITTING EXPERT TESTIMONY.**

When "faced with the proffer of expert scientific testimony, then the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine the fact in issue." Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). The Daubert standard of evidentiary reliability is not limited to scientific testimony. See Kumho Tire v. Carmichael, 526 U.S. 137 (1999).



"In Kumho Tire, the Court held that the Daubert standard applied to non-scientific expert testimony and reemphasized that the trial judge must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" U.S. v. Cunningham, 194 F. 3d 1186, 1197 (11th Cir. 1999)(citing Kumho Tire, 119 S. Ct. at 1174-76). "Rule 702 is written in the disjunctive -- expert status may be based on 'knowledge, skill, experience, training or education, 'so a district court may base its decision on any one of five grounds listed." Id. at 1266-67(citing FED. R. EVID. 702).

"[T]he Eleventh Circuit has held that expert testimony is admissible only 'if (1) the expert is qualified to testify competently; (2) the expert has used sufficient reliable methodology in reaching a conclusion; and (3) the testimony will assist the trier of fact.'" College Park Holdings, LLC v. Racetrac Petroleum, Inc., 239 F. Supp 2d 1334, 1344 (N.D. Ga. 2002)(citing Toole v. Baxter Heatlhcare Corp., 235 F.3d 1307, 1312 (11th Cir. 2000)). Also, scientific expert testimony must be both relevant and reliable to be admissible. Id. (citing Daubert, 509 U.S. at 594-95). "Daubert requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." McCovery v. Baxter Heathecare Corp., 298 F. 3d 1253, 1256 (11th Cir. 2002).

In Kumho Tire, the Court held that the Daubert standard applied to non-scientific expert testimony and reemphasized that the trial judge must ascertain whether the expert's testimony will ultimately assist the jury, as the fact finders, in evaluating the evidence offered. See Kumho at 150. Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the

trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as a expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."

Mr. Riveland's opinions lack a factual basis and, at best, are speculative. Mr. Riveland has formulated his opinion upon the documents provided to him by Plaintiff's counsel. (See May 25, 2004 Dep. Tr. of Chase Riveland at p. 82 l. 21-p. 83 l. 3.) Mr. Riveland indicated he is unable to judge whether he is being fed only small pieces of information and not all of the available information. (Id. at p. 82 l. 21-24.)

## II. THE PURPORTED "EXPERT TESTIMONY."

### A. Mr. Riveland's background and qualifications.

Mr. Riveland's proffered qualifications as an expert include a Bachelor of Science degree in Psychology, experience as a supervisor at a mental hospital and extended service in the field of corrections. (See May 25, 2004 Dep. Tr. of Chase Riveland at pp. 100-101.) Mr. Riveland's hands-on experience in dealing directly with inmates is questionable as Mr. Riveland has never worked as a warden while inmates were actually housed at the prison he was supervising. (Id. at p. 101, l.6-9.)

### B. Mr. Riveland's Testimony Does Not Qualify as Expert Testimony Under *Daubert*.

Federal Rule of Evidence 702 provides that an expert may testify if his or her Specialized "knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." The testimony of Mr. Riveland offers no specialized knowledge that will

3

assist the jury to understand the facts at issue in this case. The opinions of Mr. Riveland have no basis in specialized knowledge or reliable methodology. Further, Mr. Riveland has no factual basis to support those opinions which he does offer. Mr. Riveland's opinions are based upon his review of documents generated during the criminal investigation into the death of Frank Valdes, deposition testimony and a telephone conversation he had with Andrew McRae, a former chaplain at FSP.

Mr. Riveland's opinions are not based upon objective criteria that can be tested. Essentially, Mr. Riveland contends his opinions are valid because he says they are. This is precisely the type of purported expert testimony that is not admissible under *Daubert*. A Court is not required to admit opinion evidence that is connected to existing data only by the *expert's ipse dixit* (he himself said it; an assertion by one whose sole authority for it is the fact that he himself said it). See Norfolk, 279 F. Supp 2d at 1279 (citing General Electric Co. V. Joiner, 522 U.S. 136, 146 (1997). Also, because Mr. Riveland's opinions should not be admitted at trial they cannot be used to create a genuine issue of material fact to oppose these Defendants' Motions for Summary Judgment. Id. (citing Thomas v. FAG Bearings Corp., 846 F. Supp 1382, 1394 (W.D. Mo. 1994).

The majority of Mr. Riveland's testimony is nothing more than personal opinion which is unsupported by facts. Mr. Riveland's testimony invades the province of the jury and is inadmissible. Montgomery v. Aetna Casualty & Surety Co., 898 F. 2d 1537, 1541 (11th Cir. 1990)(stating "[a]n expert may not, however, merely tell the jury what result to reach.) His opinions do not constitute expert testimony. These Defendants will be subjected to substantial

4

prejudice should Mr. Riveland be allowed to testify in the form of opinions unsupported by specialized knowledge, or reliable methodology, or facts.

        C.     Mr. Riveland's "expert opinions" relate to Defendants' mental state and are inadmissible.

Mr. Riveland's May 24, 2004 report indicates that Crosby was deliberately indifferent to the abusive culture and practices at FSP. (Id. at Exhibit 3 ¶ 24.) However, Mr. Riveland's testimony demonstrates that he is not familiar with the application of this term to the case at hand. (See May 25, 2004 Dep. Tr. of Chase Riveland at p. 103 l. 6-13.) Further, even a witness whose testimony qualifies as expert testimony may not testify as to the legal implications of conduct. Montgomery v. Aetna Casualty & Surety Co., 898 F. 2d 1537, 1541 (11th Cir. 1990). Mr. Riveland's purported "expert opinions" in this case are inadmissible. Id. Mr. Riveland's testimony offers nothing more than a legal conclusion, i.e., testimony that does little more than tell the jury what result to reach, and is, therefore, inadmissible. Woods v. Lecureux, 110 F. 3d 1215 (6th Cir. 1996).

"Deliberate indifference" is a legal term and it is the responsibility of the court, not testifying witnesses, to define legal terms. See Id. Whether a prison official acted with deliberate indifference depends on that official's state of mind. Thus, any "expert opinion" or "expert testimony" purporting to express the opinion that a prison official is deliberately indifferent gives the false impression that the "expert witness" knows the answer to this inquiry, which depends on the prison official's state of mind. The mental state of a prison official is a matter for the trier of fact and should not be the subject of expert testimony. Where, as in the

instant case, a witness apparently seeks to stack inference upon inference and then state an opinion regarding the ultimate issue, it is highly unlikely to be helpful to the trier of fact and such an unfounded "opinion" is inadmissible. See id.

Further, Mr. Riveland's opinions, viewed in their most favorable light, are that Defendants were negligent, not deliberately indifferent. As discussed more specifically in Crosby's and Giebeig's Motions for Summary Judgment, negligence is insufficient to overcome the defense of qualified immunity.

> D. The Alleged Facts Relied Upon By Mr. Riveland Do Not Support His Opinions.

Mr. Riveland's opinions are based upon his review of documents in this action, a telephone conference with a former FSP Chaplain and a review of a video statement from Defendant Raymond Hanson. His deposition testimony reflects that his opinions are not based upon a sufficient reliable methodology. Moreover, he admits, on several occasions, that the documents generated in this action contradict his opinions.

The following paragraphs cite various examples which demonstrate that his opinions are based upon insufficient and often times inaccurate information.

> (1) Telephone conversation with Andrew McRae.

Mr. Riveland spoke with Andrew McRae by telephone on May 22, 2004. (See May 25, 2004 Dep. Tr. of Chase Riveland at p. 37 l. 5-p. 38 l. 1.) The details of this conversation are addressed in Mr. Riveland's May 24, 2004 opinion, which was identified as Exhibit 3 at his Deposition. (Id. at p. 16 l. 2-3; Exhibit 3, ¶ 12-20.) According to Mr. Riveland's May 24, 2002

report, Andrew McRae was a chaplain at FSP. (Id. at Exhibit 3, ¶ 12.) The topic of discussion involved Mr. McRae's experience at FSP under various wardens, including Crosby. (Id. at Exhibit 3, ¶ 12-20). According to Mr. Riveland, Mr. McRae said that when Mr. Crosby came many correctional officers became more aggressive and the beatings increased. (Id. at Exhibit 3, ¶ 14.)

Mr. Riveland devotes a large portion of his May 24, 2004 written opinion to his telephone conversation with Andrew McRae, but he admits Mr. McRae did not personally witness any uses of force at FSP. (Id. at p. 44 l. 4-7.) Mr. Riveland also agrees Mr. McRae only had suspicions that excessive force was being used at FSP, based upon "what he saw and what he heard from others" and that he had seen bruises and physical damage done to them. (Id. at p. 44 l. 8-14; p. 45 l. 3-12.) However, Mr. Riveland agrees that a bruise by itself would not demonstrate excessive force. (Id. at p. 44 l. 25-p. 45 l. 2.) In fact, Mr. Riveland witnessed approximately 50 cell extractions over the course of his carrier which resulted in various injuries to inmates, including: a dislocated shoulder, bloody noses or mouths, scrapes or abrasions and bruising. (See June 16, 2004 Dep. Tr. of Chase Riveland at p. 69 l. 8-p. 70 l. 10.) Despite having witnessed these injuries, Mr. Riveland did not believe the cell extractions involved excessive or unauthorized force. (Id. p. 70 l. 11-14.)

According to Mr. Riveland, Mr. McRae only spoke of two inmates that were allegedly abused at FSP; Inmate Morris and Inmate "Skitch or Skritch". (See May 25, 2004 Dep. Tr. of Chase Riveland at p. 39 l. 5-6; p. 43 l. 13-16.) However, Mr. Riveland was not given any specific details that could potentially corroborate Mr. McRae's story. (Id. at p. 41 l. 12-p. 45 l.

7

1.) With respect to Inmate Morris, Mr. McRae did not identify the date of the occurrence, who was involved, whether it was investigated, or whether it was reported to anyone in administration at FSP. (Id.)

With respect to Inmate Skritch, Mr. Riveland was not advised of the date of the alleged abuse. (Id. at p. 43 l. 17 - 22.) It is Mr. Riveland's opinion that Mr. McRae's mention of inmate Skritch is only relevant because "... there were inmates that he had heard had been beaten. And when he would ask to see them, he was not allowed on that wing to see them. And, apparently Skitch was one of those". (Id. at p. 43 l. 20-p. 44 l. 3.)

Mr. Riveland's opinions are based solely on inadmissible hearsay or inadmissible hearsay on hearsay. Mr. Riveland's alleged telephone conversation with Andrew McRae is insufficient to support his opinions that Crosby and Giebeig condoned the abuse of inmates at FSP; especially since Mr. Riveland has not reviewed any information to corroborate Andrew McRae's statements. (Id. at p. 43 l. 10-12.)

(2)  Sworn Statement and Deposition Testimony of Ron McAndrew

Mr. Riveland relies upon statements made by former FSP warden Ron McAndrew in a August 6, 1999 sworn statement and during his April 9, 2003 deposition taken in the case of Mathews v. Crosby, et. al. Case No. 3:99-CV-1117-J-32TEM. These opinions are addressed in his March 12, 2004 report. (Id. at Exhibit 7 (the report); Exhibit 8 (the sworn statement); Exhibit 16 (the deposition transcript).)

Four out of the five actions taken by Crosby referenced by Mr. Riveland in support of his opinion are based upon the statements of Ron McAndrew. (Id. at p. 114 l. 14-21.)

8

These actions are identified in paragraph 45 of Mr. Riveland's March 12, 2004 report as follows:

- that Crosby "terminated the use of video taping at FSP";

- that "he terminated the taking of photographs of inmate injuries in the clinic when use of force was the cause";

- that "he promoted the very individuals that Mr. McAndrew had warned him about as being suspected of abusing force and '. . . out of hand'";

- that "he transferred an Assistant Warden and a Colonel that Warden McAndrew believed were attempting to stop the abuse to other prisons. (sic)";

- that "despite warnings from [W]arden McAndrew about Mr. Thornton he moved him from the outside work detail supervisor position, into the main institution and promoted him." And that "Mr. McAndrew had moved him (Mr. Thornton) outside due to his fears that he would seriously injure an inmate."

(Id. at Exhibit 7 ¶ 45.)

Each of these opinions are based upon information that is either: (1) insufficient to support a cause of action against Crosby; or (2) based upon inaccurate information as described in the following paragraphs.

>   (a)   The opinion regarding Crosby's decision to stop video taping cell extractions to promote abuse is unsupported by sufficient evidence and does not support a cause of action.

Mr. Riveland's opinions regarding videotaping are based upon the allegation that Crosby stopped the requirement that use of force situations be video taped with hand held video cameras. (Id. at p. 125 l. 19-p. 126 l. 6.) However, Mr. Riveland has no knowledge as to whether there was a rule requiring that uses of force be videotaped. (Id. at p. 126 l. 22-p. 127 l. 1.) Mr.

9

Riveland's opinions are based upon his belief that, around the country at the time, it was a common professional approach to videotape cell extractions. (Id. at p. 129 l. 21-25.) Mr. Riveland did not testify, however, that such an approach was used in all prisons across the country at the time. (Id. at p. 130 l. 16-18)

Moreover, Mr. Riveland has no information to dispute that Crosby did not oppose the installation of video cameras at FSP. Mr. Riveland was questioned with regard to a memorandum, dated November 17, 1998, indicating Crosby requested the installation of video cameras at FSP prior to the death of Frank Valdes. (Id. at p. 124 l. 13-p. 126 l. 12; Exhibit 14.) In response to this inquiry, Mr. Riveland stated that he could think of no reason why Crosby would chose not to utilize video cameras other than to promote the abuse of inmates. (Id. at p. 130 l. 24-p. 131 l. 5.) This opinion is merely conclusory and is not supported by any reliable information.

    (b)    Mr. Riveland's opinion that Crosby promoted the individuals who Mr. McAndrew had Crosby were suspected of abusing force is contrary to DOC documents and is not supported by any reliable information.

Mr. Riveland's March 12, 2004 report relies upon the alleged facts that Crosby promoted three individuals Ron McAndrew had warned him were suspected of inmate abuse to support his opinion that Crosby "consciously took steps that further promoted the probability of continued abuse of inmates." (Id. at p. 110 l. 6-12; Exhibit 7 ¶ 45.) Only one of these individuals is a Defendant is this action. (Id. at Exhibit 7 ¶ 10 (referencing Officer Oscar Shipley, Lieutenant Tim Thornton, Captain John Griffis, Sergeant Joseph Ruby, Sergeant Dave Garland and others).) Of these officers allegedly suspected of abuse, Mr. McAndrew alleges Oscar Shipley, Tim

10

Thornton, Donna Clemmons and John Griffis were promoted subsequent to McAndrew's departure from FSP. (Id. at Exhibit 8 pg. 5.)[1]

With respect to John Griffis, Mr. Riveland agreed that the substance of a letter dated August 7, 1997 to John Griffis regarding his promotion to Major contradicts the statement of Ron McAndrew alleging Crosby promoted John Griffis during the time he was Warden of FSP. (Id. at p. 111 l. 6-18 at Exhibit 9 (the letter) at Exhibit 16 (McAndrew Dep. from Mathews at p. 61 l. 12-p. 62 l. 12).) The letter to Jason Griffis is dated August 8, 1997, and is from the office of "Regional Personnel." (Id.) There is no suggestion in the letter that Crosby was involved in any way in the promotion of Jason Griffis. (Id. at Exhibit 16 p. 61 l. 12-p. 62 l. 12) Moreover, according to the letter, the promotion was made while Ron McAndrew was Warden of FSP. (Id. at Exhibit 16 p. 10 l.9 - p. 12 l. 18).[2]

With respect to Tim Thornton and Oscar Shipley, Mr. Riveland has no knowledge other than McAndrew's statements that Crosby promoted these individuals. (Id. at p. 111 l. 21-p. 112 l. 5.) Moreover, Mr. Riveland has no knowledge as to whether Crosby failed to require a background investigation prior to the promotion of these individuals if he did in fact promote them. (Id. at p. 112 l. 13-17.)

---

[1] It should be noted that of the officers referenced as suspected of abuse in Mr. McAndrew's August 8, 1999 sworn statement, Mr. McAndrew testified on deposition that he later learned to trust David Garland (Id. at Exhibit 16 p. 59 l. 15-25.)

[2] Mr. McAndrew was Warden at FSP for eighteen months from September 27, 1996. Id at Exhibit 16 p. 10 l.9 - p. 12 l. 18).

11

Despite Mr. Riveland's reliance on Ron McAndrew's statements regarding Crosby's practices, he did not consider any information regarding Ron McAndrew's prior promotions at FSP. (Id. at p. 112 l. 23-p. 113 l. 4.) Accordingly, Mr. Riveland has no data to establish an objective basis for his opinions regarding prior promotions.

> (c) Mr. Riveland's opinion that Crosby transferred Assistant Warden Pattie McCusker and Colonel Christie who Warden McAndrew believed were attempting to stop the abuse is not supported by a sufficient foundation and is contrary to DOC documents.

Mr. Riveland's opinions are dependent on Ron McAndrew's statement that Crosby transferred an assistant warden and a Colonel that Warden McAndrew believed were attempting to stop inmate abuse. (Id. at Exhibit 7 ¶ 45.) The Colonel to whom Mr. Riveland refers in his reports is Colonel Alton Christie. (See June 16, 2004 Dep. Tr. of Chase Riveland at p. 16 l. 11-21.) Upon reviewing an FSP memorandum from Colonel Christie, dated August 6, 1999, Mr. Riveland testified that, assuming it is correct, Colonel Christie would not have been transferred as of the date of the memorandum. (Id. at p. 16 l. 25-p. 18 l. 16.) The only other information Mr. Riveland has to support these opinions are the statements of Ron McAndrew. (Id. at p. 18 l. 17-21.) Accordingly, there is no factual basis to support Mr. Riveland's assertion that Colonel Christie was transferred by Crosby prior to the death of Valdes.

Mr. Riveland's opinions are also dependent on Ron McAndrew's statement that Crosby transferred an assistant warden whom Warden McAndrew believed to be attempting to stop inmate abuse. (See May 25, 2004 Dep. Tr. of Chase Riveland at Exhibit 7 ¶ 45.) The assistant warden to whom Mr. Riveland refers is Pattie McCusker. (See June 16, 2004 Dep. Tr. of Chase

12

Riveland at p. 8 l. 1-3.) Ms. McCusker's testimony contradicts the statements of Ron McAndrew that Crosby transferred her because she was fighting inmate abuse. Her testimony reflects that she believed Crosby was proactive in fighting abuse. (See Dep. Tr. of Patricia McCusker at p. 24 l. 24.) There is no testimony from Ms. McCusker to even suggest that Crosby transferred her because she was attempting to stop abuse.

> (d)  The opinions dependent upon the assertion that Ron McAndrew warned Crosby about his alleged fear that Tim Thornton and other correctional officers would harm inmates have no factual basis.

Mr. Riveland's opinions are dependent upon Ron McAndrew's statements that he allegedly warned Crosby about the possibility that Defendant Tim Thornton and other correctional officers could potentially injure inmates. (See May 25, 2004 Dep. Tr. of Chase Riveland at Exhibit 7 ¶ 45.) However, Mr. Riveland cites to no facts other than Ron McAndrew's suspicions to suggest that these fears have a factual basis.

> (3)  Mr. Riveland's assertion that Crosby allegedly terminated the taking of photographs of inmate injuries in the clinic when use of force was the cause has no factual basis.

Mr. Riveland's May 25, 2004 report indicates Denise McEachern stated in an interview with the FDLE that the videotaping of cell extractions had been discontinued by Crosby and the photographing of inmate injuries had also been discontinued by Crosby. (Id. at Exhibit 7 at ¶¶ 33 & 34.) However, Mr. Riveland's deposition testimony contradicts his report. Upon being questioned about Ms. McEachern's July 30, 1999 statement to the FDLE, Mr. Riveland acknowledged that Ms. McEachern did not actually know what the procedure was for taking photographs of inmate injuries. (Id. at p. 137 l. 20.) Ms. McEachern's deposition testimony

reiterates this. She testified that "I don't know when that stopped." (See Dep. Tr. of Denise McEachern at p. 89 l. 13.) With respect to the videotaping of inmates in the clinic, Ms. McEachern testified that security officers would do this off and on, but she did not recall the time frame. (Id. at p. 91 l. 13-p. 92 l. 3.)

> (4) The opinions dependent upon the alleged statements of Captain Spuck and Captain Marsico are not supported by sufficient facts to be admissible.

Mr. Riveland's May 24, 2004 report indicates that according to Defendant Montrez Lucas' former supervisor, Captain Spuck, Lucas had always been cleared of wrongdoing in numerous physical confrontations and he believed Crosby had cleared him of a variety of situations that would have otherwise subjected him to discipline. (See May 25, 2004 Dep. Tr. of Chase Riveland at Exhibit ¶ 7.) These opinions are based upon an FDLE Investigative Report identified by Mr. Riveland at his June 16, 2004 deposition. (See June 16, 2004 Dep. Tr. of Chase Riveland at Exhibit 6.) Mr. Riveland has never spoken with Captain Spuck and has nothing to corroborate his opinion. (Id. at p. 16-p. 17 l. 5.)

Mr. Riveland's May 24, 2004 report also states Captain Spuck believed Defendant Lucas and Crosby had worked together at another institution, and when Crosby transferred to Tomoka Correctional Institution, he encouraged Lucas to transfer (Id. at Exhibit 3 at ¶ 7.) However, Mr. Riveland admits he does not know whether this is true or not. (Id. at p. 17 l. 22-23.)

With respect to Captain Marsico, Mr. Riveland testified that Captain Marsico claimed Montrez Lucas was named employee of the year, "more than likely", by Warden Crosby, but Mr. Riveland does not know whether Crosby actually did this. (Id. at p. 23 l. 1-7.)

14

  (5) The opinions that Crosby promoted a culture of abuse has no factual basis.

Mr. Riveland based his opinion regarding the culture and environment that existed at FSP during the relevant time period upon the statements of Ron McAndrew and Andrew McRae. (See May 25, 2004 Dep. Tr. of Chase Riveland at p. 115 l. 8-12 and p. 43 l. 3-9.) Mr. Riveland also bases his opinion on the opinions of Ron McAndrew and the fact that the names of correctional officers were coming up on a regular basis. (Id. at P 104 L 5-15) However, Mr. Riveland is not aware of any cases stemming from the incidents where the "names were coming up" that were substantiated. (Id. at p. 104 l. 16-18.) Moreover, Mr. Riveland agrees that when an officer is named numerous times in allegations of abuse it does not necessarily mean that the officer is using excessive force. (Id. at p. 133 l. 18-22.) Mr. Riveland also agrees that when inmates do not approve of a particular officer, for whatever reason, they will collaborate and make numerous allegations of abuse against the officer in hopes to have the officer moved without cause. (Id. at p. 133 l. 23-p. 134 l. 3.)

  (6) The opinions that are dependent upon the alleged statements of Inmate Krebs have no factual basis.

Mr. Riveland's opinions are dependent upon the alleged statements of Inmate Krebs to Frank Valdes. (Id. at Exhibit 3 ¶ 11.) Mr. Riveland cites testimony from Krebs that Frank Valdes told him that Defendant Lucas did not want Frank Valdes to mail letters out to the media and that Crosby was behind it. (Id.) However, Mr. Riveland agrees that he is not aware of any facts to support this assertion, which he accepted at "face value." (Id. at p. 35 l. 20-23.) Mr. Riveland's report also contains alleged statements from Inmate Krebs that Frank Valdes said

15

Valdes was not going to live to be electrocuted and he was going to be killed as soon as Crosby went on vacation. (Id. at Exhibit 3 ¶ 11.) However, Mr. Riveland agrees that these statements do not say anything about whether or how Crosby may have been involved. (Id. at p. 36 l. 19-p. 37 l. 1.) Moreover, Mr. Riveland agrees that other than Inmate Krebs' statements he does not have any other knowledge that Crosby was involved in the death of Frank Valdes. (Id. at p. 37 l. 2-6.)

        (7)    The opinions relating to Giebeig are merely conclusory and have no factual basis.

Mr. Riveland's opinions are primarily focused on the alleged wrongdoing of Crosby, but with respect to Giebeig he clams Giebeig "deliberately and consciously" performed his duties on July 15, 1999 regarding information he had about the alleged beating of Willie Mathews and that if he had properly performed his duties it may have prevented the same officers that beat Willie Mathews from killing Frank Valdes (See May 25, 2004 Dep. Tr. of Chase Riveland at Exhibit 7, p. 13, ¶48). This opinion is baseless speculation. In fact, Mr. Riveland agreed that he is speculating. (Id. at p. 151 l. 3-5.) He also agreed that his opinion is dependent upon: the accuracy of Mr. Mathews' statements and whether Giebeig would have been able to identify Mathews' alleged abusers. (Id. at p. 151 l. 12-22.) He also agrees that he is unaware of any cases of alleged abuse the Giebeig failed to properly investigate prior to the investigation involving inmate Willie Mathews in July 1999. (Id. at p. 152 l. 24-p. 125 l. 4.)

With respect to the Mr. Riveland's testimony regarding the alleged failure to investigate the allegations of abuse by Willie Mathews, Giebeig adopts and incorporates herein the

16

arguments contained in his Memorandum of Law in Support of his Motion for Summary Judgment.

With respect to Mr. Riveland's opinions that Giebeig allegedly failed to investigate the Valdes incident in a timely manner, Giebeig also adopts and incorporates herein the arguments contained in his Memorandum of Law In Support of Summary Judgment.

> (8)  Mr. Riveland concedes he is not aware of any facts to support his assertion of a "cover up."

Mr. Riveland's report dated March 12, 2004, provides that "many of the staff at FSP participated in a cover-up of the incident . . . ." (Id. at Exhibit 7, p. 12 ¶ 46.) However, Mr. Riveland agrees he is not aware of any specific facts to demonstrate there was a cover up. (Id. at p. 66 l. 11-18.)

> (9)  The opinions are not based upon sufficient information to satisfy the rigorous standard that must be met for the admissibility of expert testimony.

Mr. Riveland has only reviewed documents from FSP. He has not reviewed documents from other prisons for comparison. (Id. at p. 114 l. 7 - 11.) His opinions are heavily dependent upon the opinions of former warden Ron McAndrew; however, he has not investigated the accuracy of Mr. McAndrews' statements. (Id. at p. 102 l. 5-8.) Mr. Riveland claims to have an opinion regarding the "culture" that existed at FSP in July 1999, but he concedes he has limited first hand experience at FSP. (Id. at p. 115 l. 16-17.) He has only visited twice on cases unrelated to this action, each visit only lasting a day or two in length. (Id. at p. 115 l. 16-23.)

### III. CONCLUSION

Defendants Crosby and Giebeig respectfully move this Court for entry of an Order excluding all testimony of Plaintiff's expert Chase Riveland on the grounds that Mr. Riveland has no factual basis for his opinions and the subject of his opinions is not that which requires expert testimony.

Respectfully submitted,

**GOBELMAN, LOVE, GAVIN,
BLAZS & WASILENKO**

_____
Kevin A. Blazs, Esquire
Florida Bar No: 0606383
Ronald S. Wasilenko, Esquire
Florida Bar No: 0137510
Robert H. Ellis, Esquire
Florida Bar No. 0152552
Michael D. Kendall, Esquire
Florida Bar No. 0379440
815 South Main Street, Suite 300
Jacksonville, FL 32207
(904) 393-9007; (904) 393-9050 facsimile
Attorneys for Defendants Crosby and Giebeig

## CERTIFICATE OF SERVICE

I CERTIFY that a copy hereof has been furnished to **Guy Bennett Rubin, Esquire and Stuart M. Address, Esquire,** Rubin & Rubin, , P.O. Box 395, Stuart, Florida 34995; **D. Andrew Vloedman, Esquire,** 2790 N.W. 43rd Street, Suite 200, Gainesville, FL, 32606; **John F. Dickinson, Esquire and J. Ray Poole, Esquire,** Constangy, Brooks & Smith, P.O. Box 41099, Jacksonville, FL 32203-1099, and **Martin Fitzpatrick, Esquire,** P.O. Drawer 11300, Tallahassee, FL 32302, by U.S. Mail, this 25 day of June, 2004.

_____
Robert H. Ellis

P:\client\3469\PLEADINGS\3469Daubert MOL.wpd

19