FILED

202 JUN 25 P 3: 16

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

        Plaintiff,

v.                                                      Case No.: 3:01-cv-799-J-32HTS

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, MARY
HUDNALL, and RAYMOND HANSON, each in
his/her individual capacity,

        Defendants.
_____/

### DEFENDANTS DENISE MCEACHERN AND JIMMIE BURGER'S NOTICE OF FILING DEPOSITION TRANSCRIPT EXCERPTS, AFFIDAVITS, AND OTHER MATERIALS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

COME NOW Defendants, Denise McEachern and Jimmie Burger, by and through their

undersigned attorneys, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submit their

Notice of Filing Deposition Transcript Excerpts, Affidavits, and Other Materials in Support of

Motions for Summary Judgment in the above-styled action as follows:

      Tab 1        Deposition Transcript Excerpts of Jimmie Burger;

      Tab 2        Deposition Transcript Excerpts of Denise McEachern;

      Tab 3        Deposition Transcript Excerpts of Robin Rash;



<u>Tab 4</u>        Deposition Transcript Excerpts of **Raymon** Hanson;

<u>Tab 5</u>        Deposition Transcript Excerpts of **Chase Riveland**;

<u>Tab 6</u>        Deposition Transcript Excerpts of **Mario Valdes**;

<u>Tab 7</u>        Affidavit of **Dr.** Victor Selyutin;

<u>Tab 8</u>        Affidavit of **Dr.** William Hamilton;

<u>Tab 9</u>        Affidavit of **Dr.** Thomas Edwards;

<u>Tab 10</u>       Affidavit of Jimmie Burger;

<u>Tab 11</u>       Affidavit of **Denise** McEachern;

<u>Tab 12</u>       Defendant **Rash's** First Set of Interrogatories to Plaintiff; and

<u>Tab 13</u>       Plaintiff's Verified Answers to First **Interro**gatories By Defendant Rash.

DATED this  **25**  day of June, 2004.

Respectfully submitted,

CONSTANGY, BROOKS & SMITH, LLC
Post Office Box 41099
Jacksonville, Florida 32203
Telephone: (904) 356-8900
Facsimile: (904) 356-8200


By: _____
        John F. Dickinson
        Florida Bar No. 198651
        J. Ray Poole
        Florida Bar No. 0983470

Attorneys for Defendants Burger, McEachern,
Rash, and Hudnall

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Defendants Denise McEachern and Jimmie Burger's Notice of Filing Deposition Transcript Excerpts, Affidavits, and Other Materials in Support of Motions for Summary Judgment has been served this _25_ day of June, 2004, via first class United States mail upon the following:

Guy Bennett Rubin, Esquire
Rubin & Rubin
P.O. Box 395
Stuart, FL 34995

Martin Fitzpatrick, Esquire
Broad & Cassel
215 S. Monroe Str., Ste. 400
Tallahassee, FL 32301

Robert Ellis, Esquire
Gobelman, Love, Gavin, Blazs & Mathis
815 S. Main Street, Suite 300
Jacksonville, FL 32207-8140

D. Andrew Vloedman, Esquire
2790 NW 43rd Str., Ste. 200
Gainesville, FL 32606

_____
                              Attorney



1      UNITED STATES DISTRICT COURT
       MIDDLE DISTRICT OF FLORIDA
2        JACKSONVILLE DIVISION
       Case No. 3:01 CV 799 J32HTS

3

4  MARIO VALDES, INDIVIDUALLY AND AS
   PERSONAL REPRESENTATIVE OF THE ESTATE
5  OF JOY FRANCIS "FRANK" VALDES            **Certified**
6            Plaintiff                         **Copy**
7  v.
8  JAMES V. CROSBY, JR., A.D. THORNTON,
   TIM GIEBEIG, RONNIE WHITE, CHARLES STOCKLEY,
9  TIMOTHY A. THORNTON, JASON PATRICK GRIFFIS,
   DEWEY BECK, CHARLES BROWN, ROBERT SAULS,
10 MONTREZ LUCAS, ANDREW LEWIS, DONALD STANDFORD,
   JIMMIE BURGER, DENISE MCEACHERN, ROBIN RASH,
11 MARY HUDNALL and RAYMOND HANSON, each in
   his/her individual capacity
12
             Defendants
13

   _____/
14
15         Everglades Correctional Institution
           1601 SW 187th Street
16         Miami, Florida 33185
           May 14, 2004
17         1:00 P.M. to 6:00 P.M.
18
19         DEPOSITION_OF_THE_WITNESS_JIMMIE_BURGER

   _____  __  ___  _____  _____  _____
20
21
   (CERTIFIED QUESTION - page 9 line 6)
22
23
             Taken before Sandra L. Ragsdale, Registered
24 Professional Reporter and Notary Public for the State
   of Florida at Large, pursuant to Notice of Taking
25 Deposition filed in the above cause.

1    10:35.   These are the only two pages showing an

2    examination of Frank Valdes at 10:35 on 7-17-99?

3         A.   It's the only two I'm aware of, sir.

4         Q.   All right.   Why don't you go ahead and tell

5    us what you wrote on page 1 of this document?

6         A.   The top of this form is his name, race,

7    sex, number, date of birth, age, the date, and time I

8    started the evaluation.   His marital status, his

9    religion, if he's allergic to anything.   There's a

10   part here where he has to agree to evaluation and

11   treatment at Florida State Prison and by us, by the

12   medical staff.

13        Q.   Before you go further, let me just ask you

14   some questions.   Did you get this biographical

15   information directly from Mr. Valdes or did you get

16   it from his records?

17        A.   I got his -- well, both.   I got his name

18   and his race, sex, his date of birth, the date and

19   time of course I knew, and the rest of them I asked

20   him.

21        Q.   Do you recall that specifically?

22        A.   Oh, yes, sir.

23        Q.   Okay.   What was his tone of voice if you

24   can describe it, loud, soft, accent, no accent?

25        A.   I feel like he gave me appropriate

1      responses in a normal tone.   I mean I didn't see

2      anything unusual about it.

3             Q.    Did he appear to be in any level of pain?

4             A.    No, sir, he didn't.

5             Q.    Was he moaning?

6             A.    No, sir.

7             Q.    Was he groaning?

8             A.    No, sir.   Not when I was talking to him.

9             Q.    Not when you were talking to him?

10            A.    No, sir.

11            Q.    Tell me the first time you laid eyes on him

12     on 7-17-99, where were you?

13            A.    I was in the treatment room in the clinic.

14            Q.    So you did not see him being presented at

15     the front of the department?

16            A.    No, I did not.

17                  MR. POOLE:   Objection, asked and answered.

18            Q.    He was already in the examining room when

19     you first --

20                  MR. POOLE:   Objection.

21            Q.    Excuse me -- when you first laid eyes on

22     him?

23                  MR. POOLE:   Objection.   Asked and answered.

24            A.    Yes, he was in the treatment room.

25            Q.    Okay.   And what was his position in the

1    treatment room?

2         A.    He was laying on our bed in there.

3         Q.    Examining table?

4         A.    Yes, sir.

5         Q.    The head of the examining table is on the

6    back wall?

7         A.    Not on the back wall, no, sir.

8         Q.    No?

9         A.    It's out in the middle of the room to allow

10   access all around it.  You can walk all the way

11   around the table.

12        Q.    All right.  And where was his head?

13        A.    Well, it was on the pillow at the other end

14   of the table.

15        Q.    Okay.  Just so that we can from the record

16   understand where things were in the room, there's

17   only one door coming into that room?

18        A.    That's correct, sir.

19        Q.    And were Mr. Valdes's feet closest to the

20   door or was his head closest to the door?

21        A.    The feet were closest.

22        Q.    Was he on his stomach, back side?

23        A.    Well, he was on his back side.  He was

24   turned over a little bit to his left side because he

25   had handcuffs on his back.

1        A.    She told us we had several people coming in
2   and she needed help and I just went up there.
3        Q.    Okay.   Was there an examining light in the
4   room?
5        A.    Yes, sir.
6        Q.    Can you describe the examining light?
7        A.    It's not really an examining light.   It's a
8   surgical light.   It's high intensity.   It's very
9   bright.   It's a big lamp.
10       Q.    How tall is it?
11       A.    How tall, I don't know, sir.
12       Q.    It's a standing lamp?
13       A.    Yes, sir.
14       Q.    In other words, it has like a platform?
15       A.    Yes, sir.
16       Q.    Would you estimate that it's at least 4
17  feet high?
18            MR. POOLE:   Objection, asked and answered?
19       A.    Sir, I honestly don't know how tall it is.
20       Q.    It's higher than the examining table,
21  correct?
22            MR. POOLE:   Objection, asked and answered?
23       A.    Yes, sir, it is above the examining table.
24       Q.    Okay.   And it would be high enough so that
25  when it's turned on the examining table and the

1      Q.    Okay.   So what was the first thing that you

2  did when you entered the room?

3      A.    Well, I walked up on the right side of the

4  table and looked Valdes over, see what was -- see any

5  obvious problems.

6      Q.    Tell me what you did specifically in

7  looking him over.

8      A.    I started at his feet and looked at his

9  entire body on the front side.   And when I got to his

10  head I checked his head and looked at him in the

11  eyes.

12      Q.    Okay.   And tell me -- as if you were doing

13  it right now, tell me when you looked over, tell me,

14  you know, how much time and what you're looking for

15  and what you saw.

16      A.    Okay, I'm looking for obvious wounds, knife

17  wounds or, you know, looking for any types of

18  injuries.   Anything that's extremely obvious.

19      Q.    When you examined his feet area -- that was

20  first, correct?

21      A.    Yes, sir.

22      Q.    Did you examine both feet at the same time

23  or did you start with one or the other?

24      A.    No, sir, I looked at both of them.

25      Q.    All right.   And were there any signs of

1    trauma to his feet?

2         A.   No, sir.  There was not.

3         Q.   Okay.  Did you examine his legs?

4         A.   Yes, sir.

5         Q.   Any signs of trauma to his legs?

6         A.   No, sir.  I didn't see anything with his

7    legs.

8         Q.   All right.  So then you were walking around

9    the right side?

10        A.   Yes, sir.

11        Q.   Then what did you examine next after his

12   legs?

13        A.   I looked at his abdomen.  I looked at his

14   groin.  You know, continued up looking at his body.

15        Q.   When you looked at his groin did you look

16   at it with the underpants on or off?

17        A.   They were on, sir.

18        Q.   They were on?

19        A.   Yes.

20        Q.   How did you see his groin then?

21        A.   I didn't see it, but I didn't see any blood

22   either.

23        Q.   So blood would be what you're looking for?

24        A.   I would have been looking for obvious

25   trauma, yes, sir.

1      Q.   Okay.  And how is trauma obvious?

2      A.   Well, I was looking for any indication that

3   he was bleeding.

4      Q.   Right.

5      A.   No, I didn't particularly look at his groin

6   but again Valdes was alert at the time.

7      Q.   Tell me what he -- what makes you conclude

8   right now that he was alert?

9      A.   Because he was watching me as I walked up

10   the table.

11      Q.   So his eyes --

12      A.   Yes, sir.

13      Q.   -- is what makes you make that comment?

14      A.   Yes, sir.

15      Q.   Anything else?

16      A.   No, sir.

17      Q.   And at this point in time had you heard any

18   moaning or groaning?

19      A.   No, sir.  I had not.

20      Q.   Okay.  Did you ask him questions?

21      A.   Yes, sir, I did.

22      Q.   What questions did you ask him?

23      A.   You mean right then?

24      Q.   Had you asked any questions up to that

25   time?

1          MR. POOLE:  Objection, asked and answered.

2     A.    It got there very quickly.

3     Q.    All right.  What did you do next after the

4  fan had been on for a short period of time?

5     A.    Well, I returned to the table.  At that

6  point Sergeant Brown had left the room.  So that's

7  what caused the confusion regarding who had the gas.

8  I didn't know if Valdes did or Brown did because at

9  that point I could no longer detect the gas.

10          So at that point I started asking

11  questions.  I asked him his DC number which he gave

12  me.  And I also asked him if he was allergic to

13  anything.  And he responded to that no, he was not.

14  Those were the two entries I had written on there.

15  But I just have standard questions that I ask them

16  when they come into the emergency room to ensure they

17  are alert.

18     Q.    So he was being compliant in answering

19  those questions?

20     A.    That's correct, sir.

21     Q.    By this time what part of the form had been

22  filled in?

23     A.    Well, the top, I'd also asked him to sign

24  it.  And he couldn't.

25     Q.    He couldn't or he wouldn't?

1     A.    I can't remember who it was.

2     Q.    But there was an officer that did that or

3  did Valdes do it on his own or did you do it on your

4  own?

5     A.    I'm not sure who helped him up.  I know we

6  helped him up because he had the handcuffs on and

7  it's very hard to sit up with your handcuffs behind

8  your back.  I really don't remember who helped him

9  sit up.

10     Q.    By the time he was sat up did he make any

11  audible sounds by that time, moaning or groaning or

12  anything?

13     A.    No, sir, he wasn't moaning or groaning

14  then.

15     Q.    All right.  So he was sat up, you checked

16  his left side?

17     A.    Uh-huh.

18     Q.    His hands are still behind his back?

19     A.    That's correct.

20     Q.    And what area of his left side did you

21  check?

22     A.    The whole thing, sir.  I mean I listened to

23  it with a stethoscope.  I took his blood pressure at

24  that point.  I checked his respirations.  I listened

25  to his lungs.

1   whether you're just telling us what you normally do.

2   So --

3        A.   I don't remember exactly what I did in

4   checking his pulse or, you know, -- I looked at his

5   chest to check the rise and fall but I can't recall

6   exactly the rest of it.

7        Q.   Okay.  So you normally take blood pressure,

8   so you think that you took blood pressure in this

9   instance; is that correct?

10       A.   I took his blood pressure, sir.

11       Q.   Do you remember that specifically or do you

12   just remember that that's what you normally do?

13            MR. POOLE:  Objection.  Asked and answered.

14       A.   I wrote it down, sir.  I took his blood

15   pressure.

16       Q.   Okay.  And the rise and fall of the chest,

17   that's the respiration?

18       A.   That's correct, sir.

19       Q.   Okay.  And what other vitals did you take?

20       A.   I took his pulse, his respiration and his

21   blood pressure.

22       Q.   What about temperature?

23       A.   No, sir, I didn't do that.

24       Q.   Why not?

25       A.   Because he had bleeding from his lip and I

1    Q.    All right.  Did you look inside his mouth

2  to determine whether it was a cut or some other

3  source of bleeding?

4    A.    Yes, sir, I did look inside of his mouth.

5    Q.    Okay.  But you didn't put your fingers to

6  his mouth; is that correct?

7    A.    I can't recall what I did now.

8    Q.    Did you determine what the source of the

9  bleeding was?

10   A.    Yes, sir, it was an abrasion or a fever

11 blister located on his lips.

12   Q.    Isn't an abrasion different from a fever

13 blister in terms of the etiology of the trauma?

14   A.    Yes, sir, it is but it was hard, difficult

15 to tell which one it was in this case.

16   Q.    Why?

17   A.    Well, it was on his lips.  It appeared to

18 me it could have been a fever blister that had been

19 broken open somehow and started bleeding, and then

20 again it could have been an abrasion that had been

21 caused as whatever had happened to him.

22   Q.    Did you ask what had happened to him?

23   A.    Did I ask him?

24   Q.    Did you ask anyone what had happened to him

25 to cause this breaking of his lip?

1          A.    No, sir, I did not.

2          Q.    So you wouldn't have known at that time

3    whether it was an accidental trauma; is that correct?

4          A.    No, sir, I wouldn't have known that.

5          Q.    Would you have known if it was self

6    inflicted?

7          A.    It didn't give the appearance of being self

8    inflicted so I didn't ask.

9          Q.    What does self inflicted look like?

10         A.    I've never seen a self inflicted injury on

11   a mouth before but.

12         Q.    Did it look like it had come from a blunt

13   trauma exerted on him by an officer?

14         A.    I can't answer the question, sir.  I don't

15   know.

16         Q.    Do you know what that looks like?

17         A.    Blunt trauma, I can't really define it, no,

18   sir.

19         Q.    So you couldn't tell from physical

20   observation what that trauma was from and you

21   couldn't -- and you didn't ask where it came from

22   either; is that correct?

23         A.    I knew he had a use of force, sir, and the

24   injuries were very consistent with being hit with a

25   shield.  So no, sir, I didn't.

1          Q.    When you say being hit with a shield what

2     do you mean?

3          A.    I mean when they go in to try to take

4     somebody into restraints they put the shield in front

5     of them and they will trap him with it.   And the

6     injuries he had were consistent with being entrapped

7     in one and being forced to the ground.

8          Q.    All right.   Have you ever seen such a use

9     of force as you're describing?

10         A.    No, sir, I've never seen it but --

11         Q.    Then how do you know what is consistent

12    with that?

13         A.    Well, we just see a lot of use of forces

14    where they tell us that the shield was used on them,

15    the officers tell us.

16         Q.    And did the officer tell you in this case

17    that the shield was used by this point in time?

18         A.    I can't recall him telling me that, no,

19    sir.

20         Q.    So is this an assumption that you made

21    about him, the shield?

22         A.    Well, he gave the appearance of being that

23    way, sir.

24         Q.    He gave the appearance of having been --

25         A.    Of having the shield used on him.

1        Q.    Right, because you're saying that the

2   injuries on him were consistent with a shield being

3   used?

4              MR. POOLE:   Objection.   Asked and answered.

5        Q.    Is that right?

6              MR. POOLE:   Objection.   Asked and answered.

7        Q.    You can answer.

8        A.    Okay.   Well it did give the appearance the

9   shield had been used on him, yes, sir.

10       Q.    All right.   Is there a particular mark that

11  a shield makes?

12       A.    Normally when a shield is used I see a

13  bloody nose, usually like abrasions.   They could be

14  anywhere from the shield according to where he -- how

15  it's used.   And he also had signature marks on the

16  side of his chest to indicate he had had a shield,

17  the ERD shield used on him.

18       Q.    What is an ERD?

19       A.    I don't know what it stands for, sir.

20       Q.    That's the electric shield?

21       A.    Yes, sir.

22       Q.    What were the signature marks that you saw?

23       A.    Well, there's three marks down his side.

24       Q.    Is that what the signature marks are is a

25  pattern of three marks?

```
1              A.    In this case it was, sir.

2              Q.    Tell me what is a signature mark.  You used

3       that phrase.

4              A.    Well, a signature mark, it's a mark left by

5       the shield when it is used on somebody.

6              Q.    You mean when electricity is discharged?

7              A.    That's correct, sir.

8              Q.    And what is a signature, what are the

9       signature marks that you saw when you were told that

10      a shield was used?

11             A.    I don't understand the question, sir.

12             Q.    Okay.  When you say signature mark, you

13      mean the same mark made every time that the shield is

14      used?

15             A.    I wouldn't say every time, no, sir.

16             Q.    Okay.  A common mark?

17             A.    A common mark.

18             Q.    Okay.  And what does the common mark look

19      like?

20             A.    They look like red areas.  They're circular

21      and --

22             Q.    How far apart, how big are the circles?

23             A.    I couldn't tell you, sir.  I've never

24      measured them.  I don't know how big they are.  There

25      is a set pattern to them though.  They're in a line
```

1    and they do run.   In this case, particular case,

2    there was three of them.

3         Q.   Okay.   And typically do they run the entire

4    length of one's torso?

5         A.   I have never seen one do that, sir,

6         Q.   Okay.   Half?   I'm just trying to get an

7    idea.   I understand that you didn't measure them but

8    if you saw this I need you to help us and tell us

9    where you saw them.

10             MR. POOLE:   Objection.   Asked and answered.

11        A.   Well, they were on his side.   I don't know

12   what to tell you about how far they were or how big

13   they were.

14        Q.   All right.   Let me ask you to take a look

15   again at your emergency room record.   Do you note the

16   ERD shield marks, the signature marks?

17        A.   Yes, sir, I put the skin discoloration.

18   Actually I put it over here because of this line

19   here.   But actually this was down here on the side.

20   It started up under the arm like right up through

21   here (indicating).

22        Q.   You're pointing to just below the underarm?

23        A.   That's correct.   And then it had another

24   one and then a third one.

25        Q.   There was another one near the bottom of

1    up; correct?

2         A.    That's correct, sir.

3         Q.    Did he raise his arms up?

4         A.    No, sir, he couldn't.

5         Q.    Okay.  How were you able to see under his

6    arms?

7         A.    Under his arms, through there, right there.

8         Q.    Okay.  So you saw -- that would be the top

9    of his rib cage?

10        A.    Yes, sir, I could see the marks through

11   there.

12        Q.    Did you walk around the table when he was

13   sitting up?

14        A.    Yes, sir, I did.

15        Q.    So you saw both the right side and the left

16   side; is that correct?

17        A.    Yes, I saw both sides.

18        Q.    What do you call touching a person's body

19   in medical terms?

20        A.    What do you call it?

21        Q.    Yes.  Are you familiar with the term

22   palpation or palpating?

23        A.    Okay, yes, sir, I am.

24        Q.    Does that mean touching the body?

25        A.    It can mean touching, yes, sir.

1      Q.   What else can it mean?

2      A.   Palpate the lungs or listen to the noises

3  inside.

4      Q.   Okay.  Did you palpate the lungs?

5      A.   Yes, sir, I did use my stethoscope to

6  listen to his lungs front and back.

7      Q.   When did you do that?

8      A.   While he was sitting up.

9      Q.   Before or after you did the chest

10 examination, the visual?

11     A.   I looked first.

12     Q.   You looked first?

13     A.   Yes, sir.

14     Q.   And what were you listening for?

15     A.   Any unusual noises.

16     Q.   What are unusual noises?  What's the usual?

17     A.   Well, usually it's clear.  If you hear

18 anything that's different from that something's

19 wrong.

20     Q.   And what does clear sound like?

21     A.   It just sounds clear.

22     Q.   In other words, you can hear the air coming

23 in and out?

24     A.   Yes, sir.  You can hear the air.

25     Q.   Without obstruction?

1      A.    Coming in and out of the body.  There's no

2  wheezing and there's no rales.  There's no -- there's

3  no scratchy sounds I guess would be a good way to

4  handle it.

5      Q.    All right.  And everything was fine on the

6  palpation of the lungs?

7      A.    Yes, sir, they were clear.

8      Q.    Okay.  And did you perform any kind of a

9  palpation of any part of his body?

10      A.    The front?

11      Q.    Yes.

12      A.    Yes, sir, I listened to the lung in the

13  front too.  I get both sides.  Because sometimes you

14  listen to the back that you may miss something that

15  you pick up in the front.

16      Q.    Okay.  What about physically palpating the

17  muscle or the soft tissue?

18      A.    Well, no, sir.  Everything I did, I did

19  with a stethoscope.  You know, I can compress on the

20  chest with the stethoscope.  If he'd have had any

21  problems he would have said something about it, you

22  know.  If he'd have had a bunch of broken ribs I

23  would have irritated him with that stethoscope.

24      Q.    With the stethoscope?

25      A.    Absolutely.

1        Q.    Where did you put the stethoscope?

2        A.    Here.  Here.

3        Q.    When you say here let's make sure that the

4   record is clear.  On the top of the chest?

5        A.    Yes, sir, and down here also (indicating)

6   and did the same thing in the back.

7        Q.    All right.  Other than with the stethoscope

8   did you do any palpation with your fingers?

9        A.    No, sir, I didn't.

10       Q.    Did you do any other kinds of examinations

11  in the chest/torso area?

12       A.    I listened to his heart.

13       Q.    What did you hear in terms of his heart?

14       A.    I was unable to pick up any unusual noises.

15  I was listening to his chest, his heart.  I by no

16  means am an expert on a heart.  But, you know, his

17  heart was beating.  I could pick up nothing unusual

18  about it.

19       Q.    All right.  Any other examinations or any

20  other testing in his chest/torso area?

21       A.    No, sir.

22       Q.    What did you do next?

23       A.    Well, we put him back on the table.

24       Q.    So he laid back down?

25       A.    I checked his blood pressure while he was

1   up.

2          Q.   On which arm?

3          A.   I don't recall any more which arm I used.

4   I also -- yes, I checked his blood pressure while he

5   was sitting up.

6          Q.   Okay.  What happened next?

7          A.   We put him back on the table, laid him back

8   down.

9          Q.   Was the only blood you noticed coming from

10  his mouth?

11         A.   Actually there wasn't any blood coming.  It

12  had already clotted and stopped bleeding.

13         Q.   So it was dried blood around the mouth?

14         A.   Well, in that one area where the -- you

15  know, and the nose also had been bleeding but it also

16  discontinued.

17         Q.   So the nose was bleeding?

18         A.   At one time it was.  It wasn't when I saw

19  him.

20         Q.   Okay.  But you could see that his nose had

21  been bleeding?

22         A.   It had been bleeding, yes, sir.

23         Q.   All right.  And where is it noted on the

24  diagram that his nose had been bleeding?

25         A.   I didn't note it on the diagram.  Abrasion

```
 1        A.    The bloody nose had stopped.
 2        Q.    Did you know --
 3        A.    I checked it and I cleaned it.
 4        Q.    Could it have been broken?
 5              MR. POOLE:  Objection, speculation.
 6        A.    That would be -- I can't answer your
 7   question, sir.
 8        Q.    Okay.  How do you tell if a nose is broken?
 9        A.    X-ray.
10        Q.    Okay.  Did you X-ray?
11        A.    No, sir, I did not.
12        Q.    Okay.  Why not?
13        A.    I had no reason to believe that his nose
14   was broken because he gave me no complaints regarding
15   any pain in that area even though his nose had been
16   bleeding.
17        Q.    Did you find that to be a little bit
18   unusual that a person has blood about his mouth and
19   his nose and he's not complaining?
20        A.    No, sir.  At FSP I didn't find that
21   unusual.
22        Q.    And officers were standing right next to
23   him while he was not complaining, correct?
24        A.    I can't recall who the officers were in
25   there at that time.  I didn't pay any attention to
```

1          A.    He was shining it at his head.  I don't

2    know what part of the head it was hitting.  It could

3    have been in his eyes.

4          Q.    Is that normal?

5          A.    I didn't consider it normal, no, sir.

6          Q.    In fact, that was the only time you had

7    ever seen that happen, correct?

8          A.    That's correct, sir.

9          Q.    And an officer is not authorized to use

10   that surgical light, is he?

11               MR. VLOEDMAN:  Object to the form.  As

12   authorized by who, by what?

13         Q.    To your knowledge is an officer authorized

14   to use a surgical light?

15               MR. POOLE:  Objection, speculation.

16               MR. VLOEDMAN:  Objection to the form.  By

17   what policy, procedure, what?

18         A.    I can't tell you what their policies are.

19   I honestly don't know.

20         Q.    Does an officer just pick up any surgical

21   instrument that they want to?

22               MR. POOLE:  Objection, speculation, lack of

23   personal knowledge.

24         Q.    To your knowledge?

25         A.    I can't answer your question, sir.

1      A.   I don't recall him laughing.  He was
2   smiling.
3      Q.   Okay.  But you used the word laughing in
4   your sworn statement, didn't you?
5      A.   Well, okay.  I don't recall hearing him
6   making any verbal noises.  He was smiling though.
7      Q.   But you did remember that 4 days after the
8   incident, true?
9           MR. POOLE:  Object to the form.
10     A.   Did I remember what, sir?
11     Q.   The laughing.
12     A.   I said laughing.
13          MR. POOLE:  Same objection.
14     A.   But I don't remember him laughing.
15     Q.   Okay.  At page 11 I'm going to make a
16   little mark here where I want you to start reading, a
17   little check mark.
18     A.   Okay.
19     Q.   With regard to this section that you just
20   read, you indicated to the FDLE agents that Lewis
21   harassed Valdes for a pretty good while during the
22   examination, correct?
23          MR. POOLE:  Object to the form.
24          MR. VLOEDMAN:  Object to the form.
25     A.   Sir, he was only in there about 5 minutes

1    and if it had went on for a long time I would have
2    stopped it verbally and took him on.

3         Q.   How would you have stopped it?

4         A.   I would have told him to stop it.  But he
5    went -- what he did was Valdes was laying in the
6    middle of the table.  He come at him towards his side
7    with a light and as he did Valdes moved over towards
8    me.

9             MR. POOLE:  Just answer the question.  I
10   don't know that there was even a question pending at
11   this point.

12        A.   Okay.  The entire event lasted no more than
13   5 to 10 seconds.

14        Q.   The whole light incident was 5 to 10
15   seconds?

16        A.   Well, from the time the light hit him until
17   it was over.

18        Q.   Okay.  So when you say he did it for a
19   pretty good while, that's 5 to 10 seconds?

20        A.   Well, I didn't keep track of the time, sir.

21            MR. POOLE:  Objection, asked and answered.

22        Q.   But that's what you're saying you meant in
23   your sworn testimony; is that correct?

24            MR. POOLE:  Objection, asked and answered.

25        A.   I don't know what I meant there, sir.  The

1    event lasted about -- it was a very short event.

2         Q.   All right.  And I think you just said

3    earlier that the whole examination was about 5

4    minutes?

5         A.   The whole examination?

6         Q.   You said something about 5 minutes.  What

7    were you talking about?

8         A.   Lewis was in the room about 5 minutes.

9         Q.   Okay, Lewis was in the room about 5

10   minutes.  On the next page, page 13 the FDLE special

11   agent referred to you saying that you should have put

12   him in the hospital.  And you responding:  I don't

13   know, I just -- something didn't strike me right.

14             Do you recall that?

15             MR. POOLE:  Object to the form.

16        A.   No, sir.  I don't recall making that

17   statement.

18        Q.   Do you think you should have put him into

19   the hospital at that time?

20        A.   When I saw him?

21        Q.   Yes.

22        A.   No, sir.

23        Q.   And you don't recall saying something

24   didn't seem right at that time?

25             MR. POOLE:  Objection, asked and answered.

1      Q.    Okay.  Do you recall telling the FDLE that

2   there was another mark below one under his left

3   nipple like a circular patch a little bit below that

4   one?

5      A.    What you're describing is on the side here,

6   sir.

7      Q.    I'm not saying anything other than what you

8   testified to under oath on July 30th, 1999.  Were you

9   trying to describe an area on the side of his body by

10  telling the FDLE that it was directly under his left

11  nipple?

12     A.    I don't recall telling him that stuff, sir.

13     Q.    Okay.  Now when the examination -- when you

14  filled in the emergency room record and you put down

15  the time of day there as 10:30?

16     A.    Yes, sir.

17     Q.    Is that the time that you started the

18  examination?

19     A.    Yes, sir, that's the time I would have

20  asked him -- I would have went in there, it was about

21  10:30.

22     Q.    Okay.  Did you tell the FDLE in your sworn

23  statement of July 30th that the examination started

24  about 10:00?

25     A.    No, sir, I didn't.

1          Q.     Okay.   How long did the examination last?

2          A.     I was with him approximately 25 minutes.

3          Q.     Did Lewis's use of the light, that surgical

4    light that we were talking about, did that interfere

5    with your job?

6          A.     No, sir.

7          Q.     Do you recall telling the FDLE on July

8    30th, 1999 that shining a spotlight made your job

9    more difficult?

10         A.     No, sir.   I can't recall telling them that.

11         Q.     Did you tell the FDLE that as far as you

12   were concerned that interfered with your treatment of

13   the patient?

14         A.     No, sir.   I don't recall telling them that

15   either.

16         Q.     Isn't true that the officers told you, the

17   officers who brought Valdes in told you that he was

18   there because he was making too much noise in his

19   cell?

20         A.     I don't recall anybody telling me that,

21   sir.   Not any more.

22         Q.     Do you remember saying that to the FDLE

23   that that's why he was there, that's why he had gone

24   through the use of force because he was making too

25   much noise in his cell?

1    been making too much noise?

2              MR. VLOEDMAN:   Objection.   It misstates his

3    testimony by including material portions of the

4    testimony that you gave at the time as to why he was

5    removed.

6              MR. POOLE:   Objection to form.

7         A.   What was the question, sir?

8              (The reporter read from the record as

9    requested)

10             MR. VLOEDMAN:   My objection is that he's

11   misstating his testimony to the FDLE at the time

12   because that's not the complete testimony on this

13   very issue.

14        A.   I don't recall them telling me why he had a

15   use of force, sir.

16        Q.   Okay.  Did anyone examine Mr. Valdes other

17   than yourself on July 17, '99?

18             MR. POOLE:   Objection, anyone --

19        Q.   Any other medical personnel?

20             MR. POOLE:   Prior to what time?

21        Q.   During the time that you were examining Mr.

22   Valdes during that visit?

23        A.   No, no, sir.

24        Q.   Did anyone else see Mr. Valdes in the ER

25   room?

1      Q.    So you didn't know how much force was used;

2   correct?

3      A.    No, sir, I don't ask.

4      Q.    You don't ask.  Why not?

5      A.    Sir, when a man come in the emergency room

6   he's had a use of force, he's hurt.  I don't worry

7   about what happened or outside, you know.  I'm

8   dealing with a hurt man here and I don't take the

9   time to stop and say okay, officer, what did you do

10  to him.  Okay.

11     Q.    Okay.

12     A.    I check for injuries on this guy.  They

13  come into the clinic.  I do the very best I can to

14  take care of them.

15     Q.    Would you agree with me that finding out

16  the nature of the traumatic event is important to a

17  proper diagnosis?

18           MR. VLOEDMAN:  Object to form.

19           MR. POOLE:  I'll join that objection.

20           MR. ELLIS:  Join.

21     A.    To know what happened to him -- if I had a

22  question about any type of injury on him I would have

23  asked him.  If it had been a serious wound, yes, I

24  would have asked.  At the time I saw Valdes he did

25  not have any serious injuries on him.  He was alert.

1    He was oriented.  He was talking to me.  He was

2    sitting up and able to sit up on his own.  His

3    respirations were even, unlabored.  I picked up no

4    problem with him.  Okay.

5         Q.   He was talking to you?

6         A.   He was talking to me.

7         Q.   What did he say?

8         MR. POOLE:  Objection.

9         A.   He answered my questions.

10        MR. POOLE:  Objection, asked and answered.

11        Q.   You mean the two questions of his number

12   and his allergies?  Anything else?

13        MR. POOLE:  Objection, asked and answered.

14        A.   Well, I don't know what his religion was

15   either, sir.  Okay.

16        Q.   So other than those two questions what did

17   you converse with him about?

18        A.   He continued to watch me.  He quit talking.

19             (At this point, a brief recess was taken in

20   the proceedings)

21        Q.   A few minutes ago I was asking you about

22   taking a history of the incident was important.  And

23   I know that you answered that that's really not that

24   important, it's really, you know, what I see.  Is

25   that essentially correct?

1          Q.    Just so the record is clear, you did not

2     think that any of the injuries that you documented or

3     saw on Mr. Valdes's body were serious enough to call

4     a doctor about?

5          A.    No, sir, I didn't feel that.

6          Q.    And you didn't think they were serious

7     enough to keep him for observation in the medical

8     department, correct?

9          A.    No, sir.  I didn't.

10         Q.    Isn't it true that your entry on the

11    chronological record of out-patient health care that

12    we talked about earlier, the fourth entry was made on

13    a different date other than July 17, 1999?

14         A.    A different date?

15         Q.    Yes.

16         A.    It was made on 7-17-99.

17         Q.    And you say that because that's what it

18    says on the paper, correct?

19         A.    That's correct.

20         Q.    You don't remember doing it that date, do

21    you, specifically?

22         A.    Sir, I can't recall writing an incident

23    down on these sheets when I done an ER sheet.  That's

24    something that just comes automatically.

25         Q.    Okay.  Well --

1    clinic, you referred to Sergeant Brown.   Then you

2    referred to in that first statement Officer Lucas.

3    Were you aware of that?

4         A.   No, sir, I wasn't aware of that.   Sergeant

5    Lewis was the third person.

6         Q.   Okay.  Well, in the second statement you

7    said Lewis but then you make the statement:   I don't

8    want you to hold me to that because I'm not sure what

9    his name was, I didn't ask.   And I guess my question

10   to you is do you know Sergeant Lewis and do you know

11   that he was there?

12        A.   Yes, sir, I know Sergeant Lewis.

13        Q.   Okay.  You know that.  You know that he was

14   present during that period of time then?

15        A.   Yes, sir, I saw him in the clinic.

16        Q.   Okay.  Whatever involvement he had in the

17   clinic I think you've been clear about that Lewis did

18   nothing that interfered with your ability to conduct

19   a complete physical of Mr. Valdes; is that correct?

20        A.   No, sir, I didn't feel he did.

21        Q.   And you did a complete physical and you

22   were satisfied that you had been able to evaluate his

23   medical condition at the time of that visit to the

24   clinic?

25        A.   Yes, sir, I did feel he had an evaluation

1    that covered everything.

2         Q.    The only interaction Lewis had with Mr.

3    Valdes was that he had a light that shown on Mr.

4    Valdes for what you estimate to be 5 to 10 seconds?

5         A.    Yes, sir, it was a very short period of

6    time.

7         Q.    And that is your best estimate, 5 to 10

8    seconds?

9         A.    Yes, sir, it was a very short period of

10   time.

11        Q.    That light did not come in contact with Mr.

12   Valdes, it did not touch him?

13        A.    No, sir.

14        Q.    All right.   The light was some distance

15   from Mr. Valdes?

16             MR. RUBIN:   Object to the form.

17        A.    Yes, sir, it was.

18        Q.    Right.   Mr. Lewis never placed hands on Mr.

19   Valdes while you saw him, did he?

20        A.    No, sir.   He didn't.

21        Q.    He did not cause any injury to Mr. Valdes?

22        A.    No, sir.   He didn't.

23        Q.    Did not threaten Mr. Valdes?

24        A.    No, sir.

25        Q.    Treated Mr. Valdes respectfully as far as

1    emergency room record?

2         A.    That's correct, sir.

3         Q.    And you noted that on the emergency room

4    record that goes with the diagram of injury?

5         A.    Yes, sir.

6         Q.    So in fact you did note it on your medical

7    records for your examination of Frank Valdes on July

8    17th, the fact that he had a bloody nose, didn't you?

9         A.    Yes, sir.

10        Q.    He also asked you about the capillary

11   refill?

12        A.    Yes, sir.

13        Q.    The notation on the emergency room record,

14   do you see that, capillary refill to nail beds?

15        A.    Yes, sir.

16        Q.    And just to make sure we're clear, was

17   it -- did you intend to indicate when you were

18   filling out this form that the capillary refills to

19   the nail beds took more than 2 seconds?

20        A.    No, sir.   It was less than 2 seconds.

21        Q.    Okay.   So you just simply got the greater

22   sign switched?

23        A.    Yes, sir.

24        Q.    As far as you're aware, for a 36 year old

25   male would a respiration rate of 24 be within normal

1    limits?

2         A.   Yes, sir.

3         Q.   Would a blood pressure of 118 over 82 be

4    considered within normal limits?

5         A.   Yes, sir.

6         Q.   Would that be -- let's say on the range of

7    blood pressures within the acceptable range, would

8    that be considered?

9         A.   It's close to normal, sir, what's

10   considered to be normal.

11        Q.   And you were asked about his condition when

12   you saw him and whether you asked any correctional

13   officers what happened, okay.  You recall Mr. Rubin

14   asking you those questions, --

15        A.   Yes, sir.

16        Q.   -- whether you questioned the correctional

17   officers.  At the time that you were examining Mr.

18   Valdes did you have any understanding as to why he

19   was in the clinic?

20        A.   No, sir.

21        Q.   Did you know that he was there for a post

22   use of force examination?

23        A.   Yes, sir.  I knew that.

24        Q.   Did you know that he had been subject to a

25   cell extraction at that time?  You mentioned the

1          Q.   Just to make sure we're clear, you saw --

2     you heard Mr. Valdes answer your questions that

3     morning?

4          A.   Yes, sir.

5          Q.   You saw him looking at you?

6          A.   Yes, sir.

7          Q.   You saw him sitting up on his own?

8          A.   Yes, sir.

9          Q.   You saw him standing on his own?

10         A.   Well, he had an officer on each side

11    helping him turn.

12         Q.   Helping him turn around?

13         A.   I really can't say I saw him stand all by

14    himself.

15         Q.   But you saw him standing?

16         A.   I saw him extend his legs and put them on

17    the floor.

18         Q.   From what you recall he appeared to be

19    oriented?

20         A.   Yes, sir.

21         Q.   Just to make sure I'm clear, you noted

22    some -- it appeared to you that he had had a bloody

23    nose?

24         A.   Yes, sir.

25         Q.   The bleeding had discontinued?

```
 1          A.   That's correct, sir.

 2          Q.   Also had something on his lip, either an

 3   abrasion or a blister of some sort?

 4          A.   Yes, sir, he had one.

 5          Q.   And as you recall had some discoloration on

 6   his left side?

 7          A.   That's correct, sir.

 8          Q.   Then you noted discoloration I believe to

 9   his right shoulder?

10          A.   Yes, sir.

11          Q.   And those are as you recall the sum total

12   of injuries at the time that you saw?

13          A.   That's all I saw, sir.

14               MR. POOLE:  No other questions at this

15   time.  Thank you.

16               MR. RUBIN:  I've got a few follow-ups.

17                     EXAMINATION

18   QUESTIONS BY MR. RUBIN:

19          Q.   The nail bed refill that you say that it

20   was mistakenly greater than instead of less than?

21          A.   Yes, sir.

22          Q.   What does greater than indicate?

23          A.   It indicates the blood is not getting

24   pumped to the extremities or the nail beds from the

25   heart.
```

2

1     UNITED STATES DISTRICT COURT

      MIDDLE DISTRICT OF FLORIDA

2     JACKSONVILLE DIVISION

3      CASE NO.:  3:01-CV-799-J32HTS

4

MARIO VALDES, individually and

5 as Personal Representative of

 the Estate of JOY FRANCIS   **Certified**

6 "FRANK" VALDES,      **Copy**

7   Plaintiff,

8 vs.

9 JAMES V. CROSBY, JR., A. D.

 THORNTON, TIM GIEBEIG,

10 RONNIE WHITE, etc.,

11   Defendants.

12

13

14 STATE OF FLORIDA)

15 COUNTY OF CLAY  )

16  Deposition of DENISE HATTEL McEARCHERN, taken on

17 behalf of the plaintiff herein, pursuant to Notice of

18 Taking Deposition, at 10:12 a.m., on Wednesday, May 5,

19 2004, at the Clay County Courthouse, Room 206, Green Cove

20 Springs, Clay County, Florida, before S. Gay Hess, a

21 Notary Public in and for the State of Florida at Large.

22

23     - - -

24

25

```
 1    Starke.   That's the --

 2         Q      BMA of Starke.

 3         A      That's the dialysis unit.

 4         Q      How long have you worked there?

 5         A      Not quite a year.

 6         Q      And what's your capacity with that company?

 7         A      An RN.

 8         Q      That's a registered nurse?

 9         A      Registered nurse, yeah.

10         Q      Okay.   And where was your previous immediate to

11    that employer?

12         A      Department of Corrections.

13         Q      And can you give me your -- essentially your

14    resume from the beginning to the end of where you worked

15    with the Department of Corrections and in what

16    capacities.

17         A      Florida State Prison, New River, Lawtey.   A

18    senior registered nurse.

19         Q      All in that order?

20         A      Oh.   I started at NFRC, North Regional.   I get

21    those confused.

22                MR. VLOEDMAN:   North Florida Reception

23         Center?

24                THE WITNESS:   Thank you.   Yes.   They

25         changed the name of it.   Yeah, I started there.
```

1          I was there for about four months.  Then I went

2          to Florida State Prison, then New River, and then

3          Lawtey.

4          BY MR. RUBIN:

5          Q       Okay.  And how long were you at Florida State

6     Prison?

7          A       10 -- a little over 10, 11 years.

8          Q       Did your title change at all while at Florida

9     State Prison?

10         A       Only on a temporary basis.

11         Q       What was that?

12         A       I was an acting supervisor for six months.

13         Q       During what time frame?

14         A       Just prior to July 17th.  I can't remember the

15    total time.  No, no, no.  I'm sorry.  It was before then.

16    My supervisor was out for six months and I was acting

17    supervisor at that time, but I can't remember the exact

18    time frame.

19         Q       Who was the supervisor who was out?

20         A       Verrell Martin.

21         Q       How do you spell Verrell?

22         A       V-e-r-r-e-l-l, I think.

23         Q       And what was the name of that position?

24         A       She was the supervisor.  I was an acting

25    supervisor while she was out.

1      A      The inmate -- we had a bout of flu over there,

2   and this particular inmate was still vomiting and having

3   diarrhea and was severely dehydrated.

4            The nursing staff was working with him to get

5   an IV in him the night before over at the work camp, and

6   I -- she decided to go ahead and have him transferred to

7   the clinic, and he didn't get transferred until my shift.

8      Q      Okay.  And do you recall when he was

9   transferred in?

10      A      10:30ish.

11      Q      Were there any inmates in the medical

12   department at the time you arrived there in the morning?

13      A      The one that they were getting ready to send

14   back down the hall with the use of force.

15      Q      And you said you don't recall that name?

16      A      I don't recall.

17      Q      And did you have any interaction with that

18   inmate?

19      A      I don't know.

20      Q      Okay.  And that was the only inmate that was at

21   medical when you got there?

22      A      I can't remember.

23      Q      All right.  Then continue.  Chronologically

24   what else do you recall happening?

25      A      If I had any in the infirmary I would have done

1    my vital signs on them.  If I didn't have any in the

2    infirmary I would have, I don't know, just kind of hung

3    out.

4        Q    Okay.  Wait for --

5        A    Wait for something.

6        Q    -- for something.  We talked about an infirmary

7    log.

8        A    Um-hum.

9        Q    Would that be the same type of log that would

10   contain the names of any patients that would have been

11   there that morning?

12       A    Yes.

13       Q    So what is the first thing that you can recall

14   happened on the 17th with regard to anything that you

15   participated in as you were waiting for something to

16   happen?

17            MR. POOLE:  Object to the form.

18            THE WITNESS:  I was waiting for the inmate

19       from the work camp.

20       BY MR. RUBIN:

21       Q    Okay.  And Frank Valdez was brought to the

22   clinic while you were waiting or was it after the inmate

23   had already arrived?

24       A    While I was waiting.

25       Q    Okay.  And where were you waiting specifically?

1    A      In the front of the clinic.

2    Q      Is there a name for the room?

3    A      Not really.

4    Q      Is there a formal emergency room?

5    A      Yes.

6    Q      And that is not the area that we're talking

7    about?

8    A      No.  We're talking about the area where we had

9    three desks where we would either -- we would take the

10   vital signs to get the inmates ready to see the doctor on

11   a daily basis.

12   Q      Okay.

13   A      I don't know what you call it.

14   Q      That would commonly be called a triage area?

15   A      Triage.  Maybe triage, yeah.

16   Q      Okay.  And tell me what you observed in terms

17   of Mr. Valdez being brought in and by whom.

18   A      I observed him being rolled up to the clinic on

19   a flatbed dolly.  I can't remember by who.  The catch

20   team.

21   Q      How many officers?

22   A      I can't remember.  Four, maybe, five.

23   Q      Were they still wearing their uniforms?

24   A      Yes.

25   Q      When you say that they rolled him up on a

1           MR. POOLE:  Object to the form.

2           THE WITNESS:  I have seen it happen before

3      with an inmate who was so heavy he couldn't fit

4      into a wheelchair or walk, yes.

5      BY MR. RUBIN:

6      Q       Okay.  Is that the only other occasion that you

7  saw this used?

8      A       That I saw it used, yes.

9      Q       Do you know of any other occasions where it was

10  used?  Did anybody ever tell you any other situations?

11     A       No.

12     Q       As Mr. Valdez was brought in on this cart,

13  could you see his face?

14     A       Slightly.

15     Q       Okay.  And were his eyes open?

16     A       His head was down, so -- and I didn't look at

17  him.  I did not examine him, so I don't know.

18     Q       Okay.  When you say head down, would you

19  describe what his -- what his body shape or configuration

20  was on this flat cart?

21     A       He was sitting on the flatbed cart with his

22  knees kind of under -- his feet under him sitting up with

23  his handcuffs behind his back with his head down, chin on

24  chest -- well, not really on the chest, but with his head

25  down.

1      Q      Was his body leaning on the handles that the

2   cart was pushed from?

3      A      No.

4      Q      So, to the best of your observation, he was

5   holding himself up in a sitting position?

6      A      Yes, sir.

7      Q      But you don't know whether his eyes were open.

8      A      No, sir.  I didn't look.

9      Q      Why didn't you look?

10      A      When he came in, I got up and went to the back

11   to tell the med techs that the inmate was here and to get

12   his chart.

13      Q      Okay.  What is the normal protocol for a nurse

14   once an inmate is brought after a use of force?  Was this

15   a use of force, to your knowledge?

16      A      Yes.

17      Q      Okay.  Had this happened -- these kinds of

18   things, other than the flatbed, I understand you'd only

19   seen that once before, but was this an unusual situation

20   where an inmate arrives with officers at the grill gate

21   after a use of force?

22      A      No.

23      Q      Okay.  And tell me, now, not specifically what

24   happened on the 17th, but tell me what the normal

25   procedure is or the protocol, once you would be in that

1    room waiting for something to happen that you need to

2    attend to, tell me what you normally do.

3        A    It depends on the situation.

4        Q    Okay.  What are the factors that make one

5    situation different from the next?

6        A    I would get up.  If I knew they were coming, I

7    would try to have the chart ready.  If I didn't know they

8    were coming, I would go get the chart or have -- if

9    somebody was there one of us would go get the chart.

10            I would let the staff who was going to take

11   care of him know he was there, because I was also waiting

12   on the work camp inmate.

13       Q    Okay.  Were you specifically assigned to this

14   work camp inmate?

15       A    Yes.

16       Q    Okay.  What is the registered nurse's

17   responsibilities after a use of force?

18       A    It depends upon the inmate.  It depends.

19       Q    Okay.  Well, you said --

20       A    If --

21       Q    I'm sorry.

22       A    If the med tech is seeing the inmate and feels

23   like they need an RN in there for further assistance, IVs,

24   "You might want to look at this and call the doctor,"

25   because only a registered nurse can take verbal orders

1    charge of the department?

2         A     It was a name they gave us, I guess, charge

3    nurse.  I was in charge of the people under me.

4         Q     Okay.  Were all of the people who were working

5    in the medical department working under you at that time?

6         A     I was responsible for making the final

7    decisions, I guess, calling doctors and things like that.

8         Q     Why did you decide to handle the other patient

9    who was on his way rather than Valdez?

10        A     Because I was -- I had treated him prior, a

11   couple of days before, I knew the severity of his

12   problem.

13              The nurse that was giving me report told me

14   that he was going to have to come over here, and I was

15   going to try to get an IV in him, they could not because

16   he was so dehydrated.  I just knew that he was an inmate

17   that needed my care.  Jimmie Burger could not do IVs.  I

18   was the only person there that could.

19        Q     Okay.  So you made the decision to take the

20   work camp prisoner.

21        A     Yes.

22        Q     And did you assign Valdez to Burger?

23        A     No.

24        Q     How was that decided?

25        A     He just did it.

1      after he left.

2          A      No.

3          Q      Did you clean that room at all that day?

4          A      No.  We had inmate runners to do that.

5          Q      Okay.  Did you have any other interaction with

6      any of the officers who had brought Valdez in prior to

7      Valdez leaving the medical department?

8          A      No.

9          Q      Did you have any discussions with anyone in the

10     medical department about Valdez?

11         A      Jimmie?  While he was there?

12         Q      While he was there.

13         A      No.

14         Q      Okay.  Did you have any conversations with

15     Mr. Burger after Valdez left?

16         A      Yes.

17         Q      And what was that conversation?

18         A      "How did he look?"

19         Q      And was that the exact question that you asked?

20         A      Yes.

21         Q      Is that a common question to ask?

22         A      Yes.

23         Q      And what did Burger say?

24         A      He had a couple of abrasions, a fat lip, some

25     dry blood.  I'm not sure what the whole -- that was the

1    gist of the conversation.  Nothing alarming.

2         Q    Okay.  If something had been alarming, what

3    would you have done?

4         A    Jimmie would have come to me, and if there was

5    something alarming, I probably would have gone down there

6    and followed up on it.  But there was nothing alarming.

7         Q    Okay.  Nothing that was conveyed to you.

8         A    Right, nothing that was conveyed to me.

9         Q    Okay.  At what point in time are vitals taken

10   from the time that an inmate gets there after use of

11   force?

12        A    Normally as soon as they get in there,

13   depending on the situation, again.

14        Q    Okay.  Is that ever done in the triage room?

15        A    It can be, yes.

16        Q    And what would require that or justify doing it

17   there?

18        A    The inmate didn't require going to the ER.

19        Q    Okay.  Did Mr. Valdez require going to the ER?

20        A    Yes.

21        Q    How do you know that?

22        A    Well, he had blood dripping down his nose.

23   That's where our supplies are to wash him off if we need

24   to.

25        Q    Okay.  And so any sign of blood would justify

1         hand fist type of beating, no.  It was a

2    statement I made.

3    BY MR. RUBIN:

4         Q    Okay.  So beat the shit out of a person means

5    tussling.  That's the way you're interpreting that.

6         A    It was a statement I made.

7         Q    Okay.  Did you report to anyone that you

8    thought that an inmate was beaten at or around the time

9    that you made the statement to -- you made the statement

10   with Rash and -- who else was in the room?

11        A    Burger.

12        Q    -- Burger in the room?

13        A    No.  Because Burger told me that he just had a

14   little bit of abrasion.  Pepper mace makes you look red.

15   Pepper mace does make -- you know, kind of puts a rash on

16   the body.

17             After I asked Jimmie what did he really look

18   like, and Burger told me that he just had some dry blood,

19   a fat lip, then I figured that statement was an incorrect

20   statement.

21        Q    All right.  Did you review Jimmie Burger's

22   emergency -- what's it called? -- the emergency room

23   record after he completed it?

24        A    Um-hum.

25        Q    And is the document that I've placed in front

1    of you, Exhibit No. 4, that same record?

2         A    Yes.

3         Q    If you could, let's go through it and you can

4    read what he wrote.  First of all, did you ever observe

5    Mr. Burger taking blood pressure?

6         A    No.

7         Q    Okay.  I'd like you to go through the form from

8    top to bottom and tell us what Mr. Burger wrote down.

9              MR. POOLE:  Object to the form.

10        Speculation.  First you need to ask whether she

11        knows what Burger wrote.

12             THE WITNESS:  I can read his writing.

13   BY MR. RUBIN:

14        Q    Go ahead.

15        A    It says "Valdez, Frank."  Race is white male.

16   DC number, date of birth, his age.  "Date and time,

17   7-17-99, 10:35, single, Christian, no allergies."

18        Q    Okay.  And stopping right there, do you know

19   whether any of that information is accurate or inaccurate?

20        A    I just know what I read.

21        Q    Okay.  The answer is no, you don't -- you can't

22   vouch for the accuracy of any of that.

23        A    I can't vouch for the accuracy, no.

24        Q    Okay.  And what was next?

25        A    It says, "I, the undersigned, a patient in

1    Q    And when did you find that out?

2    A    A long time after that.

3    Q    Okay.  So when you reviewed this --

4    A    I did not catch that at the time, no.

5    Q    You reviewed it and didn't catch it.

6    A    Right.

7    Q    That's a mistake on your part?

8    A    That's a mistake on my part.

9    Q    All right.  If that's accurate, then Valdez

10   could have been in respiratory distress at that time;

11   correct?

12   A    If it was three seconds, no.  If it was 10

13   seconds, yes.

14   Q    Okay.  Go ahead.

15   A    "Post use of force, Jimmie Burger.  Unable --

16   temperature, unable to take.  Pulse 92.  Respiration 24.

17   Blood pressure 118 over 82," which is -- a respiration of

18   24 is normal.  Blood pressure is normal.  Pulse is

19   normal.

20        If he was in any kind of respiratory distress

21   either his respiration would have been lower or he would

22   have -- Jimmie would have told me that he was having

23   trouble breathing.

24        "Mouth and nose cleaned with H2O," which is

25   hydrogen peroxide.  "Report further signs and symptoms."

1    on there.

2       Q     All right.  I'm not talking about this specific

3    report.  I'm asking if a person -- if an inmate has

4    nothing in his chart that would indicate an inability to

5    walk, and he's presented to the emergency room with a

6    condition whereby he was unable to walk on his own, would

7    that be something that you'd expect to be in the chart, to

8    go into the chart?

9       A     I don't know how to answer that question

10   because it depends upon the circumstances.  Brought up by

11   wheelchair doesn't mean he can't walk.  If he was a

12   paraplegic, of course.

13           Some people -- he could have put in there

14   brought up.  He didn't see how he was brought up, so he

15   didn't put it in there.  Some people do it, some people

16   don't.  I can't answer that question totally.

17      Q     Okay.

18      A     Would I?  I don't know.

19      Q     You saw no need to add to this chart that he

20   was brought up on a flatbed.

21      A     No.

22      Q     You saw no need to inquire whether or not he

23   was able to walk on his own.

24      A     I asked.

25      Q     You asked whom?

1      A       Captain Thornton.

2      Q       When did this happen?

3      A       At the very beginning.

4      Q       And what did he say?

5      A       "He refused to walk.  We weren't going to drag

6   him."

7      Q       Okay.  When did this conversation occur

8   specifically?

9      A       When he first came into the clinic on the

10   flatbed.

11      Q       Okay.  Was that when he was already inside the

12   grill gate?

13      A       Yes.

14      Q       Was this what you consider to be a conversation

15   or was this just a statement?

16      A       I didn't have a long conversation with him.  I

17   said, "Why did you bring him up on that?"

18              He said, "No wheelchair was available, he

19   refused to walk, this was the best thing we had

20   available."  That was the end of it.

21      Q       Okay.  Do you know how he left the clinic?

22      A       No.

23      Q       Was there a wheelchair available in the medical

24   department?

25      A       Yes.

1      Q     Did you at the time take all of the statements

2   of the security officers as truthful at their face value?

3      A     Which statements?

4      Q     All statements.  In other words, if a security

5   officer told you something, you would just accept that as

6   true without verification?

7      A     Yes.

8      Q     Okay.  So if an inmate is brought to you and

9   the officer says, "He won't walk," that's not something

10  that medical staff should verify whether he has the

11  ability to walk or not.

12          MR. POOLE:  Objection.  That wasn't her

13      testimony.

14          THE WITNESS:  He said he refused to walk.

15      BY MR. RUBIN:

16     Q     Right.  I understand that.

17     A     He didn't say he won't, he didn't say he

18  couldn't, he said he refused to walk.

19     Q     Refused to.  Did you verify that with the

20  patient?

21     A     No.

22     Q     Okay.  So you took Officer Thornton's statement

23  as truthful; correct?

24     A     Correct.

25     Q     So you received a phone call from Tim Thornton,

1       A       No.

2       Q       Okay.  Did you ever say that to anyone?

3       A       Yes.

4       Q       Who did you say that to?

5       A       Whoever asked me.  I think FDLE asked me once,

6   and I said no.

7       Q       You said no.

8       A       I said it was possible they could have, but I

9   never saw them.

10      Q       Okay.

11      A       Or to that effect.

12      Q       All right.  And after you put those copies in

13  those slots, what happened next in connection with the

14  Valdez matter?

15      A       I went about my business.

16      Q       Okay.  You thought that that matter was

17  finished and you were waiting for your next patient?

18      A       Yes.

19      Q       And what was the next thing that happened in

20  connection with Valdez?

21      A       I got a call sometime after 2:00 o'clock.

22      Q       And who was it?

23      A       Timmy Thornton.

24      Q       What did he say?

25      A       That Valdez is rolling off the bunk, has a

1   small cut on his head.  I said, "Do you want me to come

2   down and check him out?"

3           He said, "No.  It's for informational purposes

4   only."

5           I said, "Well, I've got to come down at 3:00

6   o'clock.  I'll check him out then."

7           He said, "Okay."

8   Q       Did you ask the size of the cut on the head?

9   A       No.  Well, I did tell him, you know, "Well, if

10  he's rolling off the bunk, why don't you put him on B wing

11  where there is no bed?"

12  Q       What did he say?

13  A       The cells were full.

14  Q       Did you ask him to bring him to medical so

15  you could put him in one of the cells in the medical

16  department?

17  A       At that time I didn't think it was necessary.

18  I was going to make that decision when I went down and saw

19  him.

20  Q       I thought you said earlier that the cells on B

21  wing were essentially used for the same purpose during the

22  week as the ones in medical?

23  A       (Nods head affirmatively).

24  Q       Yes?

25  A       Yes.

1       Q       So if you're suggesting that he put him into a

2   B cell wing, why don't you suggest that he put him into a

3   medical cell?

4           MR. POOLE:  Objection.  Asked and answered.

5       BY MR. RUBIN:

6       Q       After he replied that they're full, why didn't

7   you suggest that he put him into one that was empty in the

8   medical department?

9           MR. POOLE:  Objection.  Asked and

10          answered.

11          THE WITNESS:  Because the medical

12          department is for medical problems and psychology

13          problems, and I didn't think he had a medical

14          problem at that time.  When I went down to see

15          him, then I was going to make that decision.

16      BY MR. RUBIN:

17      Q       Okay.  A cut in a person's head is not a

18   medical problem to you?

19      A       Not one to warrant housing in the infirmary,

20   no.

21      Q       Okay.  Without knowing the size; correct?

22      A       Correct.

23      Q       Without knowing blood pressure?

24      A       Correct.

25      Q       Without knowing respiratory problems?

1        A        Correct.

2        Q        Okay.  **As a registered nurse**, are you familiar

3    with head traumas?

4        A        Yes.

5        Q        Are you **familiar with head traumas** leading to

6    respiratory problems?

7        A        Yes.

8        Q        When you **hear** that a **head trauma** has occurred,

9    isn't it the medically responsible **thing** to do to diagnose

10   on a timely basis **the nature of the head** trauma?

11               MR. POOLE:  Object to the **form**.

12               THE WITNESS:  Yes.  Thornton told me the

13       inmate stated he was okay, and I was going to go

14       down and evaluate him.

15       BY MR. RUBIN:

16       Q        Thornton stated --

17       A        He was okay.

18       Q        The inmate said he was okay.

19               MR. POOLE:  That's not what she said.

20               THE WITNESS:  The inmate stated he was

21       okay.

22       BY MR. RUBIN:

23       Q        Thornton stated that the inmate said that he

24   was okay.

25       A        Um-hum.

1       Q      What does this mean, for informational

2   purposes?

3       A      I don't know.

4       Q      Had you ever heard that term before?

5       A      No.

6       Q      Do you believe that you have a responsibility,

7   when you don't know information that's given to you about

8   harm coming to an inmate, that you should inquire as to

9   what's going on?

10              MR. POOLE:  Objection.  Speculation.

11              THE WITNESS:  I said I'd be down to check

12       him out.

13       BY MR. RUBIN:

14       Q      In an hour.

15       A      No.  When I come down at 3:00 o'clock rounds.

16   It was less than an hour.

17       Q      In about an hour; correct?

18       A      Approximately.

19       Q      Okay.  And you didn't understand what Thornton

20   meant when he said for informational purposes only --

21       A      Right.

22       Q      -- correct?

23       A      Correct.

24       Q      Don't you believe that in order to know what

25   was happening you had to take some further action at that

1          I wasn't sure -- you know, I took it, he said

2   he was okay.  I said, "I will be down."

3          He said, "That's fine."  So I went down

4   there.

5     Q     Isn't it true that you thought that the

6   officers beat the shit out of him on the first

7   presentation?

8          MR. POOLE:  Objection.  Asked and

9      answered.

10         MR. ELLIS:  Join.

11         THE WITNESS:  I made a statement.

12     BY MR. RUBIN:

13     Q     Okay.  And having thought that, and then

14   having -- and then receiving a phone call several hours

15   later that the inmate has a cut on his head, you did not

16   think it was important that an immediate assessment be

17   made?

18         MR. POOLE:  Objection.  Asked and

19      answered.

20         THE WITNESS:  No.

21     BY MR. RUBIN:

22     Q     At 3:00 o'clock, what did you do?

23     A     I was on my -- told the officer to get a walk

24   so I can go down the hallway.  We had to be escorted

25   everywhere in the institution.  We had to have a male

1    escort.

2              And when I told him I needed to walk down

3    there, that's when we got the phone call that they needed

4    medical on Q wing.

5        Q     And when you got there -- did you go to the

6    cell?

7        A     Yes.

8        Q     And what did you find?

9        A     They were performing CPR on an inmate.

10       Q     Let me show you what we'll mark as Exhibit 5, a

11   two-page emergency room record.  Actually, three pages

12   (handing document to counsel).

13              (The instrument last above referred to was

14              marked Plaintiff's Exhibit No. 5

15              for Identification.)

16              MR. POOLE:   (Handing document to witness).

17   BY MR. RUBIN:

18       Q     Do you recognize the document, Exhibit 5?

19       A     Yes.

20       Q     Who filled that out?

21       A     I did.

22       Q     When did you fill that out?

23       A     Shortly after Valdez left the clinic.

24       Q     Okay.  You have a time here at the top where

25   it says date and time.  Can you tell me what that time

1    came over to work that evening and I and whoever officers

2    were in the hallway because they were all there.

3         Q     Okay.  How long did it take you to get from

4    medical over to Q?

5         A     It's a quarter-of-a-mile walk, so it takes

6    anywhere from three to five minutes, I would think.  I

7    never timed it.  I don't know.

8         Q     Okay.  And in that walk do you have to pass

9    through gates?

10        A     Three gates, I think.  It's been a while since

11   I've been there.

12        Q     Okay.  Did anything unusual happen while you

13   were walking?

14        A     No.

15        Q     Any conversation that you can recall?

16        A     Yeah.  I was telling Helen, "This is B wing,

17   this is T wing, this is the gym."  I was showing her the

18   layout of the land as we were walking fastly down the

19   hall.

20        Q     At that time did you know that an inmate -- I

21   understand from the information that you wrote that you

22   were advised to bring a stretcher.

23        A     Um-hum.

24        Q     Were you advised at that time that the inmate

25   was not breathing?

1      I've seen uses of force in the clinic, yes.

2          Q      I'm talking about unprovoked violence.

3          A      No.

4          Q      Okay.

5                 MR. RUBIN:   I guess that's all the

6      questions I have right now.

7                 MR. POOLE:   I have a few.

8                        CROSS-EXAMINATION

9      BY MR. POOLE:

10         Q      Ms. McEarchern, with reference to July 17th,

11     1999, on that date how long had you known Jimmie Burger?

12         A      Off and on I'd say roughly eight years or so.

13     He was there when I first started at FSP, he left for

14     several years, then he came back.

15         Q      So he was working there at Florida State Prison

16     when you began working there?

17         A      I believe so, yeah.

18         Q      Had you had an opportunity, in your position as

19     an RN at FSP, to observe Mr. Burger's work and make any

20     assessments as to his skills as a licensed practical

21     nurse?

22         A      All the time.

23         Q      And based upon your review of Mr. Burger's work

24     as of July 17th, 1999, did you have a personal opinion as

25     to the quality of his work?

1      A      Personal opinion.

2      Q      Yes.

3      A      He was able to handle it.

4      Q      And as to the quality of his work, what was

5  your opinion?

6      A      Very good.  Very thorough.

7      Q      Were you aware -- do you recall, as you're

8  sitting here today, at least, of any problems with the

9  quality of Mr. Burger's work as an LPN prior to July 17th,

10  1999?

11      A      No.

12      Q      As of July 17th, 1999, had you had any reason

13  to question in the past whether Mr. Burger was capable of

14  providing a post use of force examination to an inmate?

15      A      Question his ability?

16      Q      Yes.

17      A      No.

18      Q      Were you aware of any instances in the past

19  in which Mr. Burger had rendered inadequate care to an

20  inmate?

21      A      No.

22      Q      On July 17th, 1999, when Mr. Valdez was brought

23  to the clinic that morning for an examination, did you

24  have any reason to believe that day that Jimmie Burger was

25  either incapable or unwilling to provide a post use of

1    force examination on Mr. Valdez?

2        A    No.   Fully capable.

3        Q    Did you have any reason to question on that day

4    for any reason Mr. Burger's ability to provide an adequate

5    post use of force examination on Mr. Valdez?

6        A    No.

7        Q    During that visit to the clinic or between then

8    and 2:00 o'clock -- I think you testified that Mr. Burger

9    left work that day at 2:00 p.m.?

10       A    Somewhere around 2:00.   They leave about 2:00,

11   right.

12       Q    Did he ever, during that time frame, express to

13   you an opinion that Frank Valdez was in bad medical shape

14   and needed attention?

15       A    No.

16       Q    As of July 17th, 1999, how long had you known

17   Timothy Thornton?

18       A    I only knew him as an officer that became a

19   sergeant that became -- I mean, I've known him through

20   work.  I didn't know him personally.  I just knew him at

21   work.

22            How long I've known him, I don't know.  I

23   didn't really associate with him.  I just knew him and him

24   in sergeant status and then when he got his captain's

25   bars, you know, and stuff like that.

1            Plus, he also liked to go drinking with my

2    ex-husband off and on.  So I knew of him.  I knew him, but

3    I didn't know him personally.

4        Q    When he called you after 2:00 o'clock on

5    July 17th, 1999 and reported that Mr. Valdez was rolling

6    off the bunk, based upon the sound of his voice, was it

7    your impression that there was an emergency going on on

8    the next wing involving Frank Valdez?

9        A    No.  Totally calm.

10       Q    Did he to you seem to be alarmed about the

11   condition of Frank Valdez at that point?

12       A    No.

13       Q    And he told you at that point that Frank Valdez

14   had a small cut on his forehead?

15       A    Correct.

16       Q    Now, let's talk about that period of time when

17   you got that call.  Were there any other nurses -- well,

18   first of all, were there any medical doctors on staff and

19   working at FSP at that point in time?

20       A    What do you mean?  That day or being on staff?

21       Q    We're talking about when Captain Thornton

22   called you, at that point in time were there any medical

23   doctors at FSP in the medical clinic?

24       A    No.

25       Q    Were there any other registered nurses working

1    at that point in time at Florida State Prison?

2        A    No.

3        Q    And, again, just to make sure we're talking

4    about -- I'm not talking about that month, that week, that

5    day, I'm talking about when you got that call.

6        A    I was the only one there, only registered nurse

7    there.

8        Q    Were there any other LPNs or any LPNs who were

9    present in the clinic at that point?

10       A    No.

11       Q    Aside from you were there any other nurses in

12   the clinic at that point in time?

13       A    Rogers Long, he's a CMTC.

14       Q    A CMTC.  And that's a --

15       A    Certified medical tech certified or

16   correctional medical tech certified.

17       Q    Was Rogers Long permitted or able to

18   administer, let's say, IVs or injections?

19       A    No.

20       Q    Did you have a scheduled -- on that day, that

21   afternoon, a scheduled round to administer insulin

22   injections?

23       A    Yes.

24       Q    Was that a typical everyday thing?

25       A    Every day.

1      Q      And what time was that scheduled to take place?

2      A      They called it the 3:00 o'clock insulin.

3   Around 3:00ish.  It could have been a quarter after -- a

4   quarter before, a quarter after, but usually around

5   3:00 o'clock we headed down the hall and did the insulins

6   because they started eating at about 4:00 or 4:30.

7      Q      You said Rogers Long was there.  Would he have

8   been able to give insulin injections?

9      A      No.

10     Q      Were they, in fact, injections?

11     A      They were injections, yes.  Insulin is only an

12  injection.

13     Q      So at 2:00 o'clock when you got -- you know,

14  after 2:00 o'clock when you got this call from

15  Captain Thornton, were you the only person on staff

16  present at FSP who was authorized to administer

17  injections?

18     A      Yes.

19     Q      And I'm not, you know, a medical doctor or a

20  nurse, but what is -- describe for me, just briefly, if

21  you will, why you have to give insulin -- I assume you

22  give them to diabetics?

23     A      Diabetics, right.

24     Q      And what's the purpose of those insulin

25  injections?

1        Q        And let's talk about that, about what, if

2    anything, you may know about cell extractions.  You

3    mentioned that a cell extraction team came in.  First of

4    all, you know, did -- I think you mentioned a dolly.

5        A        Um-hum.

6        Q        How were the catch team or the extraction team

7    members dressed when you saw them that morning?

8        A        In their brown suits that they wear when they

9    go in on a -- suits, big, heavy, thick suits, thick gloves

10   and helmets.

11       Q        And is the clinic or any part of FSP, the

12   prison proper itself, is that air conditioned?

13       A        The clinic is, the control room is and the

14   colonel's office is that I know of, yeah.

15       Q        Was X wing air conditioned at that time?

16       A        No.  None of the wings are air conditioned.

17   They just have big ceiling fans.

18       Q        And the route between X wing and the medical

19   department, at that point in time was that air

20   conditioned?

21       A        No.  They have fans.

22       Q        How would you describe the weather conditions

23   that day in terms of temperature?  Personally to you.

24       A        Hot.  July 17th.  I can't remember, but

25   July 17th is a hot month.  It is hot on those wings.  I've

1       seen temperatures climb up to 110 on those wings.  I've

2       actually seen a thermometer with that.  So it's actually

3       hot and muggy on the wings.

4            Q       Prior to July 17th, 1999, did you ever have

5       any reason to doubt the accuracy of anything that

6       Captain Thornton told you about inmates to the extent you

7       had any conversation with him about any?

8                   Did you ever have any reason to doubt his

9       honesty or his accuracy in relaying information to you?

10           A       No.

11           Q       Did you, during the time that you talked to him

12      a little after 2:00 o'clock that day, did you believe,

13      based on your conversation, and in light of what you

14      had seen earlier that morning, did you think that he,

15      Mr. Valdez, was in bad shape and in need of, you know,

16      immediate medical care?

17           A       That morning or that afternoon?

18           Q       At the time you talked to Captain Thornton that

19      afternoon.

20           A       That afternoon?  No.

21           Q       You testified about, you know, whether you've

22      treated inmates who had injured themselves before and what

23      types of injuries.  Have you ever treated an inmate who

24      swallowed a pen?

25           A       Oh, yes.

1        A      Right.

2        Q      That documents the second emergency room visit

3    on July 17, 1999 in detail.

4        A      Right.

5        Q      So if we look at his medical record as a whole,

6    you've got three-page documentation of that second visit

7    by Mr. Valdez; don't you?

8        A      Right.

9        Q      Okay.  You were shown initially some

10   guidelines, some health services bulletins relating to the

11   suicide and self-injury prevention.  Do you recall that?

12       A      Right.

13       Q      Under "General Considerations" for those, do

14   you see where it says, "The guidelines herein are not

15   exhaustive and should serve only as a foundation on which

16   the sound clinical judgment of the responsible mental

17   health or medical professional is based"?

18       A      Right.

19       Q      Do you understand that what this document,

20   Exhibit No. A, is is this is basically some guidelines to

21   assist you in rendering your clinical judgment when faced

22   with a medical situation?

23              MR. RUBIN:  Object to the form.

24              THE WITNESS:  Right.

25          BY MR. VLOEDMAN:

000009 SEP 2 99

## STATE OF FLORIDA
## DEPARTMENT OF CORRECTIONS
## EMERGENCY ROOM RECORD

| P. (Last, First, Middle) Valdes, Frank | RACE/SEX W/M | NUMBER 072791 | DOB 10/28/62 | AGE 36 |
|---|---|---|---|---|
| DATE/TIME 7/17/99   1035 | MARITAL STATUS Single | RELIGION Christian | ALLERGIES NKA | |

### AUTHORIZATION FOR HEALTH CARE SERVICES AND ANESTHESIA

I the undersigned, a patient in this health care facility, have had explained to me and understand the nature of my condition.
I hereby authorize _FSP Medical Staff_
(and whomever he may designate as his assistants) to administer such treatment as is necessary, and to perform the following health care service: _Evaluation and treatment_

and such additional health care services as are considered necessary on the basis of findings during the course of said health care service. I also consent to the administration of such anesthesia as are necessary, with the exception of _Local_ . Any tissue or parts surgically removed may be disposed of by the facility in accordance with accustomed practice. I hereby certify that I have read and fully understand the above Authorization for Health Care Services and Anesthesia, the reasons why the above named health care service is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by _Medical Staff_
I also certify that no guarantee of assurance has been made as to the results that may be obtained.

Signature of Patient _Refused to Sign (Headcuffed in bed)_   Date _7/17/99_   Time _1030_   A.M./P.M.
Signed for Patient by _J. BURGER, SR. LPN_   Relationship ___   Date ___   Time ___   A.M./P.M.
Witnesses _FLORIDA STATE PRISON_   Reason Patient cannot sign ___

### BRIEF HISTORY _Post Use of Force_

IF ACCIDENT, STATE WHERE, WHEN AND HOW INJURED; IF ILLNESS DESCRIBE:
S: Pt in clinic, bleeding D/C'd apparent.

1: Dry blood noted to lower mouth - current active bleed.
2: Superficial abrasion noted to lip - bleeding D/C. Abrasion appears inside lip - for Dr. Reordirden noted to R side abrasion, R swollen - swelling noted to R swollen. Swallow reflex to child labs 72 teeth.
A: Post Use of Force   _J. BURGER, SR. LPN_   FLORIDA STATE PRISON

### PHYSICIAN'S REPORT

| CONDITION ON ADMISSION | GOOD ☐ | FAIR ☒ | POOR ☐ | SHOCK ☐ | BLEEDING ☒ | COMA ☐ |
|---|---|---|---|---|---|---|

TEMPERATURE: _unable to take_   PULSE 92   RESPIRATION 24   BLOOD PRESSURE 118/82
TREATMENT:
P: 1) Mouth/nose cleaned ē H₂O₂.
E: 1) Report further s/s PRN.

_100 Dr. Edwards notified_

DIAGNOSIS: _Post Use of Force_
POSITION: RN
PHYSICIAN'S SIGNATURE   _J. BURGER, SR. LPN_   FLORIDA STATE PRISON   DATE/TIME 7/17/99   1035

PLAINTIFF'S EXHIBIT No. 4 5/13/04 McArcher

DISTRIBUTION:  WHITE—HEALTH RECORD
CANARY—EMERGENCY ROOM

Ex. 4

# DIAGRAM OF INJURY



000010 SEP 24 99

FRONT          RIGHT     LEFT          REAR

TYPE OF INJURY _Abrasion /_

DATE OF INJURY _7/17/99_          TIME OF INJURY _1035_

EMERGENCY ROOM FORM COMPLETED          (YES)          NO

EMERGENCY ROOM FORM SIGNED BY INMATE          YES          (NO)

DOCTOR'S SIGNATURE                                DATE

NAME _Valdez, Frank_          NUMBER _62279 1_          C/S _W/m_

000007 SEP 24 99

### STATE OF FLORIDA
### DEPARTMENT OF CORRECTIONS
### EMERGENCY ROOM RECORD

| NAME (Last, First, Middle) | | RACE/SEX | NUMBER | DOB | AGE |
|---|---|---|---|---|---|
| Valle   Frank | | W/M | 672791 | 10/28/62 | 37 |
| DATE/TIME 7/17/99 | 1505 | MARITAL STATUS | RELIGION | ALLERGIES | |

## AUTHORIZATION FOR HEALTH CARE SERVICES AND ANESTHESIA

I the undersigned, a patient in this health care facility, have had explained to me and understand the nature of my condition.
I hereby authorize _____
(and whomever he may designate as his assistants) to administer such treatment as is necessary, and to perform the following health care service:

and such additional health care services as are considered necessary on the basis of findings during the course of said health care service. I also consent to the administration of such anesthesia as are necessary, with the exception of _____  Any tissue or parts surgically removed may be disposed of by the facility in accordance with accustomed practice. I hereby certify that I have read and fully understand the above Authorization for Health Care Services and Anesthesia, the reasons why the above named healthcare service is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by _____   I also certify that no guarantee of assurance has been made as to the results that may be obtained.

Signature of Patient _____   Date 7/17/99   Time 1505   A.M. P.M.

Signed for Patient by _____   Relationship _____   Date _____   Time _____   A.M. P.M.

Witness _____   Reason Patient cannot sign _____ CPR

## BRIEF HISTORY

IF ACCIDENT, STATE WHERE, WHEN AND HOW INJURED, IF ILLNESS DESCRIBE:

Approx 1505 - received call med needed on X-wing to Streachen Inop - open. arrival to wing CPR was in progress + inmate was transported to medical streachen + transported to Central room. Called Bell Rescue CPR in progress

SIGNATURE

## PHYSICIAN'S REPORT

| CONDITION ON ADMISSION | GOOD ☐ | FAIR ☐ | SHOCK ☐ | BLEEDING ☐ | | COMA ☐ |
|---|---|---|---|---|---|---|
| TEMPERATURE | PULSE none | | RESPIRATION | | BLOOD PRSSURE | |

TREATMENT:
To clinic c CPR still in progress, all the way. Inmate placed on back board w/ ER streachen + monitor leads attached. Inmate showed asystoli CPR resumed IV of NS started in Lt anticubical c 16 guage needle - Bld/rx. Dr Edwards contacted for orders - Dr Seldon contacted also Dr Edwards stated to continue CPR till Rescue got here - EKG w/ pulse was done, periodically. Still asystoli CPR was in continuous progress ➝ error 1580 - Rescue arrived on seen shown

DIAGNOSIS:

DISPOSITION:

PHYSICIAN'S SIGNATURE _____   D. MCFARCHERN, SRA   FLORIDA STATE PRISON   DATE/TIME 7/17/99

PLAINTIFF'S EXHIBIT
No. 5   5/11/04
McFARCHERN

Ex. 5

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**
**EMERGENCY ROOM RECORD**

000009 SEP 2 99

| NAME (Last, First, Middle) | Valdez Frank | RACE/SEX W/M | NUMBER 082791 | DOB 10/28/62 | AGE 36 |
| DATE/TIME 7/17/99 | 1505 | MARITAL STATUS | RELIGION | ALLERGIES NKA | |

## AUTHORIZATION FOR HEALTH CARE SERVICES AND ANESTHESIA

I the undersigned, a patient in this health care facility, have had explained to me and understand the nature of my condition.
I hereby authorize
(and whomever he may designate as his assistants) to administer such treatment as is necessary, and to perform the following health care service:

and such additional health care services as are considered necessary on the basis of findings during the course of said health care service. I also consent to the administration of such anesthesia as are necessary, with the exception of _____ Any tissue or parts surgically removed may be disposed of by the facility in accordance with accustomed practice. I hereby certify that I have read and fully understand the above Authorization for Health Care Services and Anesthesia, the reasons why the above named healthcare service is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by _____ I also certify that no guarantee of assurance has been made as to the results that may be obtained.

Signature of Patient _____ Date _____ Time _____ A.M. P.M.

Signed for Patient by _____ Relationship _____ Date _____ Time _____ A.M. P.M.

Witness _____ Reason Patient cannot sign _____

## BRIEF HISTORY
IF ACCIDENT, STATE WHERE, WHEN AND HOW INJURED, IF ILLNESS DESCRIBE:

SIGNATURE

## PHYSICIAN'S REPORT

| CONDITION ON ADMISSION | GOOD ☐ | FAIR ☐ | SHOCK ☐ | BLEEDING ☐ | COMA ☐ |
| TEMPERATURE | PULSE | | RESPIRATION | | BLOOD PRESSURE |

TREATMENT: [handwritten, largely illegible]

DIAGNOSIS: [handwritten, largely illegible]

PHYSICIAN'S SIGNATURE [signature]   D. MCEACHERN, SR.   FLORIDA STATE PRISON   DATE/TIME 7/17/99 1700

# DIAGRAM OF INJURY



*Swelly*

*bruising & abrasions*

000008 SEP 2 99

FRONT        RIGHT    LEFT        REAR

TYPE OF INJURY _____

DATE OF INJURY ___ *7/17/95* ___    TIME OF INJURY _____

EMERGENCY ROOM FORM COMPLETED    (YES)    NO

EMERGENCY ROOM FORM SIGNED BY INMATE    YES    (NO)

DOCTOR'S SIGNATURE _____    DATE _____

NAME *Voldly Crank* NUMBER *073791* ___ C/S _____

OC4 708   (4 83)

**3**

1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                   JACKSONVILLE DIVISION
3                        CASE NO.:  3:01-cv-799-J32HTS

4   MARIO VALDES, INDIVIDUALLY, AND AS
    PERSONAL REPRESENTATIVE OF THE ESTATE
5   OF JOY FRANCIS "FRANK" VALDES,                **Certified**
6           Plaintiff,                            **Copy**

7   ' vs.

8   JAMES V. CROSBY, JR., A.D. THORNTON, TIM GIEBEIG,
    RONNIE WHITE, CHARLES SHOCKLEY, TIMOTHY A. THORNTON,
    JASON PATRICK GRIFFIS, DEWEY BECK, CHARLES BROWN,
9   ROBERT SAULS, MONTREZ LUCAS, ANDREW LEWIS, DONALD
    STANFORD, JIMMIE BURGER, DENISE McEACHERN, ROBIN
10  RASH, MARY HUDNALL, and RAYMOND HANSON, each in
    his/her individual capacity,

11

12          Defendants.

        * * * * * * * * * * * * * * * * * * * * * * * * *
13

    DEPOSITION OF:        ROBIN RASH
14

    DATE TAKEN:           MONDAY, MAY 17, 2004
15

    TIME:                 1:00 P.M. to 3:00 P.M.
16

    PLACE:                CLAY COUNTY COURTHOUSE
17                        GREEN COVE SPRINGS, FLORIDA
18  REPORTED BY:          SHERRIE W. SMITH, RPR-CP
                          Court Reporter and Notary Public
19

20      * * * * * * * * * * * * * * * * * * * * * * * * *
21

            ST. AUGUSTINE COURT REPORTERS
22     1510 North Ponce de Leon Boulevard, Suite A
            St. Augustine, Florida  32084
23                   904-825-0570

24
25

**All Florida Reporting, Inc.**
**800-898-7373**

1      Q    Okay.  Did they cover the same territory or

2  new territories?

3      A    Basically the same.  It all circled around

4  July 17th, or whatever it was.

5      Q    Okay.  I'd like to ask you some general

6  questions about procedure in the medical department.

7  You did work at the medical department in the Florida

8  State Prison?

9      A    Yes, I did.

10     Q    What was your specific title or capacity?

11     A    Senior Licensed Practical Nurse.

12     Q    And what are the general roles of an LPN?

13     A    At FSP at the time was medications and

14  evaluation and treatment of inmates to the limit of

15  our license.

16     Q    And if there's something that is requiring

17  more than what is permitted under your licensure, then

18  you would notify either an RN or physician?

19     A    Yes.

20     Q    Part of the responsibility of an LPN is to

21  accurately document what you see?

22     A    Yes.

23     Q    Okay.  And that would go for what you

24  physically see, as well as the other pertinent

25  information, like the time that you're doing the

```
 1        Q      Okay.  And then what?

 2        A      Walked down the hallway, passed by the ER

 3   and seen Jimmy Burger evaluating Inmate Valdes.

 4        Q      Did you know who Valdes was at that time?

 5        A      Yes.

 6        Q      How did you know him?

 7        A      As an inmate at FSP.

 8        Q      Had you seen him before on medical?

 9        A      And down on the wing.

10        Q      And on the wing.  Okay.  So you did rounds?

11        A      Daily.  It was part of my job duties.

12        Q      Okay.  And was the door of the ER open?

13        A      The door was open.

14        Q      And tell us or describe for us what you can

15   recall in passing by the ER.

16        A      I stopped at the doorway, saw Inmate Valdes

17   sitting up on the examination table facing the wall or

18   Burger, which would have been my right if I was facing

19   into the doorway.

20        Q      Burger was facing toward which way?

21        A      Valdes would have been facing left.  Facing

22   Valdes.  Valdes was sitting on the examination table.

23        Q      Okay.  Was he sitting with his legs hanging

24   over?

25        A      Yes.
```

1          Q     Okay.  Were -- to the best of your

2    recollection, anyone have their hands on Valdes?

3          A     No, he was sitting up on his own.

4          Q     Okay.  Do you recall whether he had any kind

5    of restraints on his body?

6          A     Offhand recall, actually, no.  I would

7    assume, because of prior experience, he had cuffs on.

8          Q     Okay.  But you don't recall either way?

9          A     (Witness shaking head.)

10         Q     You have to answer audibly.

11         A     Okay.

12         Q     Your last answer was a no, you don't recall

13   specifically?

14         A     No, offhand, specifically, I don't recall.

15         Q     And what was Burger doing?

16         A     Evaluating him.

17         Q     Can you tell us what physically he was doing

18   in that evaluation?

19         A     At that time he was doing an assessment of

20   Valdes' injuries.

21         Q     Okay.  And do you recall if he was speaking

22   to him or had a stethoscope or, I mean, what --

23         A     I don't recall.

24         Q     -- in the evaluation process, what -- does

25   your memory --

1      A      For a limited time.  I noticed that he was

2   conscious and sitting up on his own, did not appear to

3   have trouble breathing.

4      Q      What about his breathing pattern told you

5   that?

6      A      No audible sound, three to five second

7   observation, did not appear to be in any distress.

8      Q      Again, going to not necessarily this

9   particular day, but just in general in terms of

10  nursing duties, if an inmate is moaning and groaning

11  as if they're in pain, what does that tell you or what

12  are you required to do?

13              MR. POOLE:  Objection, speculation.

14              THE WITNESS:  I'm not quite sure I

15          understand your question.

16  BY MR. RUBIN:

17     Q      If an inmate is moaning and groaning --

18     A      Yes.

19     Q      -- and you think that it may be associated

20  with pain, what is the responsibility of the nurse

21  under those circumstances?

22              MR. POOLE:  Same objection.  Objection to

23          form.

24              THE WITNESS:  I can respond to an inmate

25          complaint of something and do an evaluation.

1      Q      Okay.   In that kind of a referral when

2    there's known head trauma, is there any leeway for

3    time delay under those circumstances?

4      A      It would depend on the trauma you're

5    discussing.

6      Q      Okay.   First step would be to determine the

7    extent of the head trauma, correct?

8      A      Yes.

9      Q      And by assessing the extent of the head

10   trauma, then one could determine whether the action is

11   that is required is required to be either emergent or

12   non-emergent, correct?

13           MR. POOLE:   Object to the form.

14           THE WITNESS:   With your assessment would

15       come the degree of what you would need to

16       respond.

17   BY MR. RUBIN:

18      Q      Did you notice any injuries on Valdes when

19   you were looking at him for that three to five

20   seconds?

21      A      I had a right profile shot.   The injuries I

22   observed were some swelling to the outside of his

23   right eye, swelling to his lips and some scratches,

24   abrasions on his right neck shoulder area.

25      Q      Abrasions, right shoulder?   Is that what you

```
 1              MR. POOLE:  Objection, asked and answered.
 2    BY MR. RUBIN:
 3        Q    As accurately as possible?
 4              MR. POOLE:  Same objection.
 5              THE WITNESS:  If it can be drawn on the
 6    diagram and not a speculative injury.  A lot of
 7    times in doing an evaluation, you can put down
 8    possible -- it is possible that -- possible can't
 9    get transcribed.  You cannot physically see it.
10    BY MR. RUBIN:
11        Q    But what you can physically see --
12        A    What you can physically see, if it can be
13    diagramed, you'd put on the diagram of injury.
14        Q    All right.  What did you do -- did you see
15    anything else in the room where Valdes was on the 17th
16    that we haven't discussed?
17        A    No.
18        Q    Do you recall anything else?
19        A    No.
20        Q    What did you do after you left that doorway
21    area?
22        A    Put lunch down and started doing
23    post-use-of-force physicals on the correctional
24    officers.
25        Q    And is there any particular order that is
```

1    determined when you're seeing officers?

2         A    No.

3         Q    Okay.  Were these standard post-use-of-force

4    examinations?

5         A    Yes.

6         Q    And do you have any idea what the purpose of

7    these examinations are?

8         A    I assume workmen's comp forms.

9              MR. POOLE:  Don't -- don't assume.  If you

10        know the answer.

11             THE WITNESS:  Okay.  I -- I do not know.

12   BY MR. RUBIN:

13        Q    Do you recall who you examined first?

14        A    I believe it was Hanson.

15        Q    And was he in an extraction uniform?

16        A    Various stages, they all were, but yes.

17        Q    "Various stages" meaning?

18        A    It's hot, it's July and in FSP there is no

19   air condition.  Although there is in the clinic, it

20   worked sporadically.

21             He had been part of the catch team.  He had

22   part of the uniform on.  How much he still had on at

23   that point, I do not remember.

24        Q    Okay.  Did you observe any injuries on

25   Mr. Hanson?

1    So he said, "I don't remember line by line,"

2    or something to that effect and I asked him to

3    locate where the inaccuracy is.

4    MR. POOLE:  Keep going.

5    MR. RUBIN:  While you're doing that you come

6    across anything inaccurate, you can let us know.

7    MR. POOLE:  I know he noted one thing have

8    you seen anything else that you consider

9    inaccurate thus far.

10    THE WITNESS:  The phone number and area code

11    has changed.

12    MR. POOLE:  As far as that, is that the

13    substance of as far as the substance of this?

14    THE WITNESS:  Yes.

15    MR. POOLE:  Okay.

16    A    Page 15, the answer and time is a little

17    off, because I didn't see him at 10:00 o'clock.  It

18    was more -- more closer to 10:45, 10:50.  It says

19    10:00.

20    Q    And how do you know it was closer to 10:45

21    than 10:00 o'clock?

22    A    Because I didn't even start the one use of

23    force on Hanson until, according to the time I've got

24    on it, 10:50.

25    Q    How do you know the time is accurate on

1    recollection now?

2          A    Once again, this was something that happened

3    five years ago.

4          Q    Right.

5          A    The conversations of that day and every

6    day -- or after that have ran together.

7          Q    Okay.

8               MR. RUBIN:  I have no further questions.

9          Let me express my apology for making you come out

10         here a second time.  On that previous occasion

11         certainly didn't, you know, intend to cause you

12         any inconvenience with your family situation.

13              MR. POOLE:  I just have a few questions.

14         Does anybody else have any questions on the

15         phone?

16              MS. STREET:  I don't.  Thanks, Ray.

17              MR. FITZPATRICK:  I don't have any right

18         now, unless you raise something that will change

19         my mind.

20              MR. POOLE:  Okay.  Let me just ask you a few

21         questions, Mr. Rash, and I'll try to keep this

22         brief.

23                      CROSS-EXAMINATION

24    BY MR. POOLE:

25          Q    Mr. Rubin asked you about Health Services

1    Bulletins --

2        A    Uh-huh.

3        Q    -- and other written policies that were in

4    place at the Department of Corrections, --

5        A    Uh-huh.

6        Q    -- either institutional or otherwise during

7    July 1999.  Did those -- in your opinion, did those

8    permit, those policies permit health care

9    practitioners to still exercise discretion in the

10   performance of their duties?

11       A    There was a level of discretion --

12       Q    So, for example --

13       A    -- afforded to them.  Basically, there had

14   to be because of the fact that they changed rapidly.

15   I consistently changed --

16       Q    Okay.

17       A    The changes were anything from subtle to

18   drastic.

19       Q    So, for example, the timeframe that you had

20   to respond -- let's assume that -- and, again,

21   Mr. Rubin asked about calls from security.  Assuming

22   you got a call from security reporting an injury of

23   some sort to an inmate, under the policies or Health

24   Services Bulletins, were you given discretion,

25   depending on the situation, as to the appropriate

1    response time to those particular reports?

2        A    I honestly can't say if it was under the

3    HSBs or not.   It would be a common sense judgment

4    thing.

5            The calls we received in the clinic from

6    security were anything from what was called

7    self-declared medical emergency by the inmate, which

8    we did have to respond to; however, the response, once

9    again, would be situational dictate.

10           This inmate is declaring a medical

11   emergency -- and I'm not exaggerating -- this inmate's

12   declaring a medical emergency because he's got a

13   pimple on his butt.  Because the inmate said the magic

14   words "medical emergency," or self-declared, we had to

15   respond.

16           However, we're not going to break out a

17   trauma bag and a stretcher and go running down the

18   hallway.  That could have done -- been done any time

19   during that day.

20       Q    So -- so you were permitted to use your

21   professional judgment in determining what the

22   appropriate response time would be under the

23   circumstances?

24       A    Yes.

25       Q    Mr. Rubin asked you about head trauma,

**4**

1               UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                  JACKSONVILLE DIVISION

4

MARIO VALDES, INDIVIDUALLY,        )   Case No.
5  AND AS PERSONAL REPRESENTATIVE     )   3:01-cv-799-J32HTS
   OF THE ESTATE OF JOY FRANCIS       )
6  "FRANK" VALDES,                    )
                                      )
7          Plaintiff,                 )
                                      )
8  vs.                                )
                                      )
9  JAMES V. CROSBY JR., A.D.          )
   THORNTON, TIM GIEBEIG, RONNIE      )
10 WHITE, CHARLES SHOCKLEY,           )
   TIMOTHY A. THORNTON, JASON         )
11 PATRICK GRIFFIS, DEWEY BECK,       )
   CHARLES BROWN, ROBERT SAULS,       )
12 MONTREZ LUCAS, ANDREW LEWIS,       )
   DONALD STANFORD, JIMMIE BURGER,    )
13 DENISE MCEACHERN, ROBIN RASH,      )
   MARY HUDNALL, and RAYMON HANSON,   )
14 each in his/her individual         )
   capacity,                          )
15                                    )
           Defendants.                )
16 ─────────────────────────────────  )

17

18

       VIDEOTAPED DEPOSITION OF RAYMON C. HANSON
19
                 Chandler, Arizona
20
              Thursday, May 27, 2004
21

22

23 Reported by:
   SUE ELLEN WIGGINS
24 CA CSR No. 7736
   AZ CCR No. 50686
25 JOB No. AZ2445A

RECEIVED

JUN - 7 2004

Constangy Brooks & Smith, LLC
Attorneys at Law

COPY

1    then you became a regular correctional officer?

2        A.    Yes.

3        Q.    The training that you had, was that done at a

4    place called CTI?

5        A.    Yes.

6        Q.    Is that part of Lake City Community College?

7        A.    Yes, sir.

8        Q.    And do you recall if you were trained at all

9    by a man by the name of Montrez Lucas?

10       A.    I don't believe so, no.

11       Q.    Okay.  How many training instructors did you

12   have?

13       A.    I cannot recall, sir.

14       Q.    Okay.

15             In the year 1999, you were still employed by

16   the Department of Corrections at Florida State Prison?

17       A.    Yes, sir.

18       Q.    And what was your position at that time?

19       A.    Correction officer, CO1.

20       Q.    And what was your assignment during the

21   summer months of 1999?

22       A.    I don't understand the question, sir.  I was

23   a correction officer.  A relief officer?

24       Q.    Relief officer.  And what does a relief

25   officer do?

1    A.    No, sir.  Not that much, no.

2    Q.    Not that much.  But did you know who he was?

3    A.    I knew he was a new sergeant to FSP.

4    Q.    Okay.  What I'm asking, at that time, if you

5    saw him, would you recognize him --

6    A.    Yes, sir.  Yes.

7    Q.    -- and know his name?

8    A.    Yes.

9    Q.    Okay.  Were you contacted by any of the

10   officers who we've just discussed on July the 19th with

11   regard to Frank Valdes?

12   A.    Sergeant Griffis.

13   Q.    And what was that contact?

14   A.    He opened up the king door and told me to go

15   suit up for a cell extraction.

16   Q.    And what did you do?

17   A.    Passed my keys off to the other wing officer

18   and went and suited up.

19   Q.    And would you tell us, what is a cell

20   extraction, and what do you do to suit up?

21   A.    Cell extraction is when an inmate refuses to

22   cuff up or to -- won't admit to handcuffing procedures

23   and is forcefully extracted from his cell.

24         To suit up, you put on protective gear,

25   different uniform, a helmet, shield, gloves, anything to

1    protect oneself.

2            MR. RUBIN:   Let me show you two photographs

3    that we'll mark as Exhibits Number 1 and Number 2 for

4    this deposition.

5            (Deposition Exhibit Numbers 1 and 2 were

6    marked for identification.)

7    BY MR. RUBIN:

8        Q.    Handing you Exhibit Number 1 --

9        A.    Yes.

10       Q.    -- is that any of the equipment that you

11   would use to suit up?

12       A.    It looks like it, yes.

13       Q.    Okay.   Would you please hold it up so the

14   camera can take video of that.

15       A.    (Witness complies).

16       Q.    Handing you Exhibit Number 2, is that also

17   another locker that contains the kind of equipment that

18   was used in cell extractions at this time frame?

19       A.    Similar, yes.

20       Q.    Okay.   Please hold that up.

21       A.    (Witness complies).

22       Q.    Thank you.

23            And what is the procedure that you were

24   trained to do cell extractions?   How many officers

25   involved and what do they do?

1      A.      Five officers.   The first one through the

2   door is the shield man.   The second one in is the -- is

3   supposed to control the right arm of the inmate.   Third

4   one through, the left arm.   The fourth one, the right

5   leg.   The fifth one, the left leg.

6      Q.      And then after all of those arms and legs and

7   the body is restrained or held down, what should happen

8   next?

9      A.      Handcuffs should be applied, and leg irons.

10      Q.      And then what happens?

11      A.      Inmate's taken to medical for a post

12   use-of-force physical.

13      Q.      And what is the reason for a cell extraction,

14   as you knew it?

15      A.      Inmate refused to cuff up.

16      Q.      And why would an inmate on X Wing, if you

17   know, be asked to cuff up?

18      A.      Sir, I don't know why any inmate would refuse

19   to cuff up.   That's each individual inmate.   Some

20   inmates enjoy pain, some of them don't, just --

21      Q.      I wasn't asking --

22      A.      I don't know what each individual inmate

23   thinks.

24      Q.      I wasn't asking you what they think.   I was

25   asking you, why would an officer request an inmate to

1      A.      Yes.

2      Q.      And is another slang term for extraction team

3  the catch team?

4      A.      Yes, sir.

5      Q.      So being caught would be an inmate being

6  taken out of a cell; is that right?

7      A.      Yes, sir.

8      Q.      And the catch room, if we hear that term,

9  what would that mean?

10      A.      I never heard of the catch room.

11      Q.      Never heard of that.

12      A.      No, sir.

13      Q.      Where was the equipment that we've identified

14  in Exhibits 1 and 2, where was that room?

15      A.      I believe, across from the control room, down

16  the west -- west door?  I think that's what it's called.

17      Q.      Okay.

18              On this particular occasion, did you have a

19  certain position within the extraction team?

20      A.      Yes.  I was number one man, shield man.

21      Q.      Okay.  And the shield man is the first one to

22  go into the cell; correct?

23      A.      Yes.

24      Q.      And do you know if you were the shield man

25  because you were the largest of the officers?

1      A.      I believe so, yes.

2      Q.      Okay.  You are or you were at the time

3   approximately six feet, four inches tall and 310 pounds?

4      A.      315, 3 -- yes.

5      Q.      Did you ever -- I know you're from Colorado.

6   Is that correct?

7      A.      Yes.

8      Q.      Did you ever play football or any sports in

9   Colorado?

10      A.      No, sir.

11      Q.      If you could, for the purposes of just

12   exhibiting your height -- what do you weigh right now?

13      A.      I do not know, sir.  240, 245.

14      Q.      Okay.  So you would have been about 70 pounds

15   heavier at this time that we're talking about?

16      A.      Yes, sir.

17      Q.      If you could, please stand up.

18              MR. RUBIN:  And if you could pan back, if

19   possible.

20      A.      (Witness complies).

21      Q.      Just to give the jury an idea of size.

22              Thank you.

23              As the number one man holding the shield,

24   what would your responsibility be once you enter the

25   cell first?

1      A.      To pin the inmate to a wall, floor, bunk.

2      Q.      Just to make sure that the inmate is not

3  moving around?

4      A.      Yes, sir.

5      Q.      And of the equipment that we saw in Exhibits

6  Number 1 and Number 2, can you describe what equipment

7  you were wearing or holding?

8      A.      Um, the black uniform, which I can't really

9  make out.  I don't believe I had this helmet on.  I

10  believe I had a clear face shield.

11      Q.      Okay.  Well, go ahead and just describe it

12  verbally, what were the elements of your suit on this

13  date?

14      A.      Um, black uniform, the five-star vest.

15      Q.      That's a protective vest?

16      A.      Protective vest.  Helmet, gloves, elbow pad,

17  knee pads and a pair of boots.

18      Q.      Are there shoulder pads as well or no?

19      A.      I don't recall.  I think it was part of a

20  five-star vest.

21      Q.      Okay.  And the other officers behind you have

22  extraction uniforms on as well?

23      A.      Yes, but they don't have the five-star vest.

24      Q.      Okay.  Same uniforms except for a different

25  vest?

```
 1       A.     I don't even know if they had a vest on.    I
 2  don't remember.
 3       Q.     Okay.
 4              And how many people on this extraction team
 5  had a shield?
 6       A.     Me.  Just one.
 7       Q.     Just one.  Is this a special kind of a
 8  shield?
 9       A.     Yes, sir.
10       Q.     What makes the shield special?
11       A.     It's ERD, electronic restraining device.  It
12  shoots electricity, a jolt.  I don't know how to
13  describe it.
14       Q.     Okay.  And how were you trained in terms of
15  being the number one man on an extraction team, in terms
16  of whether or not to actually zap the inmate or not?  Or
17  is it every single case that you do zap the inmate?
18              MR. ELLIS:  Object to the form.
19              MR. RUBIN:  Let me rephrase that question.
20  BY MR. RUBIN:
21       Q.     This electronic restraining device, that's
22  built into the shield; correct?
23       A.     Yes.
24       Q.     When is the -- under what circumstances were
25  you trained to create the electrical shock through the
```

1    shield?

2        A.    I don't remember, sir.  I don't -- training

3    was very long ago.  I remember I had to take a training

4    class for the hand-held ERD as well as the shield, but I

5    don't remember when you were supposed to discharge, if

6    that's the word you're looking for.  I don't remember.

7        Q.    Was it in every cell extraction?

8              MR. VLOEDMAN:  This is Andy Vloedman again.

9    I can hear you very well, but, again, you might check

10   with Ray or Marty, I'm only picking up about half of

11   Mr. Hanson's testimony.  Perhaps you can move the phone

12   a little closer to him.

13             Mr. Hanson, respectfully, if you could speak

14   up a little bit.  I know you have a soft voice, but

15   we're having a real problem hearing you.

16             THE WITNESS:  Okay.

17             MR. POOLE:  This is Ray Poole.  I'm having

18   the same problem.

19   BY MR. RUBIN:

20       Q.    Is it your understanding that on all cell

21   extractions, the shield electricity is discharged to the

22   inmate?

23       A.    Yes, I believe.

24       Q.    So it wouldn't matter whether the inmate is

25   fighting or not fighting in the decision whether to use

1     A.    Yes, sir.

2     Q.    How was Mr. Valdes removed from the cell?

3     A.    Um, I don't remember who carried him out of

4  the cell.

5     Q.    He did not walk out on his own, did he?

6     A.    No.  He refused.

7     Q.    In fact -- I'm sorry?

8     A.    I thought he was refusing to walk.

9     Q.    Did you ever hear him refuse to walk?

10    A.    No, sir.

11    Q.    He was dragged down the corridor to the grill

12 gate; correct?

13          MR. FITZPATRICK:  Object to the form.  This

14 is Marty Fitzpatrick again.

15          THE WITNESS:  I believe so, sir.

16 BY MR. RUBIN:

17    Q.    Okay.  Let me ask you if this refreshes your

18 recollection.

19          On page 40 of your trial testimony, line 24,

20 "How was he taken out of the cell?"

21          "Half carried, half drug."

22          Do you recall that?

23    A.    Yes, sir.

24    Q.    Okay.  Is that accurate?

25    A.    I believe so, sir.

1              And the place that Mr. Valdes was taken to

2      was the quarter deck; correct?

3          A.    Yes, sir.

4          Q.    And at this time, you had an opportunity to

5      see Mr. Valdes?

6          A.    Yes, sir.

7          Q.    He had blood on his face, his lip and his

8      nose?

9              MR. FITZPATRICK:  Object to the form.

10             THE WITNESS:  I believe it was on his lip.

11     A drop of blood on his lip.

12             MR. RUBIN:  Okay.

13             THE WITNESS:  If I remember correctly.

14     BY MR. RUBIN:

15         Q.    And do you recall if he had any other bruises

16     or abrasions?

17         A.    A bruise or abrasion or dirt on his shoulder?

18     Chest?  Front chest, shoulder area?

19         Q.    Okay.  The way you're answering, are you

20     unsure?

21         A.    I'm trying to remember, sir.

22         Q.    Okay.  Let me ask you if this refreshes your

23     memory, on page 43 of the trial testimony, line 4.

24             "Did you see any injuries at that time, sir?"

25             Answer:  "He had blood on his lip or his nose

1   and better than it is today?

2       A.      Yes, sir.

3       Q.      And you gave a sworn statement to the state

4   attorney's office even before the trial; correct?   An

5   immunity statement.

6       A.      Yes, sir.

7       Q.      And it was videotaped; correct?

8       A.      Yes.

9       Q.      And that came closer in time to the events of

10  July 1999; correct?

11      A.      Yes, sir.

12      Q.      And would you say that that would have been

13  your best recollection of the events?

14      A.      Yes, sir.

15      Q.      Once you and the other members and Valdes

16  were on the quarter deck, what happened next?

17      A.      I don't --

18      Q.      Was Valdes taken anywhere?

19      A.      Taken to the, uh, clinic.

20      Q.      And is that standard procedure?

21      A.      Yes, sir.

22      Q.      Have you ever heard the term "touching

23  someone up"?

24      A.      No, sir.

25      Q.      Touching an inmate up?   No?

1      Q.    Can you read what you wrote?

2      A.    Yes, sir.  Yeah.  Do you want me to read it

3   out loud?

4      Q.    Yes, please.

5      A.    Approximately 1000 hours on July 17th, 1999,

6   I was summoned by Captain Thornton to the ready room for

7   cell extraction on Inmate Valdes, Frank, DC Number

8   072791, housed in Cell X1203.  At approximately 10:25,

9   Captain Thornton ordered Inmate Valdes to cuff up.

10  Inmate Valdes refused, and Captain Thornton ordered the

11  cell open.  I went to the cell first, striking the ERD

12  shield -- excuse me.  With the ERD shield striking

13  Inmate Valdes in the upper torso and face area.

14         I can't read what it says -- I forced Inmate

15  Valdes to the rear of the cell against the toilet.

16  Inmate Valdes was trying to strike me with an

17  undispersed or unidentified object which turned -- I

18  can't read it.  Hand-pinned him in the rear of the cell,

19  give him three three-second bursts with ERD shield.

20  Inmate Valdes continued to fight -- I can't read.  Um,

21  Inmate Valdes's arms.  And that's about it.

22         "I ordered to write this report by Captain

23  Thornton."  I added that later on that day.

24     Q.    Okay.  And other than what you added on later

25  that day, that is the language that we were talking

1    BY MR. VLOEDMAN:

2        Q.    One of the reasons the inmates have to

3    cuff -- the main reason an inmate has to cuff up is to

4    remove them safely from the cell so that officers can

5    enter the cell; is that correct?

6        A.    Yes, sir.

7        Q.    And officers have to enter the cell for a

8    variety of reasons, including searching for weapons at

9    times; correct?

10       A.    Yes, sir.

11       Q.    And that's what you were told this day, was

12   that the concern was that if Valdes actually had a

13   grenade in there and would release it, that there was a

14   concern that that could be used as a weapon; is that

15   correct?

16             MR. RUBIN:   Object to form.  Assumes facts

17   not in evidence.  Move to strike.

18   BY MR. VLOEDMAN:

19       Q.    Isn't that what you advised?

20       A.    Yes, sir.

21       Q.    Now, when you get to a cell, if an inmate is

22   to cuff up, what an inmate is to do is back up to the

23   cell door and place his hands behind his back so that he

24   can be cuffed with officers safely on the other side of

25   the door; correct?

1   is the fear that somebody's going to get hurt by this

2   inmate; is that correct?

3        A.   Yes, sir.

4        Q.   All right.

5             At any point when you all were standing at

6   that door, all Valdes had to do was stand up, back up

7   and extend his hands behind him so he could be cuffed;

8   correct?

9        A.   Yes, sir.

10       Q.   And at that time all of this would come to a

11  halt.

12       A.   Yes, sir.

13            MR. RUBIN:   Objection.

14  BY MR. VLOEDMAN:

15       Q.   Now, the fact that he was on X Wing -- and

16  that's the wing he was on at the time this happened; is

17  that correct?

18       A.   Yes, sir.

19       Q.   What information did that give you about how

20  he had been behaving within the institution?

21       A.   Um, I guess not abiding by the rules?  That's

22  where they house most of the dangerous inmates.

23       Q.   Well, isn't it a fact that most of the

24  inmates that are on X Wing were on X Wing because those

25  cells on X Wing are closed management cells; correct?

1       A.      No, sir.

2       Q.      And there was nothing about Valdes's

3   appearance that caused your brother to make any

4   statement about, What happened to that man?  What's

5   wrong with that man?  Nothing like that.

6       A.      No, sir.

7       Q.      Okay.  And, in fact, isn't it true, when your

8   brother came up there, basically you looked at him and

9   kind of rolled your eyes and said, "Can you believe this

10  is going on this early in the day?"

11      A.      Yes, sir.  On our Monday morning.

12      Q.      Right.  And, again, Valdes's condition was

13  such it wasn't causing you any concern that he had any

14  real significant injury.

15              MR. RUBIN:  Objection.  Asked and answered.

16  BY MR. VLOEDMAN:

17      Q.      Isn't that correct?

18      A.      Yes, sir.

19      Q.      Now, Mr. Valdes was taken down the corridor

20  to the infirmary, finally on a cart because he wouldn't

21  walk; is that correct?

22              MR. RUBIN:  Objection.

23              THE WITNESS:  Yes, sir.

24              MR. RUBIN:  Speculation.

25  ///

1      Q.    Mr. Hanson, do you recall that at the time

2   that taped statement was given, you really were given

3   information that you -- later turned out to be incorrect

4   about Mr. Valdes and the cause of his death?

5            MR. RUBIN:  Objection.  Vague.

6            THE WITNESS:  I don't understand, sir.

7   Can --

8   BY MR. VLOEDMAN:

9      Q.    Well, let me ask you this:  Do you remember

10  at some point when you were deposed by a number of

11  attorneys representing various correctional officers at

12  Florida State Prison?

13     A.    Yes.

14     Q.    Do you remember at that deposition, for the

15  very first time, you were shown photographs of what

16  Mr. Valdes looked like at the time of his death?

17     A.    Yes, sir.

18     Q.    And that was the first time you'd ever seen

19  those photographs, when you were shown by attorneys

20  representing correctional officers; correct?

21     A.    Yes, sir.

22     Q.    And when you saw that, it was obvious to you,

23  wasn't it, that Mr. Valdes's condition at the time of

24  his death was different than Mr. Valdes's condition

25  after the cell extraction?

1   A.  Very different, sir.

2   Q.  All right.  And at the time you were actually

3 interviewed by the state attorney, though, and gave that

4 sworn statement, you weren't told that information, were

5 you?  You weren't told that his condition was different

6 at the time of his death than it was after the cell

7 extraction.

8   A.  Yes, sir, I was not.

9   Q.  And, in fact, you were led to believe,

10 weren't you, that Mr. Valdes had died from injuries he

11 sustained in the cell extraction?

12     MR. RUBIN:  Objection.

13     THE WITNESS:  Sir, I don't --

14 BY MR. VLOEDMAN:

15   Q.  Weren't you led to believe that?

16     MR. RUBIN:  Objection.

17     THE WITNESS:  I don't know what -- how he

18 died, sir.

19 BY MR. VLOEDMAN:

20   Q.  But that was the implication that was given

21 to you, wasn't it --

22   A.  Yes, sir.

23   Q.  -- that it was from --

24     It was their belief it was from injuries

25 sustained in the cell extraction?

1    point that he was on the quarter deck, he was conscious?

2        A.    Yes, sir.

3        Q.    I'm sorry?

4        A.    Yes.

5        Q.    He didn't appear to be in any distress to you

6    at that point?

7        A.    No, sir.

8        Q.    And he was not gasping for air.

9        A.    No, sir.

10        Q.    In fact, his breathing appeared to be fine at

11   that point?

12        A.    Yes, sir.

13        Q.    At that time, July of 1999, had you had any

14   type of first responder or first aid training?

15        A.    Yes, sir.

16        Q.    Okay.  Would you describe for us what type of

17   training you've had, as of that time.

18        A.    It was during CTI, the academy.  CPR,

19   different medical -- um, first responder, um, how to

20   bandage a wound.  CPR.  I -- I don't know what you're

21   asking me.

22        Q.    Well, were you taught how to recognize, for

23   example, you know, various injuries, what types of signs

24   or symptoms you might want to look for?

25        A.    We can't hear you, sir.

1          MR. ELLIS:  Ray, you're a little bit low.

2          MR. POOLE:  I'm sorry?

3          MR. ELLIS:  We're having a -- we can't quite

4     hear.

5          MR. POOLE:  Okay.  Can you hear me now?

6          MR. ELLIS:  Yeah.  That's better.

7          MR. POOLE:  I feel like that cell phone

8     commercial.

9     BY MR. POOLE:

10         Q.    Mr. Hanson, as part of that first responder

11    training, were you told what types of signs or symptoms

12    to look for when assessing someone's physical condition?

13         A.    I believe so.

14         Q.    Okay.  You said that Mr. Valdes was not

15    having any trouble breathing when he was taken from his

16    cell and put on the quarter deck.

17         A.    Not to my knowledge, sir, no.

18         Q.    And you noticed no signs of respiratory

19    distress whatsoever.

20         MR. RUBIN:  Objection.  Asked and answered.

21         THE WITNESS:  No, sir.

22    BY MR. POOLE:

23         Q.    He wasn't complaining about his ribs?

24         A.    No, sir.

25         Q.    And he wasn't holding his side or his ribs,

1    was he?

2          A.    Sir, he was handcuffed.

3          Q.    Okay.  He wasn't complaining about his side.

4          A.    No, sir.

5          Q.    And at that point in time you weren't, in

6    fact, you weren't concerned whatsoever Mr. Valdes was

7    seriously injured, were you?

8          A.    I'm sorry?

9          Q.    At that point in time you had no concerns

10   whatsoever that Mr. Valdes was seriously injured?

11         A.    No, sir.

12         Q.    No concerns whatsoever that he was in a

13   life-threatening condition or situation?

14         A.    No, sir.

15         Q.    Instead, all you noticed was an abrasion on

16   his left chest area?

17         A.    Yeah.  And some blood on his lip or mouth.

18         Q.    Okay.  So abrasion, and that means a scrape;

19   right?

20         A.    Scrape, or it could have been dirt.

21         Q.    Okay.  So just to clarify, you saw either a

22   scrape or dirt on his left chest area?

23         A.    Yes, sir.

24         Q.    Okay.  And you saw some blood on his lip or

25   his nose?

1         MR. POOLE:  Okay.

2    BY MR. POOLE:

3         Q.    So Mr. Hanson, just to sum up, when you saw

4    Mr. Valdes on the quarter deck right after he was

5    removed from his cell, the only injuries that you noted

6    were a small amount of blood either coming from his nose

7    or his lip and a scrape or dirt on his left chest area?

8         A.    Yes, sir.

9         MR. RUBIN:  Objection.  Asked and answered.

10   BY MR. POOLE:

11        Q.    And nothing else.

12        A.    I'm sorry?

13        Q.    No other injuries.

14        A.    No, sir.

15        Q.    Okay.  And moving on to while he's being

16   taken to the clinic, after he was removed from the

17   quarter deck and he was all the way to the clinic, did

18   he appear to be conscious at that time?

19        A.    I didn't pay attention, sir.  I don't know.

20        Q.    Once you arrived at the clinic with

21   Mr. Valdes, did he exhibit any kind of signs of distress

22   at that point?

23        A.    Not to me, no, sir.

24        Q.    Okay.  You didn't notice any problems with

25   him breathing when he was in the clinic?

1     A.     No, sir.

2     Q.     In fact, he appeared to be breathing fine to

3  you?

4     A.     Yes, sir.

5     Q.     Did you at that point notice any additional

6  injuries that you hadn't previously told us about?

7     A.     That's when the boot mark or the footprint on

8  his neck.

9     Q.     On the right side?

10    A.     I don't remember which side, sir.

11    Q.     Did you see him undergo any physical --

12  physical examination?

13    A.     I just remembered his legs coming up, and I

14  walked away and sat down and tried to cool off and

15  waited for my use-of-force physical.

16    Q.     Did you see a nurse exam him when he was in

17  the clinic?

18    A.     I don't remember, sir.

19    Q.     Okay.

20           And during the time he was in the clinic,

21  from what you could tell, he appeared to be conscious?

22    A.     Yes, sir.

23    Q.     Okay.  He moved.

24    A.     Yes.

25    Q.     Brought his knees up to his chest?

**5**

COPY



UNITED STATES DISTRICT COURT JUN 2 0 2004
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION Brooks & Smith, LLC
Attorneys at Law

MARIO VALDES,

      Plaintiff,

vs.      Civil No. 3:01-cv-799-J32HTS

JAMES V. CROSBY JR.
et.al.,

      Defendants.



VOLUME II
DEPOSITION OF CHASE RIVELAND
Taken on behalf of the Defendant
June 16, 2004

- - -

BE IT REMEMBERED THAT, pursuant to the Washington
Rules of Civil Procedure, the deposition of CHASE
RIVELAND was taken before Kim Scheuerman #2517, a
Certified Shorthand Reporter, and a Notary Public for the
State of Washington, on June 16, 2004, commencing at the
hour of 9:00 a.m., the proceedings being reported at
Naegeli Reporting Corporation, 601 Union Street, Suite
1624, Seattle, Washington.

Case 3:01-cv-00799-TJC-HTS   Document 299   Filed 06/25/04   Page 125 of 207 PageID 3393
Chase Riveland                           Volume II                          June 16, 2004

68

1      Q.    And so there were no inmates housed or incarcerated

2   at those prisons during that period of time?

3      A.    That's correct.

4      Q.    Have you ever served as a correctional officer in a

5   prison?

6      A.    I have not.

7      Q.    Have you ever participated in a cell extraction of

8   an inmate in prison?

9      A.    No.

10     Q.    Have you ever served as a correctional officer in a

11  county or a local jail?

12     A.    No.

13     Q.    And have you ever served as a chief jailer at

14  either a county or a local jail?

15     A.    No.

16     Q.    Have you ever witnessed a cell extraction?

17     A.    Yes.

18     Q.    And how many of those have you seen, Mr. Riveland?

19     A.    Probably about 50.  Rough estimate, 50.

20     Q.    And did you authorize the 50 that you, roughly the

21  50 that you saw, did you authorize any of those extractions

22  to take place?

23     A.    I'm not sure what you mean by "authorize."

24     Q.    Were those performed under your supervision and

25  control?


**NAEGELI**
**REPORTING**
**CORPORATION**

**800.528.3335**
www.NaegeliReporting.com
**503.227.7123 FAX**

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376         509.838.6000          208.667.1163

Court Reporting      Trial Presentation      Videoconferencing      Videography

1    A.   No.

2         Q.   Have you ever authorized or permitted a cell

3    extraction to take place?

4         A.   In the sense that I was the director of the

5    agencies and signed the policies guiding that, yes.  But if

6    your question relates to the direct supervision, again, the

7    answer would be "No."

8         Q.   In the 50 or so cell extractions that you have

9    personally observed, were any of those or did any of those,

10   in your opinion, involve the unlawful and excessive use of

11   force?

12        A.   No.

13        Q.   Did any of those 50 or so extractions result in any

14   injuries of any type to the inmates?

15        A.   Yes.

16        Q.   And roughly, how many of the cell extractions that

17   you observed resulted in some type of injury to the inmate?

18        A.   I would estimate 15 to 20.

19        Q.   So based on your observation, it was pretty common

20   in those extractions for an inmate to be injured in some way,

21   shape, or form?

22        A.   It's not uncommon.

23        Q.   The 15 or 20 instances that you personally

24   witnessed in which an inmate was injured, what was the most

25   severe injury that you saw?



**800.528.3335**
**www.NaegeliReporting.com**
503.227.7123 FAX

| Portland, OR | Seattle, WA | Spokane, WA | Coeur d'Alene, ID |
| 503.227.1544 | 206.622.3376 | 509.838.6000 | 208.667.1163 |
| Court Reporting | Trial Presentation | Videoconferencing | Videography |

1      A.    I believe a dislocated shoulder.

2      Q.    Did any of the inmates that you saw who were

3  injured have any bloody noses or bloody mouth?

4      A.    I would say a couple, yes.

5      Q.    Did any of them have scrapes or abrasions as a

6  result of the extractions?

7      A.    Yes.

8      Q.    Did any of them have, from what you could see,

9  bruising as a result of the extractions?

10     A.    Some did, yes.

11     Q.    And again, in none of those cases, in your opinion,

12 did those cell extractions involve excessive or unauthorized

13 use of force?

14     A.    That is correct.

15     Q.    So would you agree then, Mr. Riveland, that it's

16 not unusual for an inmate to have at least some injuries as a

17 result of a cell extraction?

18     A.    That's true.

19     Q.    In any of the 50 or so extractions that you

20 observed, was the use of chemical agents or gas of some sort

21 involved?

22     A.    In many of them, yes.

23     Q.    And in those instances, did you observe whether any

24 of those inmates who were gassed exhibited any signs or

25 symptoms, such as watering eyes?

**NAEGELI**
**REPORTING**
C O R P O R A T I O N

**800.528.3335**
**www.NaegeliReporting.com**
**503.227.7123 FAX**

Portland, OR      Seattle, WA      Spokane, WA      Coeur d'Alene, ID
503.227.1544      206.622.3376     509.838.6000     208.667.1163

Court Reporting      Trial Presentation      Videoconferencing      Videography

Case 3:01-cv-00799-TJC-HTS   Document 299   Filed 06/25/04   Page 128 of 207 PageID 3396
Chase Riveland                        Volume II                        June 16, 2004

71

1        A.    They do.

2        Q.    And did they exhibit any symptoms, such as an

3   increase in the flow of mucous from their nose; did you ever

4   notice that?

5        A.    Frequently.

6        Q.    And did you notice whether the gas resulted in any

7   discoloration of their skin, reddening of their skin or any

8   discoloration?

9        A.    In some instances.

10       Q.    Bear with me just a minute.   Let me look at my

11  notes.   I think you mentioned that you were previously in

12  charge of corrections for the -- is it the State of Oregon;

13  is that correct?

14       A.    The State of Washington and the State of Colorado.

15       Q.    State of Washington and Colorado.   During your

16  tenor as the director of corrections for the State of

17  Washington, were cell extractions permitted within Washington

18  state prison?

19       A.    They were.

20       Q.    Were all of those extractions videotaped?

21       A.    They were.

22       Q.    Were inmates, following all of those extractions,

23  photographed?

24       A.    They were.

25       Q.    To your knowledge, how many extractions took place

NAEGELI
REPORTING
CORPORATION

800.528.3335
www.NaegeliReporting.com
503.227.7123 FAX

Portland, OR          Seattle, WA          Spokane, WA          Coeur d'Alene, ID
503.227.1544          206.622.3376         509.838.6000         208.667.1163

Court Reporting       Trial Presentation   Videoconferencing    Videography

**6**

1                   UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA

2                   JACKSONVILLE DIVISION

3
                   CASE NO.:  3:01-CV-799-J-32HTS

4

5

6     MARIO VALDES, individually and
     as Personal Representative of

7     the Estate of JOY FRANCIS
     "FRANK" VALDES,

8
         Plaintiff,

9
     vs.

10
     JAMES V. CROSBY, JR.,

11    A. D. THORNTON, TIM GIEBEIG,
     etc.,

12
         Defendants.

13    _____

14

15    STATE OF FLORIDA)

16    COUNTY OF DUVAL )

17        Deposition of MARIO BENEDICT VALDES, taken on behalf

18    of the Defendants herein, pursuant to Notice of Taking

19    Deposition, at 12:01 p.m., on Thursday, June 3, 2004, at

20    233 East Bay Street, Suite 912, Jacksonville, Duval

21    County, Florida, before S. Gay Hess, a Notary Public in

22    and for the State of Florida at Large.

23

24                - - -

25            CERTIFIED COPY

---

ASSOCIATED STENOTYPE REPORTERS
912 Blackstone Building, Jacksonville, Florida (904)356-0401

1      A      I don't recall.

2      Q      Mr. Valdes, were you aware that your son,

3  Frank, had been convicted of first-degree murder?

4      A      (Nods head affirmatively).  Yes.

5      Q      Did you attend his murder trial?

6      A      No, sir.

7      Q      Do you know where the murder trial took place?

8      A      I think it was somewhere in North Florida.

9  Jacksonville.

10     Q      Do you remember when it took place?

11     A      I don't remember.

12     Q      Do you know who Frank's attorney was in that

13  first-degree murder trial?

14     A      I don't remember.

15     Q      Do you know whether he had a public defender or

16  whether he had a privately-retained attorney?

17     A      I don't remember.

18     Q      In a first-degree murder trial, were you

19  aware -- let me back up.  Are you aware or were you aware

20  that your son, Frank, had been sentenced to death because

21  of that first-degree murder conviction?

22     A      I was aware.

23     Q      In a first-degree murder case where the death

24  penalty is at issue, you have two phases.  There's a guilt

25  phase.  There's sort of the typical trial, guilty or



CONSTANGY BROOKS    Fax:9043568900    Jun 21 2004  11:22    P.02

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

**Plaintiff,**

v.                                                    **Case No.: 3:01-cv-799-J-32HTS**

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, MARY
HUDNALL, and RAYMOND HANSON, each in
his/her individual capacity,

**Defendants.**
_____/

## AFFIDAVIT OF VICTOR SELYUTIN, M.D.

STATE OF FLORIDA      )
                      ) ss.
COUNTY OF BRADFORD  )

Before me, the undersigned authority, personally appeared Victor Selyutin, M.D., who being duly sworn, deposes and says:

1.      My name is Victor Selyutin, and I am at least eighteen (18) years of age.  I give the following information, of which I have personal knowledge, both freely and truthfully and without the promise of any benefit, financial or otherwise.

2.      I am a medical doctor and have been licensed to practice medicine in the State of
Florida since February 19, 1986. I earned my M.D. degree on July 1, 1970, from the Kiev
Medical Institute. On July 1, 1973, I completed my medical residency at the Kiev Medical
Institute.

3.      I am employed by the Florida Department of Corrections as a medical doctor at
the Florida State Prison. I have held that position since August 13, 1990.

4.      Throughout my employment with the Florida Department of Corrections and as
part of my duties at Florida State Prison, I have performed medical examinations and provided
medical treatment to inmates.

5.      Also as part of my duties at Florida State Prison, I have routinely performed what
are known as "post use of force" medical examinations on both inmates and correctional officers.

6.      During July 1999, inmates at Florida State Prison were required to undergo post
use of force medical examinations whenever they were subjected to any form of physical force
by correctional officers. More specifically, inmates at Florida State Prison were required to
undergo post use of force medical examinations whenever they were forcibly removed from their
cells by correctional officers or subjected to chemical agents such as pepper spray and tear gas.

7.      During July 1999, correctional officers at Florida State Prison were also required
to undergo post use of force medical examinations of whenever they used physical force to
remove an inmate from his cell.

8.      Because my duties at Florida State Prison include performing post use of force
medical examinations on both inmates and correctional officers following the forcible removal of
inmates from their cells, I am aware that such forcible removals are performed by teams of four
(4) or five (5) correctional officers. I am also aware that correctional officers who participate on

2

such teams wear protective gear such as helmets, elbow and knee pads, and protective vests, when forcibly removing an inmate from his cell. I am also aware that correctional officers use a protective shield when forcibly removing inmates from their cells. It is my understanding that the protective shield is used to pin an inmate to the floor or to a cell wall, thereby helping to subdue the inmate prior to removing him from his cell.

9.    Because cell extractions involve the forcible removal of inmates from their cells by teams of correctional officers dressed in protective gear, it is not unusual for inmates to sustain injuries as a result of such extractions. It is common for an inmate to sustain abrasions, bruises, or a bloody nose as a result of a cell extraction.

10.    Inmates who have been exposed to chemical agents such as pepper spray or tear gas commonly exhibit physical symptoms such as reddening of the skin and significant amounts of mucous coming from their nose.

11.    At times, correctional officers at Florida State Prison bring inmates to the medical clinic in a wheelchair or cart when the inmates refuse to walk on their own. Some of the inmate cells are located as much as a quarter of a mile from the medical clinic. In addition, the wings on which the inmate cells are located and the corridor leading from those wings to the medical clinic are not air conditioned. It is therefore easier for correctional officers to use a wheelchair or cart to transport inmates to the medical clinic who refuse to walk on their own.

12.    I reviewed the July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes as part of my duties at Florida State Prison. A copy of those records are attached as Exhibit A. Those records noted only minor injuries to inmate Frank Valdes. The injuries noted in the post use of force medical examination records attached as

3

Exhibit A did not necessitate that inmate Frank Valdes either be admitted to the Florida State Prison medical clinic or sent to an outside hospital for further evaluation and treatment.

13.      The July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes indicate that his vital signs were normal at the time of his examination. The only injuries noted in those records were that inmate Frank Valdes had dried blood around his nose and mouth, a superficial abrasion inside his lip, and skin discoloration on the left side of his abdomen and on his right shoulder. The policies and procedures of the Florida Department of Corrections that were in effect during July 1999 did not require that an inmate with normal vital signs and with such minor injuries either be admitted to the Florida State Prison medical clinic or sent to an outside hospital for further evaluation and treatment.

14.      The injuries noted in inmate Frank Valdes post use of force medical examination records are consistent with the types of injuries commonly observed on inmates following a cell extraction.

15.      At times, a medical doctor or nurse may not be able to make a contemporaneous entry into an inmate's medical records and therefore may make such entries at a later date and/or time. For example, an emergency situation may prevent a medical doctor or nurse from making a contemporaneous entry into an inmate's medical records. Such "late entries" are common and were not prohibited by the policies and procedures of the Florida Department of Corrections that were in effect during July 1999.

Further sayeth the Affiant naught.

VICTOR SELYUTIN, M.D.
FLORIDA STATE PRISON

Victor Selyutin, M.D.

4

## NOTARY JURAT

The foregoing instrument was acknowledged before me this 21st day of June, 2004, by

Victor   Selyutin,   M.D.,   who   is   personally   known,   to   me   or   who   produced

_____ as identification and who did take an oath.

_Karen J. Redd_

Notary Public, State of Florida
(Signature)

_Karen J. Redding_

Notary Public, State of Florida
(Print Name)

Karen J. Redding
MY COMMISSION # CC981310 EXPIRES
November 12, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

My Commission Expires on: _____

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**
**EMERGENCY ROOM RECORD**

| NAME: Last, First, Middle | | | RACE/SEX | NUMBER | DOB | AGE |
|---|---|---|---|---|---|---|
| Willie, Frank | | | W/M | 072791 | 10/28/62 | 36 |

| DATE/TIME | MARITAL STATUS | RELIGION | ALLERGIES |
|---|---|---|---|
| 7/7/99  1035 | Single | Christian | NKA |

## AUTHORIZATION FOR HEALTH CARE SERVICES AND ANESTHESIA

I the undersigned, a patient in this health care facility, have had explained to me and understand the nature of my condition.

I hereby authorize FSP Medical Staff

(and whomever he may designate as his assistants) to administer such treatment as is necessary, and to perform the following health care service:

Evaluation et treatment

and such additional health care services as are considered necessary on the basis of findings during the course of said health care service. I also consent to the administration of such anesthesia as are necessary, with the exception of ____local____ Any tissue or parts surgically removed may be disposed of by the facility in accordance with accustomed practice. I hereby certify that I have read and fully understand the above Authorization for Health Care Services and Anesthesia, the reasons why the above named health care service is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by ____ Nursing staff ____

I also certify that no guarantee of assurance has been made as to the results that may be obtained.

Signature of Patient Refused to Sign (Explanation in back)      Date 7/7/99    Time 1030      A.M. / P.M.

Signed for Patient by   J. BURGER, SR. LPN    Relationship ____    Date ____    Time ____    A.M. / P.M.

Witness ____ FLORIDA STATE PRISON    Reason Patient cannot sign ____

## BRIEF HISTORY  Past use of force

IF ACCIDENT, STATE WHERE, WHEN AND HOW INJURED; IF ILLNESS DESCRIBE:  S: Pt on chair, bloody D/C to (R) forearm.

any blood noted to L side / mouth — Currently active, nose

O: Superficial abrasion noted to lip — bloody D/C ____ noted lip — FTP (R) area/distal

(L) & (R) side abdomen, (R) shoulder. ③ swelling noted to (R) shoulder. (reddening/bruising/swelling) noted to R (R) (hit) side 72 inch.

A: Past use of force.

SIGNATURE J. BURGER, SR. LFN
FLORIDA STATE PRISON

## PHYSICIAN'S REPORT

| CONDITION ON ADMISSION | GOOD ☐ | FAIR ☑ | POOR ☐ | SHOCK ☐ | BLEEDING ☑ | COMA ☐ |
|---|---|---|---|---|---|---|

| TEMPERATURE | PULSE | RESPIRATION | BLOOD PRESSURE |
|---|---|---|---|
| Unable to obtain | 92 | 24 | 118/82 |

TREATMENT:
P: ① mouth / nose cleaned c̄ H₂O₂

E: ① Report further s/s PPN.

1105 — Dr. Edwards notified.    [signature]

DIAGNOSIS
Past use of force

DISPOSITION
PTD

PHYSICIAN'S SIGNATURE
[signature]    J. BURGER, SR. LPN
FLORIDA STATE PRISON

DATE/TIME  7/7/99  1035

**DISTRIBUTION:**  WHITE—HEALTH RECORD
CANARY—EMERGENCY ROOM FILE
PINK—LOCAL REQUIREMENTS

EXHIBIT 37

# DIAGRAM OF INJURY



FRONT            RIGHT    LEFT            REAR

TYPE OF INJURY _Abrasion /_____

DATE OF INJURY _7/17/99_        TIME OF INJURY _1035_

EMERGENCY ROOM FORM COMPLETED        (YES)        NO

EMERGENCY ROOM FORM SIGNED BY INMATE        YES        (NO)

DOCTOR'S SIGNATURE _____        DATE _____

NAME _Valdez, Frank_        NUMBER _60791_        C/S _W/m_

DC-708 (4-83)

EXHIBIT _33_

**8**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

Plaintiff,

v.                                      Case No.: 3:01-cv-799-J-32HTS

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, MARY
HUDNALL, and RAYMOND HANSON, each in
his/her individual capacity,

Defendants.
_____/

## AFFIDAVIT OF WILLIAM F. HAMILTON, M.D.

STATE OF FLORIDA      )
                      ) ss.
COUNTY OF ALACHUA     )

Before me, the undersigned authority, personally appeared William F. Hamilton, M.D.,

who being duly sworn, deposes and says:

1.      My name is William F. Hamilton, and I am at least eighteen (18) years of age.  I

give the following information, of which I have personal knowledge, both freely and truthfully

and without the promise of any benefit, financial or otherwise.

2.      I am a medical doctor and am licensed to practice medicine in the State of Florida.

I attended medical school at the University of Miami and earned my M.D. degree in 1975.  I

completed my residency in anatomic and clinical pathology at the Duke University Medical Center. I thereafter completed a fellowship in forensic pathology at the at the office of the Chief Medical Examiner at the University of North Carolina, in Chapel Hill, North Carolina. I am certified by the American Board of Pathology in anatomic pathology, clinical pathology, and forensic pathology.

3.     I am the District Medical Examiner for the Eighth District of Florida. The Eighth District of Florida includes Alachua, Baker, Bradford, Gilchrist, Levy, and Union Counties. I have held my position as District Medical Examiner for the Eighth District of Florida since 1981.

4.     My basic duty as District Medical Examiner is to investigate deaths in order to determine the cause and manner of deaths. More specifically, I investigate deaths suspected to be caused by suicide or homicide, as well as deaths of individuals who are in police custody or who are incarcerated in prison.

5.     Pursuant to my duties as District Medical Examiner for the Eighth District of Florida, I performed a post-mortem examination on the body of Frank Valdes at 1:30 p.m. on July 18, 1999.

6.     The autopsy I performed on the body of Frank Valdes revealed that, based upon a reasonable degree of medical probability, he died as a result of multiple blunt traumatic injuries. Those autopsy findings were noted in my postmortem examination report, dated July 18, 1999, and bearing case number ME 99-198, as follows:

> Multiple blunt traumatic injuries including contusions, abrasions and lacerations of face and scalp, fracture of mandible; patterned and unpatterned abrasions and contusions on anterior and posterior trunk, multiple serial rib fractures of right and left halves of ribcage, fracture of sternum, right and left hemothoraces and subcutaneous emphysema extending from lower face to scrotum; lacerations and hemorrhage of gut mesenteries and liver capsule; hemorrhage within and around right adrenal gland; abrasions of right and left legs from knee to ankle level and linear abrasions on right and left wrists.

2

Surgical absence of vermiform appendix and spleen, remote.

Focal coronary arteriosclerosis and subendocardial scar in anterolateral wall of cardiac left ventrical.

Pulmonary congestion and edema.

Fat emboli and bone marrow emboli in pulmonary circulation.

Copies of my postmortem examination report and body diagrams concerning Frank Valdes are attached hereto as Exhibit A.

7.     Based upon a reasonable degree of medical probability, no single injury caused Frank Valdes' death. Instead, he died as a result of multiple injuries.

8.     Based upon a reasonable degree of medical probability, the injuries that I identified during the autopsy of Frank Valdes and that resulted in his death occurred contemporaneously, i.e., within a few minutes of each other.

9.     The injuries that I identified during the autopsy of Frank Valdes and that resulted in his death were very fresh. None of those injuries showed any evidence that they had begun the process of healing. For example, there was no evidence that the wounds had begun crusting over, none of the bruises had evolved, and there was no remarkable swelling around the injuries Therefore, based upon a reasonable degree of medical probability, none of those injuries could have been inflicted five hours before Frank Valdes' death.

10.     Once Frank Valdes received the injuries that resulted in his death, he would not have been able to speak or sit up on his own. He would have been breathing in a labored fashion and would have lost consciousness very quickly -- probably within a minute or two -- after he sustained those injuries. More likely than not, Mr. Valdes died within only five (5) to ten (10) minutes after receiving those injuries.

3

11.     Frank Valdes was pronounced dead at 4:18 p.m. on July 17, 1999.  At that time, he had not been dead for long.

12.     Based upon a reasonable degree of medical probability, Frank Valdes would not have survived the injuries that I identified during the autopsy.

Further sayeth the Affiant naught.

_William F. Hamilton, M.D._

## NOTARY JURAT

The foregoing instrument was acknowledged before me this _21st_ day of June, 2004, by William F. Hamilton, M.D., who is personally <u>known</u> to <u>me</u> or who produced _____ as identification and who did take an oath.

_Catherine Helena Weldon_

Notary Public, State of Florida
(Signature)

_Catherine Helena Weldon_

Notary Public, State of Florida
(Print Name)

My Commission Expires on: _July 26, 2005_

CATHERINE HELENA WELDON
MY COMMISSION # DD 045132
EXPIRES: July 26, 2005
1-800-3-NOTARY  FL Notary Service & Bonding, Inc.

4

FRANK VALDEZ                                          ME 99-198

18 JULY 99
1330 HOURS

POSTMORTEM EXAMINATION
OF THE BODY OF
FRANK VALDEZ

The body is that of a well developed well nourished somewhat muscular young adult white man measuring 69" in length. It is received without clothing or valuables. A hospital identification band encircles the right wrist. An intravascular line is present in the left elbow region and an oral airway and orotracheal tube protrude from the mouth.

There are multiple blunt traumatic injuries evident on external surfaces of the body. Included are abrasions, bruises and lacerations of forehead, cheek, nose and chin, a right periorbital hematoma, lacerations and swelling of upper and lower lips, a fracture of the left side of the mandible just anterior to the ramus, an ill-defined pattern of abrasions and bruises on right lateral neck region, multiple bruises and partial imprint of a probable shoe or boot sole on mid-abdomen, linear abrasions and scrapes on both wrists, abrasions and probable patterned injuries on mid-back, abrasions and bruises on both legs extending from knee level to ankle. The head is not abnormally mobile upon the neck. The scalp has small soft tissue hemorrhages underlying the previously noted injuries on forehead. Calvarium and skull base are intact. The brain weight is 1670 g. The dura is unremarkable. The leptomeningeal vessels are congested. No discrete subarachnoid hemorrhage is identified. The cerebral hemispheres are symmetrical and have normal gyral configurations. The arteries of the circle of Willis are normally distributed and free of notable congenital anomaly or atheromatous deposit. There is no evidence of asymmetric displacement of brain structures. Multiple cuts through brain and upper cervical spinal cord reveal no other abnormalities. There is palpable subcutaneous emphysema in lower

1

FRANK VALDEZ                                                    ME 99-198

face, neck, anterior chest wall, abdomen and scrotum.  The scrotum is swollen to a diameter of 4 ½".  Compression displaces from air from the scrotal sac.  Incisions into the scrotum reveal no hemorrhagic injuries.

The neck organ block has a few hemorrhages in the soft tissues.  Bony and cartilaginous structures are intact.  The right and left pleural spaces each contain about 1 pint of blood.  There are multiple serial rib fractures involving right ribs 1 – 10 and left ribs 1 – 9 anteriorly, laterally and posteriorly.  The gladiolus sternae has a transverse fracture 1 cm. distal from the union with the manubrium sternae.  Shoulder and pelvic girdles, spine and extremity long bones are grossly intact.

The heart weight is 405 g.  The epicardial surface is smooth and glistening.  The coronary arteries are normally distributed.  There is a focal 40% narrowing of the anterior branch of the left coronary artery.  The right coronary artery is widely patent throughout its length and left circumflex artery is adequately patent.  The myocardium has a subendocardial scar of about 3 cm. length in the anterolateral aspect of the left ventricular wall.  The myocardium is otherwise red-brown and normally firm.  The valves are minimally sclerotic.  The aorta is mildly sclerotic throughout its length and vessels originating therefrom are adequately patent in proximal portions of their distribution.  The right and left lungs weigh 530 g. and 390 g. respectively.  Lung substance is congested.  Sectioning reveals no obvious lacerations or antemortem diseases.  The mediastinal lymph nodes are unremarkable.  The esophagus is intact.  The stomach contains about 4 oz. of gray-tan fluid.  No intact capsules, tablets or crystalline residua are identified in stomach or proximal small bowel.  There is hemorrhage into gut mesenteries.  The vermiform appendix is absent and pericecal adhesions are noted.  The liver weight is 1550 g. There is

2

FRANK VALDEZ                                                    ME 99-198

subcapsular hemorrhage distally adjacent the right triangular ligament of the liver.
Sectioned liver surface is uniform red-brown and hepatic parenchyma is slightly softer than
usual.  The gallbladder contains several ml. of golden-brown bile.  The extrahepatic biliary
tree is patent.  There is hemorrhage in the peripancreatic soft tissues but no distinct
hemorrhage into the pancreatic parenchyma.  The pancreas is autolyzed.  The spleen is
absent and there are multiple adhesions in the area of the splenic bed.  The right adrenal
gland is surrounded by a layer of blood.  Left adrenal gland is unremarkable.  The right and
left kidneys have a combined weight of 295 g.  The cortical surfaces are smooth.  Cortices
and medullae have normal thicknesses and are clearly demarcated.  The renal vessels,
pelvocalyceal systems and ureters are unremarkable.  The urinary bladder contains less
than 1 oz. of straw colored urine.  Internal genitalia are normal male.

     Microscopic examination of tissue sections generally confirms gross impressions
Lung sections have marked vascular engorgement with numerous lipid droplets in vascular
lumina along with a bone marrow embolus.  Peri-adrenal hemorrhage is confirmed in right
adrenal gland along with hemorrhage into adrenal medullae.  Renal tubular lining is
autolyzed.

3

FRANK VALDEZ                                                    ME 99-198

## AUTOPSY FINDINGS

1.  MULTIPLE BLUNT TRAUMATIC INJURIES INCLUDING CONTUSIONS,
    ABRASIONS AND LACERATIONS OF FACE AND SCALP, FRACTURE OF
    MANDIBLE; PATTERNED AND UNPATTERNED ABRASIONS " AND
    CONTUSIONS ON ANTERIOR AND POSTERIOR TRUNK, MULTIPLE SERIAL
    RIB FRACTURES OF RIGHT AND LEFT HALVES OF RIBCAGE, FRACTURE
    OF STERNUM, RIGHT AND LEFT HEMOTHORACES AND SUBCUTANEOUS
    EMPHYSEMA EXTENDING FROM LOWER FACE TO SCROTUM;
    LACERATIONS AND HEMORRHAGE OF GUT MESENTERIES AND LIVER
    CAPSULE; HEMORRHAGE WITHIN AND AROUND RIGHT ADRENAL
    GLAND; ABRASIONS OF RIGHT AND LEFT LEGS FROM KNEE TO ANKLE
    LEVEL AND LINEAR ABRASIONS ON RIGHT AND LEFT WRISTS.

2.  SURGICAL ABSENCE OF VERMIFORM APPENDIX AND SPLEEN, REMOTE.

3.  FOCAL CORONARY ARTERIOSCLEROSIS AND SUBENDOCARDIAL SCAR
    IN ANTEROLATERAL WALL OF CARDIAC LEFT VENTRICLE.

4.  PULMONARY CONGESTION AND EDEMA.

5.  FAT EMBOLI AND BONE MARROW EMBOLI IN PULMONARY
    CIRCULATION.


PROBABLE CAUSE OF DEATH:  BEATING.


WILLIAM F. HAMILTON, M.D.


WFH/ali

4

OFFICE OF THE MEDICAL E[ ] [ ] E[ ]

ME-99-1

·606 SW 3 Ave·

GAINESVILLE, FLORIDA 32601

## BODY DIAGRAM

Front                    Back

LAC 2 × 16"
7/8

MULTIPLE ABRASIONS &
BRUISES ON
FACE & RIGHT
EAR, LEFT NECK
& SHOULDER & UPPER
INCONTOUR & LOWER     FIP

ORAL AIRWAY
AND OROTRACHEAL
TUBE
PATTERN

FX
MANDIBLE

9" × 9"
PATTERN

2"
AB

7 × 3½"
PARTIAL
IMPRINT OF
SIDE OF SOLE

(8 × 5")
ILL DEFINED
BRUISE PATTERN
2 CURVI-
LINEAR
COMPONENTS

ID BAND
#SF-212 15567
VALDEZ, FRANK

LIVER
ABRASION
(CURVILINEAR
SHOE SOLE?)

2" SCAR

SUB Q EMPHYSEMA

TATTOO

SCROTAL
SWELLING
4½" DIA
(LIA IN SAC)

BRUISES

4"
CURVILINEAR
ABRADED

4

530/
1550/
CW 29
1670

MSRF
A.LP.
R 1-10 (12 FRA)
L 1-9 (18 FRA)

Decedent's
Height _____ 69 _____ inches

Name _____ FRANK VALDEZ _____

Examined
By _____ [signature] _____ MD

Date _18 Jul

DHS Form 1917 (2/74)

Medical Examiner's Office
)  Gainesville, Florida 32601  )

## BODY DIAGRAM—HEAD



Front



Back

Decedent's Name _____ FRANK VALDEZ _____
Examined  ME 99-158
By _____ Wm F Hamilton MD  Date 18 July 99

Medical Examiner's Office
6xx SW 3 Ave.
Gainesville, Florida 32601

## BODY DIAGRAM—HEAD



Right

Left

Decedent's Name _____ FRANK · VALDEZ _____
                         ME 99-195
Examined
By _____  Date 18 July 99

**9**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

        Plaintiff,

v.                                    Case No.: 3:01-cv-799-J-32HTS

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, MARY
HUDNALL, and RAYMOND HANSON, each in
his/her individual capacity,

        Defendants.

_____/

## AFFIDAVIT OF THOMAS S. EDWARDS, M.D.

STATE OF FLORIDA    )
                       ) ss.
COUNTY OF DUVAL    )

      Before me, the undersigned authority, personally appeared Thomas S. Edwards, M.D.,

who being duly sworn, deposes and says:

      1.    My name is Thomas S. Edwards, and I am at least eighteen (18) years of age.  I

give the following information, of which I have personal knowledge, both freely and truthfully

and without the promise of any benefit, financial or otherwise.

      2.    I am a medical doctor and am licensed to practice medicine in the State of Florida.

I attended medical school at Tulane University and earned my M.D. degree in June 1950.  I

thereafter completed my medical residency at the New York Eye and Ear Infirmary and New York University in June 1957. I have practiced medicine in the State of Florida for nearly fifty (50) years.

3.      I was previously employed by the Florida Department of Corrections as the Medical Executive Director at Florida State Prison. I held that position from September 1998 until August 1999. In my position as Medical Executive Director, I was responsible for overseeing the operations of the entire medical department at Florida State Prison. My duties included clinical supervision of all members of the medical staff, including nurses, who worked at Florida State Prison; evaluating the work performance of all members of the medical staff, including nurses, who worked at Florida State Prison; ensuring that members of the medical staff at Florida State Prison complied with the policies and procedures of the Florida Department of Corrections, as those policies and procedures related to the provision of medical care to inmates at Florida State Prison; and providing medical examinations and treatment to inmates at Florida State Prison.

4.      I am familiar with the policies and procedures of the Florida Department of Corrections that were in effect during July 1999, as those policies and procedures related to the provision of medical care to inmates at Florida State Prison.

5.      During July 1999, post use of force medical examinations of inmates incarcerated at Florida State Prison were required each time an inmate was subjected to any form of physical force by correctional officers. For example, post use of force medical examinations of inmates were required whenever inmates were forcibly removed from their cells by correctional officers.



2

6.      During July 1999, post use of force medical examinations of correctional officers at Florida State Prison were also required whenever a correctional officer used physical force to remove an inmate from his cell.

7.      Because my duties at Florida State Prison included overseeing the operations of the entire medical department, including post use of force medical examinations of inmates and correctional officers following the forcible removal of inmates from their cells, I am aware that such forcible removals were performed by teams of correctional officers.

8.      It was not unusual for inmates to sustain injuries as a result of being forcibly removed from their cells by correctional officers.  Due to the nature of cell extractions, in which inmates were forcibly removed from their cells by teams of correctional officers, it was not unusual to see that an inmate has sustained abrasions, bruising, or a bloody nose as a result of an extraction.

9.      During July 1999, post use of force medical examinations of inmates incarcerated at Florida State Prison were also required each time an inmate was subjected to chemical agents, such as pepper spray or tear gas.

10.     It was not unusual for inmates who had been subjected to chemical agents such as pepper spray or tear gas to exhibit symptoms such as reddening of the skin and significant amounts of mucous coming from their nose.

11.     It was not unusual for correctional officers at Florida State Prison to bring inmates to the clinic in a wheelchair or on a cart.  Correctional officers at Florida State Prison at times transported inmates to the clinic in a wheelchair or on a cart when the inmate was non-compliant and refused to walk on his own.

3

12.     On July 17, 1999, I was the medical doctor on call for Florida State Prison.  On that date, there were no medical doctors or psychologists working on site at Florida State Prison, and there was a shortage of nurses working at the prison.

13.     On July 17, 1999, I spoke with nurse Denise McEarchern several times by telephone about a seriously ill inmate who had been transported to Florida State Prison from a nearby prison work camp.  During one of our telephone conversations that morning, Ms. McEarchern informed me that inmate Frank Valdes had just been brought to the medical clinic for a post use of force medical examination and that another nurse named Jimmie Burger was examining him.  During that conversation, Ms. McEarchern did not express any concern to me about Frank Valdes' medical condition, nor did she in any way suggest that Frank Valdes had either a serious or life threatening condition.

14.     Approximately thirty (30) minutes later, I again spoke with Ms. McEarchern.  At that time, I was informed that nurse Jimmie Burger had examined inmate Frank Valdes and did not find any serious injuries.  I was then informed that Frank Valdes had been taken back to his cell.  Based on the information I was given during that call -- as well as information I received during the earlier call with Ms. McEarchern -- I did not believe that inmate Frank Valdes needed to be transported to a hospital or admitted to the medical clinic at Florida State Prison.

15.     A few minutes after 2:00 p.m. that same day, I again spoke with Ms. McEarchern.  At that time, she informed me that she had received a call concerning inmate Frank Valdes.  She informed me that the medical staff had not yet completed their 12:00 medical rounds because they were short of nurses and because of the earlier interruptions caused when the work camp inmate came in and when inmate Frank Valdes had been brought in to the clinic for examination and treatment.

4

16.    I next spoke with Ms. McEarchern by phone between 3:00 and 3:30 p.m. that day. At that time, she informed me that inmate Frank Valdes had been brought to the clinic and that CPR was being performed on him.

17.    As part of my duties at Florida State Prison, I reviewed the July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes. A copy of those records are attached as Exhibit A. The injuries to inmate Frank Valdes that were noted in those records were minor. The policies and procedures of the Florida Department of Corrections that were in effect during July 1999 did not require that an inmate with minor injuries of the type noted in the post use of force medical examination records attached as Exhibit A either be admitted to the Florida State Prison medical clinic or be sent to an outside hospital for further evaluation and treatment.

18.    The July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes indicate that he had a bloody nose, but that the bleeding had discontinued at the time of his examination. The policies and procedures of the Florida Department of Corrections that were in effect during July 1999 did not require that an inmate with a bloody nose either be admitted to the Florida State Prison medical clinic or be sent to an outside hospital for further evaluation and treatment.

19.    The July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes indicate that he also had a superficial abrasion to his lip and dried blood in or around his mouth. The policies and procedures of the Florida Department of Corrections that were in effect during July 1999 did not require that an inmate with a superficial abrasion to his lip and dried blood in or around his mouth either be admitted to the Florida State Prison medical clinic or be sent to an outside hospital for further evaluation and treatment.

5

20.     The July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes indicate that he also had skin discoloration on the left side of his abdomen and on his right shoulder, but with no swelling to his right shoulder.  The policies and procedures of the Florida Department of Corrections that were in effect during July 1999 did not require that an inmate with skin discoloration either be admitted to the Florida State Prison medical clinic or be sent to an outside hospital for further evaluation and treatment.

21.     The July 17, 1999, post use of force medical examination records concerning inmate Frank Valdes indicate that his vital signs were normal at the time of his examination.  The policies and procedures of the Florida Department of Corrections that were in effect during July 1999 did not require that an inmate with normal vital signs either be admitted to the Florida State Prison medical clinic or be sent to an outside hospital for further evaluation and treatment, where the only signs of injury were a bloody nose, superficial abrasion to a lip, and skin discoloration.

22.     In my experience, there were times when medical doctors and nurses employed at Florida State Prison made what are known as "late entries" in an inmate's medical records.  Depending upon circumstances, a medical doctor or nurse may not be able to make a contemporaneous entry into an inmate's medical records and therefore may make such entries at a later date and/or time.  For example, an emergency situation may prevent a medical doctor or nurse from making a contemporaneous entry into an inmate's medical records.  Such "late entries" were common in the general medical community and were not prohibited by the policies and procedures of the Florida Department of Corrections that were in effect during July 1999.

Further sayeth the Affiant naught.

Thomas S. Edwards, M.D.

6

## NOTARY JURAT

The foregoing instrument was acknowledged before me this 23rd day of June, 2004, by

Thomas S. Edwards, M.D., who is personally known to me or who produced
Driver's License No:

E 363-837-28-335-0 _____ as identification and who did take an oath.

Pamela A. Zuk
Notary Public, State of Florida
(Signature)

Pamela A. Zuk
Notary Public, State of Florida
(Print Name)

My Commission Expires on: _____

PAMELA A ZUK
MY COMMISSION # 965873
EXPIRES: Sep 5, 2004
1-800-NOTARY   FL Notary Service & Bonding, Inc.

7

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**
**EMERGENCY ROOM RECORD**

| NAME, Last, First, Middle | | D.C. NUMBER | NUMBER 072791 | DOB 10/28/62 | AGE 36 |
|---|---|---|---|---|---|
| DATE/TIME 7/17/99 1035 | MARITAL STATUS Single | RELIGION Christian | | ALLERGIES NKA | |

## AUTHORIZATION FOR HEALTH CARE SERVICES AND ANESTHESIA

I the undersigned, a patient in this health care facility, have had explained to me and understand the nature of my condition.

I hereby authorize ___ FSP Medical Staff

(and whomever he may designate as his assistants) to administer such treatment as is necessary, and to perform the following health care service: Evaluation & treatment

and such additional health care service as are considered necessary on the basis of findings during the course of said health care service. I also consent to the administration of such anesthesia as are necessary, with the exception of ___ local ___ Any tissue or parts surgically removed may be disposed of by the facility in accordance with accustomed practice. I hereby certify that I have read and fully understand the above Authorization for Health Care Services and Anesthesia, the reasons why the above named health care service is considered necessary, its advantages and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by ___ Medical Staff

I also certify that no guarantee of assurance has been made as to the results that may be obtained.

Signature of Patient _Refused to Sign (Explained in back)_   Date 7/17/99   Time 1030   A.M./P.M.

Signed for Patient by _J. BURGER, SR. LPN_   Relationship ___   Date ___   Time ___   A.M./P.M.

Witness _____   FLORIDA STATE PRISON   Reason Patient cannot sign ___

## BRIEF HISTORY Past Use of Carol

IF ACCIDENT, STATE WHERE, WHEN AND HOW INJURED; IF ILLNESS DESCRIBE: S: Pt in clinic, Bleeding DK (R) present.

He bled total to less 1 month — can't recall how

O: Superficial abrasion total to lip — Bleeding DK. Abrasion approx. inside lip — stopped FSP associated
1x2 & 1x3 (R) side abrasion, (R) shoulder) & swelling total to (R) shoulder. Shoulder R&B in mid side. 72 Sorab.

A: Past Use of Carol.

SIGNATURE J. BURGER, SR. LPN
FLORIDA STATE PRISON

## PHYSICIAN'S REPORT

| CONDITION ON ADMISSION | GOOD ☐ | FAIR ☑ | POOR ☐ | SHOCK ☐ | BLEEDING ☑ | COMA ☐ |
|---|---|---|---|---|---|---|
| TEMPERATURE On able to take | PULSE 92 | | RESPIRATION 24 | | BLOOD PRESSURE 118/82 | |

TREATMENT:
P: (1) Mouth/Nose cleaned c̄ H₂O₂.
E: (1) Report further s/s PRN.

1100 — Lt. Edwards notified    [signature]

DIAGNOSIS: Past Use of Carol

DISPOSITION: FSP

PHYSICIAN'S SIGNATURE _J. Burger LPN_   J. BURGER, SR. LPN   FLORIDA STATE PRISON   DATE/TIME 7/17/99 1035

DISTRIBUTION:   WHITE—HEALTH RECORD
CANARY—EMERGENCY ROOM FILE
PINK—LOCAL REQUIREMENTS

DC4-701C (3-80)

EXHIBIT 30

# DIAGRAM OF INJURY



FRONT          RIGHT     LEFT          REAR

TYPE OF INJURY _Abrasion_

DATE OF INJURY _7/17/99_          TIME OF INJURY _1035_

EMERGENCY ROOM FORM COMPLETED          (YES)          NO

EMERGENCY ROOM FORM SIGNED BY INMATE          YES          (NO)

DOCTOR'S SIGNATURE                    DATE

NAME _Valdes Frank_          NUMBER _67279 /_          C/S _w/m_

DC-708 (4-83)

EXHIBIT _33_

**10**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

        Plaintiff,

    v.                                  Case No.: 3:01-cv-799-J-32HTS

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, MARY
HUDNALL, and RAYMOND HANSON, each in
his/her individual capacity,

        Defendants.

_____/

## AFFIDAVIT OF JIMMIE BURGER

STATE OF FLORIDA    )
                      ) ss.
COUNTY OF DADE    )

    Before me, the undersigned authority, personally appeared Jimmie Burger, who being duly sworn, deposes and says:

    1.    My name is Jimmie Burger, and I am at least eighteen (18) years of age. I give the following information, of which I have personal knowledge, both freely and truthfully and without the promise of any benefit, financial or otherwise.

2.     On July 17, 1999, I was employed by the Florida Department of Corrections as a Licensed Practical Nurse at Florida State Prison.   At that time, I had been a nurse for approximately nineteen (19) years.

3.     I pursued a career in nursing because I wanted to help people overcome their medical problems.

4.     Throughout my nursing career, I always provided each and every one of my patients with the best possible medical care and treatment that I was trained and capable of giving.

5.     Throughout my nursing career, I never ignored or concealed any of my patients' injuries or medical conditions.   To the contrary, I always made every effort to identify any injuries or medical conditions that my patients may have had and to provide nursing care for those injuries or conditions to the best of my training and abilities.

6.     I had a good career record as a nurse.   Aside from this case, I have never been sued for any alleged deficiencies in the performance of my duties as a nurse.

7.     On July 17, 1999, I examined an inmate named Frank Valdes at Florida State Prison.   I did not ignore or conceal any of Mr. Valdes' injuries, but instead carefully examined him for approximately twenty-five (25) minutes for signs of any and all injuries that he may have had.   Based upon my examination of Mr. Valdes, I believed that he had only minor injuries that are commonly associated with cell extractions.

Further sayeth the Affiant naught.

_Jimmie E. Burger_
Jimmie Burger

2

## NOTARY JURAT

The foregoing instrument was acknowledged before me this 3⅃ day of June, 2004, by

Jimmie Burger, who is personally known to me or who produced

DEPT. OF CORRECTIONS PRISON I.D. as identification and who did take an oath.

_____
Notary Public, State of Florida
(Signature)

MAKIBA S. JONES
_____
Notary Public, State of Florida
(Print Name)

My Commission Expires on: 9/3/07

Makiba S. Jones
Commission #DD246800
Expires: Sep 03, 2007
Bonded Thru
Atlantic Bonding Co.. Inc.

11

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

        Plaintiff,

v.                              Case No.: 3:01-cv-799-J-32HTS

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, MARY
HUDNALL, and RAYMOND HANSON, each in
his/her individual capacity,

        Defendants.
_____/

### AFFIDAVIT OF DENISE MCEACHERN

STATE OF FLORIDA    )
                      ) ss.
COUNTY OF BRADFORD )

    Before me, the undersigned authority, personally appeared Denise McEachern, who

being duly sworn, deposes and says:

    1.    My name is Denise McEachern, and I am at least eighteen (18) years of age.  I

give the following information, of which I have personal knowledge, both freely and truthfully

and without the promise of any benefit, financial or otherwise.

    2.    I worked as a Registered Nurse for the Florida Department of Corrections from

1988 until 2003. On July 17, 1999, I was employed by the Florida Department of Corrections as

a Registered Nurse at Florida State Prison. I worked at Florida State Prison for over ten (10) years.

3.    I became a Licensed Practical Nurse in 1982, and I became a Registered Nurse in 1988. I chose a nursing career because I care about people and want to help them overcome their physical and medical problems.

4.    I have never concealed or ignored any of my patients' medical conditions. Instead, I have always done my best to identify each and every injury or medical condition that my patients have. Moreover, I have always provided the best possible medical care and treatment possible to each of my patients.

5.    I have never had my nursing license suspended or revoked.

6.    On July 17, 1999, an inmate at Florida State Prison named Frank Valdes was brought to the medical clinic for a post use of force medical examination. I knew at the time that Mr. Valdes had been forcibly removed from his cell by correctional officers.

7.    Although I did not examine Mr. Valdes, I saw him when he was brought to the medical clinic. Based upon my discussions with Jimmie Burger following his examination of Mr. Valdes, as well as my review of Jimmie Burger's emergency room notes concerning Mr. Valdes, I believed that Mr. Valdes had only minor injuries that are commonly associated with cell extractions.

8.    I did not ignore or conceal any of Mr. Valdes' injuries. I would not have jeopardized my nursing license and livelihood, much less the welfare of Mr. Valdes, by ignoring his medical condition.

Further sayeth the Affiant naught.

Denise McEachern

2

## NOTARY JURAT

The foregoing instrument was acknowledged before me this ____ day of June, 2004, by

Denise   McEarchem,   who   is   (personally   known)   to   me   or   who   produced

_____ as identification and who did take an oath.




Notary Public, State of Florida
(Signature)

Sandra L. Wilkerson

Notary Public, State of Florida
(Print Name)

My Commission Expires on:  5/18/05

SANDRA L. WILKERSON
MY COMMISSION # DD049411
EXPIRES: September 18, 2005
Bonded Thru Notary Public Underwriters

**12**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES,

        Plaintiff,

v.                                        Case No.: 3:01-cv-799-J-32HTS

JAMES V. CROSBY, JR., A.D. THORNTON,
TIM GIEBEIG, RONNIE WHITE, CHARLES
SHOCKLEY, TIMOTHY A. THORNTON,
JASON PATRICK GRIFFIS, DEWEY BECK,
CHARLES BROWN, ROBERT SAULS,
MONTREZ LUCAS, ANDREW LEWIS,
DONALD STANFORD, JIMMIE BURGER,
DENISE MCEACHERN, ROBIN RASH, and
MARY HUDNALL, each in his/her individual
capacity,

        Defendants.

_____/

## DEFENDANT RASH'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

PLEASE TAKE NOTICE that Defendant, Robin Rash (hereinafter "Defendant"), by and

through his undersigned attorneys, pursuant to Rule 33 of the Federal Rules of Civil Procedure,

requests that Plaintiff, Mario Valdes (hereinafter "Plaintiff"), answer in writing and under oath,

within thirty (30) days after service hereof, the following written Interrogatories.  In answering,

Plaintiff is asked to identify separately, and in a manner suitable for use in a subpoena, all sources of

information, whether human, documentary, or otherwise, any and all records maintained by him or

any other person or organization on which Plaintiff relies in answering the Interrogatories, or which

1

pertain or relate to the information called for in the Interrogatories. In lieu of identifying particular

documents or information garnered therefrom when such identification is required, said documents

may, at Plaintiff's option, be attached to the responses to these Interrogatories.

## INTERROGATORY NO. 1

Identify and describe in detail all facts that support your allegation, contained in paragraph five (5) of your First Amended Complaint, that you "fully exhausted [your] administrative rights and remedies" prior to filing this action, and describe all actions taken by you or by Joy Francis "Frank" Valdes (hereinafter "Valdes") to exhaust those administrative rights and remedies.

## ANSWER TO INTERROGATORY NO.1

3

## INTERROGATORY NO. 2

Identify and describe in detail all facts that support your allegation, contained in paragraph eighty-one (81) of your First Amended Complaint, that "[a]ll conditions precedent have been satisfied or they have otherwise been waived" prior to filing this action, and describe all actions taken by you or by Valdes to satisfy those conditions precedent.

## ANSWER TO INTERROGATORY NO. 2

**4**

<u>INTERROGATORY NO. 3</u>

Identify and describe the "prison nurse" referenced in paragraph twenty-nine (29) of your First

Amended Complaint, including the nurse's name, gender, race, complexion, approximate age,

height, weight, hair and eye color, and any other physical characteristics that would assist the

parties in establishing the nurse's identity.

<u>ANSWER TO INTERROGATORY NO. 3</u>

5

INTERROGATORY NO. 4

Identify the date and time during which the physical attack alleged in paragraph thirty-two (32) of
your First Amended Complaint took place, and identify and describe in detail each injury that
you claim Valdes sustained as a result of that attack.  For each injury, specify the part of Valdes'
body that was injured and the nature of that injury.

ANSWER TO INTERROGATORY NO. 4

6

INTERROGATORY NO. 5

State whether Valdes requested and/or received any medical examination or treatment for the injuries identified in response to interrogatory number four (4), above. If so, describe in detail the request made by Valdes, the medical examination or treatment provided to Valdes, the person or persons who provided such examination or treatment, and the date and time such examination or treatment was provided.

ANSWER TO INTERROGATORY NO. 5

INTERROGATORY NO. 6

Identify the date and time during which Valdes was subjected to an "extraordinary amount of mace," as alleged in paragraph thirty-seven (37) of your First Amended Complaint, and identify and describe in detail each injury that you claim Valdes sustained as a result of the mace. For each injury, specify the part of Valdes' body that was injured and the nature of that injury.

ANSWER TO INTERROGATORY NO. 6

INTERROGATORY NO. 7

State whether Valdes requested and/or received any medical examination or treatment for the injuries identified in response to interrogatory number six (6), above. If so, describe in detail the request made by Valdes, the medical examination or treatment provided to Valdes, the person or persons who provided such examination or treatment, and the date and time such examination or treatment was provided.

ANSWER TO INTERROGATORY NO. 7

9

<u>INTERROGATORY NO. 8</u>

Identify the date and time during which the physical attack alleged in paragraph thirty-nine (39) of

your First Amended Complaint took place, and identify and describe in detail each injury that

you claim Valdes sustained as a result of that attack.  For each injury, specify the part of Valdes'

body that was injured and the nature of that injury.

<u>ANSWER TO INTERROGATORY NO. 8</u>

## INTERROGATORY NO. 9

State whether Valdes requested and/or received any medical examination or treatment for the injuries identified in response to interrogatory number eight (8), above. If so, describe in detail the request made by Valdes, the medical examination or treatment provided to Valdes, the person or persons who provided such examination or treatment, and the date and time such examination or treatment was provided.

## ANSWER TO INTERROGATORY NO. 9

11

INTERROGATORY NO. 10

Identify the date and time during which "VALDES was taken to the prison medical facility," as alleged in paragraph forty (40) of your First Amended Complaint, and describe in detail each injury that you claim Valdes had sustained at the time he was taken to the prison medical facility. For each injury, specify the part of Valdes' body that was injured and the nature of that injury.

ANSWER TO INTERROGATORY NO. 10

INTERROGATORY NO. 11

Identify and describe in detail all facts that support your allegation, contained in paragraph forty-

four (44) of your First Amended Complaint, that:

      (a)  Defendant McEachern knew about Valdes' "serious medical condition";

      (b)  Defendant Burger knew about Valdes' "serious medical condition";

      (c)  Defendant Rash knew about Valdes' "serious medical condition".

In addition, identify how and when Defendants McEachern, Burger, and Rash first became aware

of Valdes' "serious medical condition."

ANSWER TO INTERROGATORY NO. 11

## INTERROGATORY NO. 12

Identify and describe in detail all facts that support your allegation, contained in paragraph forty-

four (44) of your First Amended Complaint, that:

      (a) Defendant McEachern was "intentionally and callously indifferent to VALDES' medical
needs";

      (b) Defendant Burger was "intentionally and callously indifferent to VALDES' medical
needs";

      (c) Defendant Rash was "intentionally and callously indifferent to VALDES' medical
needs".

## ANSWER TO INTERROGATORY NO. 12

14

INTERROGATORY NO. 13

Identify and describe in detail all facts that support your allegation, contained in paragraph forty-five (45) of your First Amended Complaint, that Defendant Hudnall was "called and informed of VALDES' condition," and identify who made that call as well as the date and time during which the call took place.

ANSWER TO INTERROGATORY NO. 13

15

INTERROGATORY NO. 14

Identify and describe in detail all facts that support your allegation, contained in paragraph forty-

five (45) of your First Amended Complaint, that Defendant Hudnall was "failed to instruct any of the

medical personnel to provide medical attention to VALDES" and/or "failed to take any immediate

action to intercede."

ANSWER TO INTERROGAORY NO. 14

16

INTERROGATORY NO. 15

Identify and describe in detail all facts that support your allegation, contained in paragraph forty (40) of your First Amended Complaint, that Defendants Burger, Rash, McEachern, and/or Hudnall falsely reported the nature or severity of Valdes' injuries, or in any way attempted to "cover up" the beatings Valdes allegedly suffered.

ANSWER TO INTERROGATORY NO. 15

17

INTERROGATORY NO. 16

Identify the date and time during which the physical attack alleged in paragraph forty-one (41) of your First Amended Complaint took place, and identify and describe in detail each injury that you claim Valdes sustained as a result of that attack. For each injury, specify the part of Valdes' body that was injured and the nature of that injury.

ANSWER TO INTERROGATORY NO. 16

18

INTERROGATORY NO. 17

State whether Valdes requested and/or received any medical examination or treatment for the injuries identified in response to interrogatory number sixteen (16), above. If so, describe in detail the request made by Valdes, the medical examination or treatment provided to Valdes, the person or persons who provided such examination or treatment, and the date and time such examination or treatment was provided.

ANSWER TO INTERROGATORY NO. 17

19

## INTERROGATORY NO. 18

List the names and addresses of all medical doctors, osteopathic physicians, chiropractic physicians, nurses, medical facilities, or other medical care providers by whom or at which Valdes was examined or treated for any physical injury that he suffered or sustained as a result of the incidents alleged in your First Amended Complaint. For each, identify the dates on which Valdes was examined and/or received treatment, the condition or injury for which he was examined and/or treated, and describe the examination and/or treatment given.

## ANSWER TO INTERROGATORY NO. 18

20

## INTERROGATORY NO. 19

Identify and describe in detail all medical conditions or injuries that Valdes suffered or sustained prior to July 16, 1999.  For each, describe the nature of the condition or injury, the cause of the condition or injury, the date of onset of the condition or injury, whether the condition or injury was ongoing on July 16, 1999, and the names and addresses of each health care practitioner or facility by whom or at which Valdes was examined or treated for the condition or injury.

## ANSWER TO INTERROGATORY NO. 19

INTERROGATORY NO. 20

Identify and describe in detail all psychiatric and/or psychological conditions that Valdes suffered or developed prior to July 16, 1999. For each, describe the nature of the condition, the cause of the condition, the date of onset of the condition, whether the condition or injury was ongoing on July 16, 1999, and the names and addresses of each psychiatrist, psychologist, licensed clinical social worker, licensed mental health counselor, or other mental health care practitioner or facility by whom or at which Valdes was examined or treated for the condition.

ANSWER TO INTERROGATORY NO. 20

22

INTERROGATORY NO. 21

List the names and addresses of all psychiatrists, psychologists, licensed clinical social workers,

licensed mental health counselors, or other mental health care providers, not otherwise listed in

your answers to these interrogatories, by whom or at which Valdes has been examined or treated

at any time in his entire life.  For each, identify the dates on which Valdes was examined and/or

received treatment, the condition or injury for which he was examined and/or treated, and

whether the condition or injury was resolved.

ANSWER TO INTERROGATORY NO. 21

## INTERROGATORY NO. 22

List the names and addresses of all medical doctors, osteopathic physicians, chiropractic physicians, nurses, medical facilities, or other medical care providers, not otherwise listed in your answers to these interrogatories, by whom or at which Valdes has been examined or treated at any time in his entire life. For each, identify the dates on which Valdes was examined and/or received treatment, the condition or injury for which he was examined and/or treated, and whether the condition or injury was resolved.

## ANSWER TO INTERROGATORY NO. 22

INTERROGATORY NO. 23

Identify and describe in detail all facts supporting your contention that:

    (a) Defendant McEachern's actions alleged in your First Amended Complaint proximately caused Valdes' death;

    (b) Defendant Burger's actions alleged in your First Amended Complaint proximately caused Valdes' death;

    (c) Defendant Rash's actions alleged in your First Amended Complaint proximately caused Valdes' death;

    (d) Defendant Hudnall's actions alleged in your First Amended Complaint proximately caused Valdes' death

ANSWER TO INTERROGATORY NO. 23

25

INTERROGATORY NO. 24

Aside from this case, have you ever been a party to any legal proceeding in which you pursued

any claim for compensatory damages for physical injuries or emotional distress, or for punitive

or liquidated damages?  If so, identify the nature of the legal proceeding, the court or forum in

which the proceeding was pending, the dates during which the proceeding was pending, and the

name and address of the other parties to the proceeding.

ANSWER TO INTERROGATORY NO. 24

INTERROGATORY NO. 25

Identify the probate court that appointed you as the personal representative of Valdes' estate, as

alleged in paragraph seventy-five (75) of your First Amended Complaint, the date on which you

were appointed as personal representative of Valdes' estate, the case number assigned to Valdes'

probate proceedings, whether Valdes died intestate, and the names and addresses of all potential

beneficiaries of Valdes' estate.

ANSWER TO INTERROGATORY NO. 25

27

DATED this __11__ day of December, 2002.

Respectfully submitted,

CONSTANGY, BROOKS & SMITH, LLC
Post Office Box 41099
Jacksonville, Florida 32203
Telephone: (904) 356-8900
Facsimile: (904) 356-8200

By: _____
John F. Dickinson
Florida Bar No. 198651
J. Ray Poole
Florida Bar No. 0983470

Attorneys for Defendants,
Robin Rash, Mary Hudnall, Denise
McEachern, and Jimmie Burger

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of Defendant Rash's First Set of Interrogatories to Plaintiff

have been served this __ll__ day of December, 2002, via first class United States mail upon the

following:

Guy Bennett Rubin, Esquire
Rubin & Rubin
P.O. Box 395
Stuart, FL 34995

Leslei G. Street, Esquire
Pennington, Moore, Wilkinson, Bell and
    Dunbar, P.A
P.O. Box 10095
Tallahassee, FL 32302-2095

Kevin A. Blaz, Esquire
Gobelman, Love, Gavin, Blazs & Mathis
815 S. Main Street, Suite 300
Jacksonville, FL 32207-8140

D. Andrew Vloedman, Esquire
2790 NW 43rd Str., Ste. 200
Gainesville, FL 32606

Kelly Overstreet Johnson, Esquire
Laureen Galeoto, Esquire
Broad & Cassel
215 S. Monroe Str., Ste. 400
Tallahassee, FL 32301

Attorney

## **AFFIDAVIT**

STATE OF FLORIDA      )
                               )    **ss.:**

COUNTY OF _____ )

       BEFORE ME,  personally **appeared** _____, **who,** after having first been duly

sworn, deposes and says that **Defendant Rash's** First Set of **Interrogatories** to Plaintiff  are true and

correct to the best of his knowledge and belief.

       The foregoing instrument **was acknowledge** before me **this** _____ day of _____, 2002,

by _____, who is personally **known** to me or who has produced

_____ as identification **and** who _____ did/_____ did not

take an oath.

Notary:

(Printed) Name:

Title: Notary Public, State of Florida

Serial Number:

My Commission Expires:

(NOTARY SEAL)

**13**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARIO VALDES, INDIVIDUALLY, AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF JOY FRANCIS "FRANK"
VALDES

Case No. 3:01-cv-799-J32

Plaintiff,

vs.

JAMES V. CROSBY JR., A.D. THORNTON, TIM GIEBEIG,
RONNIE WHITE, CHARLES SHOCKLEY,
TIMOTHY A.THORNTON, JASON PATRICK
GRIFFIS, DEWEY BECK, CHARLES BROWN,
ROBERT SAULS, MONTREZ LUCAS,
ANDREW LEWIS, DONALD STANFORD,
JIMMIE BURGER, DENISE MCEACHERN,
ROBIN RASH, and MARY HUDNALL, each
in his/her individual capacity,

Defendants.

RECEIVED

FEB 1 0 2003

Constangy, Brooks & Smith, LLC
Attorneys at Law

## PLAINTIFF'S VERIFIED ANSWERS
## TO FIRST INTERROGATORIES
## BY DEFENDANT RASH

Plaintiff, MARIO VALDES, by and through his undersigned counsel, pursuant to Fed.R.Civ.P. 33, hereby provides his Unverified Answers to the First Interrogatories by Defendant Rash, and states[1]:

1.      Valdes was murdered by Defendant Correctional Officers. Deceased inmates cannot file a grievance.

2.      Mario Valdes opened the Estate of Joy Francis Valdes and was duly appointed as Personal Representative on November 15, 1999.

3.      Identification of nurse is unknown at this time.

4.      a.      First attack was on July 16, 1999 at or around 3:30 p.m.

        b.      Specific part of body injured and nature of injury will be left for
expert testimony. See attached autopsy report.

        c.      Specific part of body injured and nature of injury will be left for
expert testimony. See attached autopsy report.

5.      None.

6.      a.      The macing attack occurred at approximately 9:30 am on the
morning of July 17, 1999.

        b.      Specific part of body injured and nature of injury will be left for
expert testimony. See attached autopsy report.

7.      Yes. Decedent was taken to medical after his "cell extraction" at
approximately 10:30 a.m. on July 17, 1999 and was given a cursory examination by
Nurse Burger, Nurse Rash and Nurse McEachern. No treatment was provided

8.      a.      Physical attack was approximately 10:00 a.m. on July 17, 1999.

        b.      Specific part of body injured and nature of injury will be left for
expert testimony. See attached autopsy report.

        c.      Specific part of body injured and nature of injury will be left for
expert testimony. See attached autopsy report.

9.      See Response to Number 7.

10.     a.      See response to Number 7.

        b.      Specific part of body injured and nature of injury will be left for
expert testimony. See attached autopsy report.

---

[1] Verified Answers will be forwarded to Counsel upon receipt.

c.       Specific part of body injured and nature of injury will be left for expert testimony. See attached autopsy report.

11.     a.      Decedent's injuries were obvious and Defendant was medical personnel assigned to clinic on July 17, 1999. Defendant saw Valdes and saw Defendant Thornton strike Valdes in the clinic. Any competent medical professional would have known about his serious condition.

b.      Decedent's injuries were obvious and Defendant was medical personnel assigned to clinic on July 17, 1999. Defendant examined Valdes. Any competent medical professional would have known about his serious condition.

c.      Decedent's injuries were obvious and Defendant was medical personnel assigned to clinic on July 17, 1999. Defendant was in the clinic when Valdes was escorted there. Any competent medical professional would have known about his serious condition.

12.     a.      Decedent's injuries were obvious. Any competent medical professional would have to act intentionally and callously indifferent to omit these observations and to not intervene on behalf of a patient.

b.      Decedent's injuries were obvious. Any competent medical professional would have to act intentionally and callously indifferent to omit these observations and to not intervene on behalf of a patient.

c.      Decedent's injuries were obvious. Any competent medical professional would have to act intentionally and callously indifferent to omit these observations and to not intervene on behalf of a patient.